UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

TODD KELVIN WESSINGER

CIVIL ACTION

VERSUS

NO. 04-637-JJB-SCR

BURL CAIN, WARDEN

## RULING ON PETITION FOR WRIT OF HABEAS CORPUS

Before the Court is Petitioner's Amended Petition for Writ of Habeas Corpus. (Doc. 120). Respondent filed an opposition. (Doc. 129). Petitioner filed a reply. (Doc. 132). The Court did not refer this matter to the Magistrate Judge. For the following reasons, the petition is denied.

## BACKGROUND AND PROCEDURAL HISTORY

Kelvin Todd Wessinger was charged by grand jury indictment with two counts of first degree murder for the November 19, 1995 deaths of Stephanie Guzzardo and David Breakwell, a violation of La. R.S. 14:30. He pled not guilty to both counts. After a two-day jury trial, Wessinger was convicted on both counts on June 24, 1997. The penalty phase of the trial took place the next day, at which time the jury unanimously returned death sentences for both counts. The trial court formally sentenced Wessinger to death by lethal injection on September 17, 1997. Wessinger appealed his conviction and sentence to the Louisiana Supreme Court, which affirmed both. *State v. Wessinger*, 98-1234 (La. 5/28/99), 539 So. 2d 162. Wessinger appealed to the United States

Supreme Court, which denied cert. *Wessinger v. Louisiana*, 528 U.S. 510 (1999). The Court also denied his application for rehearing on January 24, 2000. *Wessinger v. Louisiana*, 528 U.S. 1145 (2000). It was on that day Wessinger's conviction became final under Louisiana law.

On June 11, 2001,[1] Wessinger filed an application for post-conviction relief in state court ["Amended State Petition"].[2] The trial court referred the matter to the judicial commissioner for a report and recommendation. The commissioner recommended dismissal of the Amended State Petition in its entirety without prejudice because the claims were procedurally barred. (Doc. 121-1 ex. M at 2-3).[3] Wessinger then filed a second amended application ["Second Amended State Petition"] as a supplement to the first. This application re-urged and re-argued the claims raised in the first amended application and added an additional

---

[1] Much happened between January 24, 2000 and June 11, 2001. Within a week of his conviction becoming final, an execution date was set for April 5 of that year, despite the fact that Wessinger had not been appointed post-conviction counsel. On March 30, the court granted a motion to stay the execution in order to allow the Louisiana Indigent Defender Assistance Board ("LIDAB") to file an application for post-conviction relief by April 17. This was pushed back one week at the request of the LIDAB. At an April 24 hearing, the court denied a request for more time to find post-conviction counsel and set the execution date for June 7, despite the fact that the one-year statute of limitations for Wessinger to file for post-conviction relief would not run out until January 23, 2001. On June 2, the court appointed Winston Rice as *pro bono* counsel. Mr. Rice was unable to perform the work due to personal difficulties. Ultimately, present counsel was substituted on January 3, 2001.

[2] This was his first amended petition. The original petition was a "shell" petition used stop the statute of limitations clock. The Amended State Petition made the following claims for relief: (1) cumulative error at trial necessitates reversal of the conviction and sentence; (2) petitioner received ineffective assistance of counsel at the guilt phase of trial; (3) petitioner received ineffective assistance of counsel at the penalty phase of trial; (4) petitioner received ineffective assistance from his experts; (5) petitioner received ineffective assistance of counsel at the motion for new trial; (6) petitioner received ineffective assistance of counsel on appeal; (7) petitioner received ineffective assistance of counsel during his post-conviction relief proceedings; (8) petitioner received ineffective assistance of counsel based on a conflict of interest; (9) a conflict of interest existed at trial where trial counsel developed a friendship with the victim's family; (10) the prosecutor suppressed from petitioner exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); and (11) juror misconduct necessitates reversal of petitioner's conviction and sentence.

[3] The commissioner pointed to a Louisiana criminal code article that requires post conviction petitions allege specific facts or risk possible dismissal. La C.Cr.P. art. 926.

Case 3:04-cv-00637-JJB-SCR   Document 135   02/23/12   Page 2 of 77

100 pages of argument.[4]  Apparently this Second Amended State Petition was referred to the commissioner shortly before a status conference that was held on September 4, 2003.  While a supplemental report was issued (doc. 121-1 ex. N) it appears that neither the judge nor the parties had received it by that time.

It was at this status conference where the trial judge ultimately denied relief on both petitions.  The trial court ruled the claims from the Amended State Petition to be procedurally barred and denied the claims from the Second Amended Petition without the necessity for an evidentiary hearing.  The court did not issue written findings of fact or conclusions of law.  The Louisiana Supreme Court denied writs on September 3, 2004.

Wessinger filed his original petition for writ of habeas corpus with this Court on September 7, 2004.  This was a skeletal writ filed to toll the limitation period provided under 28 U.S.C. § 2254, the Antiterrorism and Effective Death Penalty Act of 1996, ("AEDPA").  The Court ruled that Wessinger's claims were not time-barred due to the doctrine of equitable tolling (Doc. 19).  On June 22, 2005, Wessinger filed his first amended petition.  He filed the instant Amended Petition and Request for Evidentiary Hearing on October 31, 2010. (Doc. 120).  Wessinger presents 12 claims to the Court's attention: (1) His indictment failed to

_____

[4] Specifically, the second amended complaint made the following claims: (1) cumulative error; (2) petitioner received ineffective assistance of counsel at the guilt phase of trial; (3) petitioner received ineffective assistance of counsel at the penalty phase of trial; (4) petitioner received ineffective assistance of counsel during voir dire; (5) inconsistent testimony and favorable evidence violated *Brady*; (6) the selection of the grand jury foreperson violated due process; (7) the state's use of peremptory challenges violated the equal protection clause (*Batson*); and (8) the state proceedings violated *Apprendi* and *Ring*.

3

include any guilt or penalty phase aggravating circumstances and the verdict lacked a unanimous finding by the jury as to the existence of aggravating circumstances in the guilt or penalty phase; (2) the selection of the grand and petit juries tainted the entire process; (3) media coverage of the murders so prejudiced the community that Wessinger could not receive a fair trial in East Baton Rouge Parish; (4) admission of hearsay evidence violated the Sixth Amendment right to confrontation; (5) the state withheld exculpatory evidence in violation of *Brady v. Maryland*; (6) the death sentences must be overturned because of improper evidence and arguments made during the penalty phase; (7) he was denied his Fourteenth Amendment right to be present during all proceedings in the case against him; (8) the jury was not provided with a burden of proof on mitigation in violation of the Eighth Amendment; (9) the aggravating circumstances were presented to the jury in violation of the Eighth and Fourteenth Amendments; (10) Louisiana's lethal injection protocol violates his Eighth and Fourteenth Amendment rights; (11) he received ineffective assistance of counsel because (a) his counsel failed during the voir dire process to take steps to prevent discrimination during the selection process, (b) his counsel was ineffective during the guilt phase, (c) his counsel was ineffective during the penalty phase, (d) counsel failed to object when the trial court improperly stated the law during the guilt phase, and (e) trial counsel failed to obtain a complete transcript of the proceedings; and (12) cumulative error renders the convictions unconstitutionally unreliable.

As to these claims, Wessinger contends they were not adjudicated by the state court as required by the AEDPA and that he is entitled to an evidentiary hearing to develop his claims. The state responded, contending Wessinger's claims have no merit, should be considered procedurally barred, and that no evidentiary hearing is required or allowed under 28 U.S.C. § 2254(e)(2). Further, the state argues Wessinger has not met his burden under the AEDPA for obtaining a Certificate of Appealability and that such certificate should be denied. (Doc. 129).

## **STANDARD OF REVIEW**

Federal court review of habeas corpus petitions filed by state prisoners is governed by 28 U.S.C. § 2254. Paragraphs (d) and (e) of the statute are the relevant provisions before the Court in this petition. They provide:

> **(d)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> **(1)** resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> **(2)** resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
>
> **(e)(1)** In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden

Case 3:04-cv-00637-JJB-SCR   Document 135   02/23/12   Page 5 of 77

of rebutting the presumption of correctness by clear and convincing evidence.

**(2)** If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--

**(A)** the claim relies on--

**(i)** a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

**(ii)** a factual predicate that could not have been previously discovered through the exercise of due diligence; and

**(B)** the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. §§ 2254(d)-(e).

Paragraph (d) sets forth a barrier to habeas writs, dictating that they not be granted for any claim that was adjudicated on the merits unless that adjudication was deficient for either of the reasons provided in subparagraphs (1) or (2).

Paragraph (e)(1)  establishes a presumption of truth given to determinations of factual issues made by the state court and sets forth a clear and convincing burden on a petitioner seeking to rebut this presumption. Paragraph (e)(2) then provides that a federal court shall not hold an evidentiary hearing on an undeveloped factual basis for a claim unless the claim relies on new Supreme Court law or a factual predicate that was not known of through due

Case 3:04-cv-00637-JJB-SCR   Document 135   02/23/12   Page 6 of 77

diligence.  Even then, the facts underlying the claim would have to be enough to establish by clear and convincing evidence that, basically, his conviction was not reasonable.

A recent Supreme Court case, *Cullen v. Pinholster*, has clarified the relationship between these two paragraphs.  131 S.Ct. 1388 (2011).  In *Pinholster*, the Court faced a similar factual situation; the petitioner had been convicted of murder and was claiming ineffective assistance of counsel in the penalty phase of his trial.  The federal court held an evidentiary hearing and then found counsel's performance ineffective.  In affirming this decision, the Ninth Circuit, sitting *en banc*, determined the evidence from the evidentiary hearing in the federal district court could be used in addition to the state court record to determine whether the state court's decision violated § 2254(d)(1).  *Id*. at 1398.  In reversing, the Supreme Court held "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Id*. at 1398.  The same is true for review under § 2254(d)(2); the plain words of this provision make that beyond dispute.  And while the dissent and Justice Alito's concurring opinion in *Pinholster* found that this interpretation of the statute renders § 2254(e)(2), the evidentiary hearing provision, to be too narrow, it is now the law of the Supreme Court that an evidentiary hearing may not be held unless and until a petitioner has prevailed on a claim under § 2254(d), thus showing either that a claim was not adjudicated at the state court level or that the

decision of the state court was unreasonable legally or factually. The Court found that this restriction on evidentiary hearings fits with the purpose of the AEDPA to "strongly discourage" new evidence being presented in federal court proceedings. *Id*. at 1401. This is because "federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue instate proceedings." *Id*. (citing *Harrington v. Richter,* 131 S.Ct. 770, 787 (2011).

In the cases it has considered since Pinholster, the Fifth Circuit has acknowledged and applied this narrow availability of an evidentiary hearing. *See McCamey v. Epps*, ___F.3d ___, 2011 WL 4445998 (5th Cir. 2011) (finding that district court improperly held evidentiary hearing where petitioner's claims were adjudicated on the merits at the state court); *Higgins v. Cain*, 2011 WL 3209843 (5th Cir. 2011) (district court did not err in refusing to hold evidentiary hearing); *Pape v. Thaler*, 645 F.3d 281 (5th Cir. 2011) (district court erred in holding evidentiary hearing on claim of ineffective assistance of counsel and using the evidence to conclude state court had unreasonably applied *Strickland*.).

Therefore, in assessing each of Wessinger's claims the Court will consider first whether the claim was adjudicated at the state court level. If it was, the Court will next determine whether the determination made by the state court was unreasonable legally under § 2254(d)(1) or factually under § 2254(d)(2). In order to show unreasonableness under § 2254(d)(1), Wessinger must show there was

Case 3:04-cv-00637-JJB-SCR   Document 135   02/23/12   Page 8 of 77

no reasonable basis for the state habeas court's decision. *Pinholster*, 131 S.Ct. 1388, 1402 (2011). In making this determination, the Court "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that these . . . are inconsistent with the holding in a prior decision" of the Supreme Court. *Id*. To prevail under § 2254(d)(2), Wessinger must show a particular factual determination made by the state court was unreasonable. To meet this, he must show the decision "rests upon a determination of fact that lies against the clear weight of the evidence" such that it is "arbitrary and therefore objectively unreasonable." *Ward v. Sterns*, 334 F.3d 696 (7th Cir. 2003). However, he does not have to make this showing by clear and convincing evidence. *Miller-El. V. Cockrell*, 537 U.S. 322, 342 (2003).

 If the claim clears this hurdle, the Court will next determine whether Wessinger is entitled to an evidentiary hearing on that claim, using the framework of § 2254(e). Claims that were not adjudicated at the state court level do not have to clear the § 2254(d) bar and proceed directly to § 2254(e), so long as they are not procedurally barred.

As for claims that were dismissed by the state court as procedurally barred, they will be reviewed de novo if Wessinger can overcome the procedural bar. When a state court decision rests on a state law ground that is independent of a federal question and adequate to support the judgment, federal courts lack

Case 3:04-cv-00637-JJB-SCR   Document 135   02/23/12   Page 9 of 77

jurisdiction to review the merits of the case. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991); *Moore v. Roberts*, 83 F.3d 699, 702, *reh. denied*, 95 F.3d 56 (5th Cir. 1996). For the independent and adequate state ground doctrine to apply, the state courts adjudicating a habeas petitioner's claim must explicitly rely on a state procedural rule in dismissing the claim. *Moore,* 83 F.3d at 702. The procedural default doctrine presumes that the "state court's [express] reliance on a procedural bar functions as an independent and adequate ground in support of the judgment." *Id*.

A petitioner can overcome this presumption by showing the procedural rule is not "strictly or regularly followed." *Id*. If he cannot or does not make this showing, he can still overcome the bar by showing either (1) cause for the procedural bar and actual prejudice as a result of the violation of federal law or (2) that failure to consider this claim will result in a fundamental miscarriage of justice. *Smith v. Johnson*, 216 F.3d 521, 524 (5th Cir. 2000). Cause is shown through objective external factors that prevented the petitioner from raising the claim before. *U.S. v. Flores*, 981 F.2d 231, 235-36 (5th Cir. 1993). Further, this must be something that cannot be fairly attributed to the petitioner. *McCowin v. Scott,* 67 F.3d 100, 102 (5th Cir. 1995). As for prejudice, the petitioner must show that, but for the error, he might not have been convicted. *U.S. v. Guerra*, 94 F.3d 989, 994 (5th Cir. 1996). This standard is "a significantly higher hurdle" than the plain error standard that applies on direct appeal. *U.S. v. Shaid*, 937

F.2d 228, 232 (5th Cir. 1991). The miscarriage of justice exception requires a petitioner to show he is actually innocent of the charges against him. *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001).

## LAW AND ANALYSIS

### Were the Claims Adjudicated on the Merits at the State Court Level?

In his Amended Federal Petition, Wessinger makes the argument that none of his claims were adjudicated on the merits by the state court. (Doc. 120 at 31). Much of this argument is based on the quality and timing of the hearing at which they were "adjudicated." After he filed his Amended Federal Petition, but before the State filed its opposition, the law on what constitutes a "claim adjudicated on the merits" was clarified by the Supreme Court.

In *Harrington v. Richter*, the Supreme Court "held and reconfirmed that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" 131 S.Ct. 770, 785 (2011). Further, there is no prohibition against an adjudication being made in a summary fashion. *Id*. at 784. Indeed, there is a presumption that the state court decision was adjudicated on the merits "in the absence of any indication or state-law procedural principles to the contrary." *Id*. at 785-86. "The presumption may be

Case 3:04-cv-00637-JJB-SCR   Document 135   02/23/12   Page 11 of 77

overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id*. at 786.  This reason must be more than "pure speculation." *Id*.  This case does not disturb existing Fifth Circuit precedent that holds when a claim is denied at the state court level on procedural grounds, that decision is not an adjudication on the merits that is subject to deference under the AEDPA.  *Graves v. Dretke*, 442 F.3d 334, 339 (5th Cir. 2006); *see also Powell v. Quarterman*, 536 F.3d 325, 343 (5th Cir. 2008).  Assuming the claim was not procedurally barred, the review of the claim is *de novo*.  *See Wright v. Quarterman,* 470 F.3d 581 (5th Cir. 2006) citing *Solis v. Cockrell,* 342 F.3d 391, 394 (5th Cir. 2003).

In the September 4, 2003 status conference in which the state court dismissed Wessinger's claims, the court ruled that all claims from the first amended state petition be dismissed as procedurally barred.  The state court then denied relief on all the claims contained in the Second Amended State Petition, which contained all of the claims from the Amended State Petition as well.  With two exceptions, the state court stated it was denying relief on the merits.  The exceptions were the ineffective assistance of counsel claim that alleged racial and gender discrimination in the selection of the grand jury foreperson (Claim II-1) and the claim that admission of hearsay evidence violated his Sixth Amendment right of confrontation (Claim IV).  The state court ruled these were procedurally barred.  PCR Vol. III, 9/4/03 Status Conference Tr.  at

25-27.[5]  For the reasons discussed above, these two claims, as they were not adjudicated on the merits, are not entitled to deference under the AEDPA and, if they clear the procedural bar, will be reviewed de novo.  The remainder of the claims, under *Richter*, were adjudicated despite their summary nature.  Therefore, Wessinger bears the burden of showing each claim satisfies one of the two exceptions in § 2254(d) in order to proceed.

## CLAIM I- FAILURE TO INCLUDE AGGRAVATING CIRCUMSTANCES IN INDICTMENT AND FAILURE OF JURY TO UNANIMOUSLY FIND EACH AGGRAVATING FACTOR

Wessinger's first claim is that the failure of the grand jury indictment to include the aggravating factors relied upon to obtain his conviction and death sentence was a violation of both the notice requirement of the Sixth Amendment and the due process clause of the Fourteenth Amendment.  This claim also asserts that the failure of the jury to unanimously find these aggravating factors was a violation of the jury requirement of Sixth Amendment (Doc. 120 at 35).  The trial court denied this claim on the merits at the status conference.  PCR R. Vol. III, 9/4/03 Status Conference Tr. at 27.

The first portion of Wessinger's claim, which alleges that the grand jury indictment was flawed, asserts that Wessinger was not fully informed of the

---

[5] The record in this matter is in two sections.  The first is ten volumes and includes everything occurring before and through Wessinger's trial.  Tr. R. Vol. I-X at #.  The second, the cited above, is eleven volumes and contains everything relating to the post-conviction litigation. Because this portion is not bates-stamped, the Court will refer to it by volume and title of the document, as in this case the transcript of the September 4, 2003 status conference.

Case 3:04-cv-00637-JJB-SCR   Document 135   02/23/12   Page 13 of 77

charges the state intended to bring against him because the aggravating circumstances the state intended to rely upon were not included in the grand jury indictment. (Doc. 120 at 37). The second portion of this claim argues that the Sixth Amendment requires that a jury must unanimously find that each aggravating factor relied upon to justify a sentence of death exists. Wessinger argues that the jury instructions and verdict form used at trial court were ambiguous as to whether the jury must unanimously find that each aggravating factor relied upon existed. As a result, Wessinger argues, it is unknown if the jury unanimously agreed upon the existence of each aggravating factor used to justify Wessinger's conviction and sentence. (Doc. 120 at 41).

Both portions of this claim rely on the applicability to this matter of several Supreme Court decisions which were decided after Wessinger's trial and direct appeals were final, primarily *Ring v. Arizona*. *Ring* held that aggravating factors that justify an increase in the maximum punishment for first degree murder from life imprisonment to death become elements of a greater offense and a jury must find they exist beyond a reasonable doubt.[6] 536 U.S. 584, 609 (2002). The first portion of this claim relies upon the applicability of *Ring* because if these aggravating factors are not considered elements of the offense with which Wessinger was charged he need not have been informed of them in the

---

[6] Another case, *Apprendi v. New Jersey*, held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. *466,* 489 (2000). The Supreme Court has specifically stated that *Apprendi* does not apply retroactively, however. *Harris v. U.S.*, 536 U.S. 545, 581 (2002).

indictment. The second portion of this claim relies upon the applicability of *Ring* because the Sixth Amendment only requires that a jury unanimously find that every essential element of an offense exists. *In Re Winship*, 397 U.S. 358 (1970). If *Ring* is inapplicable in this case the aggravating factors will not be considered elements of the offense with which Wessinger was charged. As Ring was decided after Wessinger's trial, it only benefits him if it may be applied retroactively.

In *Schriro v. Summerlin,* the Supreme Court clearly stated that *Ring* is not to be applied retroactively. 542 U.S. 348, 353 (2004). *Schriro* held that "*Ring's* holding is properly classified as procedural" and that it therefore should not be applied retroactively. *Id.* Additionally, *Schriro* addressed whether the *Ring* holding falls within the retroactivity exception for watershed rules of criminal procedure which implicate the fundamental fairness and accuracy of the criminal proceeding and determined that it did not. *Id.* at 353-358. As the entirety of Wessinger's first claim hinges on the applicability of the *Ring* holding, which does not apply to his case, it was not unreasonable that this claim was denied.


## CLAIM II: IMPROPER SELECTION OF THE GRAND AND PETIT JURIES

In this claim, Wessinger asserts two things: (1) that the selection of the foreperson of the grand jury that indicted him was done in a discriminatory way that violates his Sixth and Fourteenth Amendment rights (doc. 120 at 43); and (2)

that he was denied an impartial petit jury from a fair cross-section of the community  (doc. 120 at 53). The Court will address each in turn.

## 1.  Grand Jury Foreperson Discrimination

Wessinger did not raise this claim until his post-conviction filing.  The state court ruled it procedurally barred.  PCR Vol. III 9/4/03 Status Conference at 25-27.  The State maintains this acts as an independent and adequate state law bar to this claim in habeas corpus.  (Doc. 129 at 45).  While acknowledging this bar, Wessinger asserts he meets the standard for overcoming it or, in the alternative, that it was ineffective assistance of his trial counsel for failing to preserve this claim.  (Doc. 120 at 51).  If Wessinger overcomes the bar, the Court will review the claim *de novo*.  The Fifth Circuit has addressed this very issue and found in the State's favor.  Therefore, this Court is bound to follow that precedent.

In *Pickney v. Cain*, the petitioner was convicted of rape and sentenced to life in prison.  337 F.3d 542 (5th Cir. 2003).  In his state post-conviction filing, he raised grand jury foreperson discrimination for the first time.  In the alternative, he argued it was ineffective assistance of counsel not to file a motion to quash the indictment.  *Id*. at 544.  The court acknowledged a petitioner can show cause by proving ineffective assistance of counsel.  *Id.* at 545, citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  The court did not address whether he had made this showing because it found Pickney had not shown actual prejudice.  *Id*. In making this determination, the court determined that had Pickney been successful in

Case 3:04-cv-00637-JJB-SCR   Document 135   02/23/12   Page 16 of 77

having his indictment quashed, the state would simply have sought and obtained a second indictment. After analyzing the evidence the State used to obtain the original indictment, it concluded that "[g]iven the strength of the State's case, a successful grand jury challenge would have served no purpose other than to delay the trial." *Id.* The Court followed the Eleventh Circuit in holding that the presumption of prejudice expressed by the Supreme Court in *Rose v. Mitchell* only applies in cases where the claim was preserved by a motion to quash. *Id*. at 545-546 (*accord Francois v. Wainwright*, 741 F.2d 1275, 1283 (11th Cir. 1984). Key to this finding was language from *Rose* that, "there is no contention in this case that the respondents sought to press their challenge to the grand jury without complying with state procedural rules." *Id*. at 546 (quoting *Rose v. Mitchell*, 443 U.S. 545, 559 n. 8 (1979)). Therefore, the Fifth Circuit held, "where a defendant has failed to show actual prejudice, we will not consider the merits of a procedurally defaulted claim of racial discrimination in the selection of a grand jury foreperson." *Id*. at 546.

The Court understands the significant difference in presuming prejudice in the indictment arena: without the presumption it will be very difficult to show the facts underlying the defective indictment would not have supported an indictment from a non-discriminatorily created grand jury. And while this is as it should be, the Court notes how radically the playing field can be tilted depending on whether counsel filed a motion to quash—a motion that almost surely would have been

Case 3:04-cv-00637-JJB-SCR   Document 135   02/23/12   Page 17 of 77

denied at the trial court level. And while it may not agree with *Pickney*, it is controlling on this Court.

Turning to the facts before this Court, the Court finds that, had Wessinger's counsel timely filed a motion to quash and succeeded on the motion, the State would have sought and obtained a second indictment. Among the evidence was the eyewitness testimony of two people present at the restaurant on the day of the shooting. One, Armentor, testified he saw Wessinger ride up on his bicycle and greeted him before going into the restaurant. He testified Wessinger shot him twice in the back as soon as he walked through the door. Armentor identified Wessinger from a photo lineup. A second eyewitness, Ricks, testified Wessinger pointed his gun at his head and pulled the trigger but the gun jammed, allowing Ricks to flee. Ricks told the 911 operator Wessinger was the shooter. The murder weapon and a pair of gloves worn during the shooting were found in an abandoned house across the street from Wessinger's house. Based on the strength of the evidence the grand jury challenge would have resulted only in delay of the trial. Therefore, following *Pickney*, the Court finds Wessinger has failed to show actual prejudice.

As for his claim of ineffective assistance of counsel for failing to file a motion to quash, the *Pickney* court found that petitioner had not satisfied the prejudice prong of *Strickland v. Washington* for the same reason. *Id*. Therefore,

Case 3:04-cv-00637-JJB-SCR   Document 135   02/23/12   Page 18 of 77

the Court also finds Wessinger's ineffective assistance claim does not pass *Strickland*.

The Court recognizes that the end result of this is a situation where his trial attorneys' possibly ineffective assistance would now preclude Wessinger from gaining relief for that very ineffective assistance. While understanding Wessinger's frustration, and agreeing largely with Justice Johnson's concurring opinion in *State v. Langley*,[7] this Court cannot overlook the controlling precedent of this circuit. Relief on this claim is denied.

**Petit Jury Discrimination**

There are four separate issues that make up this claim. All were adjudicated on the merits and are entitled to deference under the AEDPA. Each one will be taken in turn.

a. <u>Denial of an Impartial Jury From a Fair Cross-Section of the Community</u>

In this claim, Wessinger asserts his Sixth and Fourteenth Amendment rights were violated by the unconstitutional composition of his petit jury. (Doc. 120 at 53). He claims the process by which the jury venire was selected purposely excluded African-Americans from the jury venire. This claim was

---

[7] Justice Johnson noted the "cruel irony" that a white co-defendant could gain relief under this discrimination claim though his African-American co-defendant could not due only to the fact that his attorney filed a motion to quash his indictment. She then mentions the many prisoners who were indicted by such illegally constituted grand juries, noting, "[t]hey will not have the benefit of *Cambell* and *Langley* because of the ineffective assistance of their counsel in failing to file timely a pretrial motion to quash their indictments." 95-1489 (La. 4/3/02), 813 So.2d 356, 375-76. While this Court does not necessarily endorse Justice Johnson's ultimate solution, it is nonetheless in agreement with her assessment of the problem.

Case 3:04-cv-00637-JJB-SCR   Document 135   02/23/12   Page 19 of 77

denied at the state court level on the merits.  Therefore, that decision is owed deference by this Court, and will be evaluated under § 2254(d).  The parties disagree as to whether the test from § 2254(d)(1) or (2) should apply, with the State applying the former and Wessinger the latter.  As the Court finds the state court decision passes both tests, the question is moot.

To succeed on a claim of violation of the fair cross-section requirement, Wessinger must show: (1) the group alleged to be excluded is a 'distinctive' group in the community; (2) the representation of the group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) the underrepresentation is due to systematic exclusion of the group in the jury selection process.  *Duren v. Missouri,* 439 U.S. 357, 364 (1979).  The test under the Equal Protection Clause is similar.[8]  He contends the state court made an unreasonable factual determination when it found there was not enough evidence to support his claim.

The record includes testimony from the jury coordinator of East Baton Rouge Parish and a jury clerk.  They testified the venire was chosen randomly by computer.  All members of the venire then reported to the clerk's office.  A clerk then walked through the room giving out panel sheets.  They testified that the sheets were not given out on a "first-come-first-served" basis, as alleged by

---

[8] The three showings a petition must make are: (1) the group is recognizable, distinct class, singled out for different treatment; (2) underrepresentation of that group over a significant period of time; and (3) a selection process "susceptible to abuse or is not racially neutral."  *Castaneda v. Partida*, 430 U.S. 482, 494 (1977).

Wessinger. The Louisiana Supreme Court, on direct appeal, dismissed this ground because Wessinger did not show how this method, if it were indeed the method used to choose panels, discriminates against any certain segment of the community. *Wessinger*, 736 So. 2d 162, 170-72 (La. 1999).

Wessinger asserted that only 13 of the 64 members of his venire were black, which is less than the ratio of blacks living in East Baton Rouge Parish at the time, which he asserts was one-third. In his Amended Petition to this Court, Wessinger points out that of the 240 jurors who have sat on the 24 capital cases since 1991, less than 10 percent were black. Further, he argues the first-come-first-served method discriminates against those who are tardy, which he posits is usually a result of taking public transportation, a group he claims is largely black. However, as the Louisiana Supreme Court noted, he does not provide empirical evidence to back these allegations.

During the September 4, 2003 status conference, the state court briefly addressed this claim, noting it had been "litigated on appeal."[9] R. Vol. III 9/4/03 Status Conference Tr. at 27. The Court finds that based on the record before the state court, this was neither an unreasonable application of the law nor was it an unreasonable factual determination. Therefore, relief on this claim is denied.

b. State's Use of Peremptory Challenges Violated Equal Protection

---

[9] The court went on to say it found there no evidence in the record to support this. For reasons discussed in the next section (b), the Court assumes the trial court was conflating the two issues.

Case 3:04-cv-00637-JJB-SCR   Document 135   02/23/12   Page 21 of 77

In this claim Wessinger asserts that the State's use of its peremptory strikes violated his Equal Protection rights. (Doc. 120 at 58). Specifically, the State used only three of its 12 allotted peremptory strikes, with two of those struck being black. Wessinger did not object to these strikes at trial; the State claims he thereby waived the objection and was procedurally barred from bringing it during post-conviction proceedings. (Doc. 129 at 63, citing La. Code Crim. P. art. 930.4(B) ("If the application alleges a claim of which the petitioner had knowledge and inexcusably failed to raise in the proceedings leading to conviction, the court may deny relief.")).

At the status conference, the trial court seems to have combined discussion of the previous issue with this, stating, "That was handled on appeal. I don't believe there was any spontaneous or contemporaneous objections [sic] to that. And in addition, the petition doesn't allege any specific facts that would indicate that." PCR Vol. III 9/4/03 Status Conference Tr. at 27. As there is no evidence the Court can find that this issue was addressed on direct appeal, the Court is of the opinion the state court was determining the use of peremptory challenges to have been procedurally barred while the fair cross-section issue, which was addressed by the Louisiana Supreme Court on appeal, was denied on the merits. As for the state court's final assertion that the petition did not allege any specific facts, the court seemed to be referring to both issues, in essence

22

saying there was no evidence to support either claim of racial discrimination relating to the petit jury.

Wessinger did not address the procedural bar to this claim in his petition or in his reply. Thus, he did not argue the cause and prejudice exception to the bar. Therefore, the Court finds he has not met his burden and the claim is denied.

c. Jurors Excluded for Cause Without Proper Showing

Wessinger challenges the dismissal of three prospective jurors, Cuadra, Bossom, and Shropshire for cause. (Doc. 120 at 64). The thrust of the argument is that these three were improperly struck for cause because they expressed reservations about imposing the death penalty.

As the Louisiana Supreme Court noted on direct appeal, a prospective juror may be challenged for cause when his or her beliefs about capital punishment would "prevent or substantially impair him from making an impartial decision as a juror in accordance with his instructions and his oath." La. C.Cr.P. art. 798(2)(b). However, a juror may not be excused for cause simply because she has expressed "conscientious or religious scruples" against it. *Wessinger*, 736 So.2d at 173-74, citing *Witherspoon v. Illinois*, 391 U.S. 510, 521-23 (1968). It is only those who are "irrevocably committed . . . to vote against the death penalty" who are properly excused for cause. *Id*. at 173 (citations omitted). The trial judge has great discretion in deciding challenges for cause, and these

determinations are entitled to great deference, so long as they are supported by the record. *Id*. at 174. Further, a juror may be struck for cause when he is "not impartial, whatever the cause of his partiality." La. C.Cr. P. art. 797(2).

First, with regard to Cuadra, Wessinger claims the State had no objections to him until they read his answer on the jury questionnaire, where he answered the question, "How do you feel about the death penalty?" in the following way: "I believe in the death penalty only in extreme cases when the convicted individual's existence poses a threat to society while incarcerated." Tr. R. Vol. II at 355. He contends Cuadra was never directly questioned about this response but was struck nonetheless.

The transcript of the colloquy shows that Cuadra and another juror, Felps, each were familiar with the facts surrounding the case. Tr. R. Vol. VI at 1283. The defense moved to strike Felps for cause due to media exposure and the State challenged Cuadra for the same reason. The colloquy reveals that Felps expressed he had no problem imposing the death penalty while Cuadra expressed the above qualification. The State pointed out that both Felps and Cuadra had extensive knowledge of the facts of the case but that the defense had moved to strike only Felps.

And while Cuadra's feelings about the death penalty alone would not have been enough to merit a strike for cause, the record provides evidence that Cuadra might have been rendered impartial by his familiarity with the case. The

24

record indicates Cuadra lived two miles from the restaurant at the time of the crime. He was very familiar with the details from news reports; he remembered one of the victims begging for her life, that another was shot in the head, and that the defense reportedly planned to use the "rap music" defense at trial. Based on the record that was before the state court, it was not contrary to or an unreasonable application of clearly established federal law for the state court judge to deny relief relating to Cuadra.

Likewise with juror Bossom, who stated during voir dire that she was uncomfortable with the idea of sentencing someone to the death penalty. And while that and her other statements would make her a close call on this issue alone, the record indicates there was another reason she was struck for cause. That reason is that she said she would have a problem with a defendant not testifying on his own behalf and that it would prejudice her against him. As this is a violation of Louisiana Code of Criminal Procedure article 797(2), the Court finds the state court's decision to deny relief on this claim was not contrary to or an unreasonable application of clearly established federal law.

Juror Shropshire clearly indicated in his voir dire questioning that he "does not believe in the death penalty." Tr. R. Vol. VII at 1544. Upon repeated questioning by the defense, he agreed that he might be able to vote for the death penalty. Although he stated he would have voted for the death penalty in the Timothy McVeigh case, he stated that, in the current case, he could sentence

Case 3:04-cv-00637-JJB-SCR   Document 135   02/23/12   Page 25 of 77

Wessinger to "life in prison or something like that," at most.  *Id.* at 1542.  As there is evidence in the state court record that juror Shropshire was biased against the death penalty, the Court finds the state court's decision to deny relief on this claim was not contrary to or an unreasonable application of clearly established federal law.

     d.  <u>Misapplication of Hardship Challenge</u>

Wessinger's final claim is that one of the jurors, Hotard, should have been excused for hardship because he was involved in a community theater production that was rehearsing most evenings.  He acknowledged he could serve but might be distracted by thoughts of the play.  The state court's decision not to excuse him was not contrary to or an unreasonable application of clearly established federal law.  Relief on this claim is denied.

## CLAIM III: WESSINGER DID NOT RECEIVE A FAIR TRIAL DUE TO PRE-TRIAL MEDIA COVERAGE

Wessinger's third claim is that he did not receive a fair trial as required by the due process clause of the Fourteenth Amendment due to pretrial publicity (Doc. 120 at 75).  This claim was first asserted in trial court as a motion to quash and was subsequently raised on direct appeal in appellate court and at the Louisiana Supreme Court.  The Louisiana Supreme Court denied this claim on the merits (Doc. 120 at 78).

Case 3:04-cv-00637-JJB-SCR   Document 135   02/23/12   Page 26 of 77

Wessinger's claim is that East Baton Rouge Parish was an improper venue because the crime in this case took place at a well known restaurant in Baton Rouge and resulted in two murders. Wessinger claims that this crime received significant media coverage and that this coverage resurfaced several times because Wessinger's original defense attorney was suspended from practice and later disbarred (*Id*. at 75). An expert witness for the defense testified that thirty-one percent of potential jurors were prejudiced by pretrial media coverage (Doc. 120 at 76). Wessinger also asserts that this case was highly publicized because his original defense attorney planned to use a "rap music" defense, which the media incorrectly reported would consist of an argument that the violence advocated in rap music prompted Wessinger's actions (*Id.* at 76).

Extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial unconstitutionally unfair. *State v. Connelly*, 96-1680 (La. 7/1/97), 700 So.2d 810, 815, *quoting Dobbert v. Florida*, 432 U.S. 282, 303 (1977). Rather, a defendant seeking a change of venue must show that the extent of the prejudice in the minds of the community renders a fair trial impossible. *State v. Wilson*, 476 So.2d 503 (La. 1985). Generally, the defendant bears the burden of proving prejudice due to pretrial media coverage. *State v. Williams,* 708 So.2d 703, 728 (La. 1983). Prejudice can be presumed, however, when media coverage pervades the proceedings. *Murphy v. Florida,* 421 U.S. 794, 799 (1975); *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963). Wessinger claims that prejudice should be presumed in this case due to the

Case 3:04-cv-00637-JJB-SCR   Document 135   02/23/12   Page 27 of 77

sensational nature of the "rap music" defense and the coverage the media afforded this defense (Doc. 120 at 78). The Louisiana Supreme Court considered this issue on direct appeal. 736 So.2d at 172-73. In finding the trial court's denial of the motion was not manifestly erroneous, the court considered the voir dire process. It noted that of the 65 prospective jurors examined during voir dire, most knew the crime Wessinger was accused of committing. The court noted that only five were excused for cause due to having a set opinion about his guilt and that most had only a vague recollection of the facts underlying the crime or the defendant's name. The court concluded the facts were similar to cases in which denial of a change of venue had been held proper and denied relief. Based on the record before it, the Court finds the state court did not unreasonably apply *Williams*, *Murphy*, or *Dobbert*."

## CLAIM IV- THE ADMISSION OF HEARSAY EVIDENCE VIOLATED THE SIXTH AMENDMENT RIGHT TO CONFRONTATION

Wessinger's eighth claim is that the admission of hearsay evidence violated his Sixth Amendment right to confrontation. (Doc. 120 at 78). Wessinger also asserts, in the alternative, that the failure of trial counsel to object to hearsay evidence constitutes ineffective assistance of counsel. (Doc. 120 at 81). The Court will address each of these claims in turn.

Wessinger first raised the claim that the trial court erred by admitting hearsay on direct appeal. (Doc. 120 at 80). He did not, however, assert a

confrontation claim at that time. (Doc. 129 at 71). The Louisiana Supreme Court ruled the hearsay claim was procedurally barred by the contemporaneous objection rule. *Wessinger*, 736 So.2d at 178.

In this claim Wessinger asserts that the trial court improperly admitted hearsay on several occasions during the guilt phase of the trial. Specifically, Wessinger complains of the admission of his arrest warrant, along with all other warrants, through Detective Keith Bates. Wessinger also claims that the testimony of two other police officers constitutes hearsay, as these officers each testified that a key witness positively identified Wessinger. Lastly, Wessinger asserts that Detective Bates testified about Wessinger's flight from Baton Rouge by describing his phone conversations on this matter with a witness. (Doc. 120 at 80).

As in Wessinger's second claim, the State maintains that this claim is barred by the independent and adequate state ground doctrine (doc. 129 at 71) while Wessinger asserts that he can overcome this bar by showing cause and prejudice (doc. 120 at 81). The law regarding the state procedural bar and the exception to it provided by the cause and prejudice test is laid out in the Court's discussion of Wessinger's second claim. The contemporaneous-objection rule is not only "firmly established and regularly followed", additionally, as the state argues, it is well settled that it is "an independent and adequate state procedural ground". *Wainwright v. Sykes*, 433 U.S. 72, 86-87 (1977). Wessinger asserts that the cause and prejudice requirements for overcoming this bar are met by the

Case 3:04-cv-00637-JJB-SCR   Document 135   02/23/12   Page 29 of 77

ineffective assistance of counsel rendered in relation to this claim. (Doc. 120 at 80). **He does not discuss case law or in any way explain to the Court why he passes this test. Similarly, the State provides no reasons why Wessinger does not meet his burden, it simply says the claim is barred. (Doc. 129 at 71-72.)** The Court will not rule on whether the cause requirement has been met as it finds that Wessinger cannot meet the prejudice requirement.

To show prejudice, Wessinger must show that, but for the error of admitting the hearsay evidence, he might not have been convicted. *U.S. v. Guerra*, 94 F.3d 989, 994 (5th Cir. 1996). Wessinger concedes that all of the declarants in the hearsay statements complained of were available at trial. (Doc. 120 at 80). The Court finds that, but for the admission of the hearsay testimony, Wessinger has not shown he might not have been convicted. It is highly probable that the State would have called the declarants to testify as to their statements. Thus, the evidence would likely have come in regardless. Even had it not come in, the weight of the other evidence is such that the Court cannot say its absence might have led to a not guilty verdict.

The finding of no prejudice also eliminates Wessinger's alternate ineffective assistance of counsel claim for not making contemporaneous objections to the hearsay statements: as the Court has found no prejudice, Wessinger cannot meet the second prong of *Strickland.* See *Pickney*, *337* F.3d at 546. As Wessinger has not cleared the state procedural bar, relief on his claim on the admission of hearsay is denied.

## CLAIM V: WITHHOLDING *BRADY* MATERIAL

In this claim, Wessinger contends certain evidence was withheld from him by prosecutors in violation of *Brady v. Maryland*. (Doc. 120 at 82-104). While the State claims it provided open file discovery throughout the prosecution, Wessinger claims this was not the case. Either way, it is clear that certain information did not make it into the hands of the defense team for use at trial.

The prosecution's suppression of material evidence favorable to the accused violates due process regardless of whether or not the prosecution acted in good faith or bad faith in failing to make a timely disclosure of the evidence. *Brady,* 373 U.S. 83 (1963). To be entitled to federal habeas corpus relief on a *Brady* claim, the petitioner must show: (1) the prosecution suppressed evidence, (2) the suppressed evidence was "favorable to the accused," and (3) the evidence was "material" either to guilt or punishment. *Brogdon v. Blackburn*, 790 F.2d 1164, 1167 (5th Cir. 1986). Evidence that is "favorable to the accused" includes evidence that tends directly to exculpate the accused as well as evidence that impeaches the testimony of a witness where the reliability or credibility of that witness may be determinative of guilt or innocence. *Giglio v. United States*, 405 U.S. 150, 154, (1972). The touchstone of materiality is a "reasonable probability" of a different result. *Kyles v. Whitley*, 514 U.S. 419, 115 (1995). "The question is not whether the defendant would more likely than not

have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*.

Wessinger claims the state withheld the following exculpatory evidence: (1) Eric Armentor's November 19, 1995 statement to police at the scene; (2) Armentor's taped statement to police from November 22, 1995; (3) Alvin Rick's November 19, 1995; (4) Ricks's 911 call; (5) Eric Mercer's November 19, 1995 statement to police; (6) Willie Grigsby's November 19, 1995 statement; (7) Tilton Brown's November 29, 1995 statement to police; (8) Brown's criminal records; (9) a report showing Brown had been arrested prior to giving his interview to police; (10) Randolph Harden's cooperation plea agreement; (11) a report showing Wessinger's fingerprints were not on the murder weapon, on other physical evidence, or at the crime scene; (12) a letter from Capital One Credit stating that $2,500 had been withdrawn from Ms. Guzzardo's credit card account in California three days after her death; and (13) supplemental police reports concerning the investigation of Wessinger in Texas, including contact with Randolph Harden. (Doc. 120 at 82-83).

The state notes that two of these claims, numbers (12) and (13), were not brought up until the instant proceeding and should be procedurally barred. (Doc. 129 at 84-85). Wessinger did not address this in his reply brief. After examining the state court record, the Court agrees that the two issues were not litigated at

Case 3:04-cv-00637-JJB-SCR   Document 135   02/23/12   Page 32 of 77

the state court level and may not be heard by this Court. As the Court finds the state court's determination on the materiality of the remaining claims was not unreasonable, the Court pretermits deciding the first two elements of the *Brady* claim.

In finding the state court was not unreasonable, the Court notes the quantity and quality of the evidence of guilt that was part of the record before the state court, as listed by the State in its brief. (Doc. 129 at 82-83). This evidence included, inter alia, two eyewitness identifications by survivors (Armentor and Ricks), testimony that Wessinger borrowed the gun from a friend, testimony he asked Brown, a friend, to help him, testimony he had told others he planned the robbery, and testimony Wessinger told people afterwards that he had robbed the restaurant and killed several people. Additionally, there was a recording of a 911 call containing one of the victim's pleas for mercy before being killed. While the alleged *Brady* material potentially would call into question the credibility or reliability of some of the witnesses, it was not unreasonable, based on the record before it, for the state court to find the evidence in question was not material under *Brady*.

The fact that Eric Armentor's statements contained slightly different versions of the events does not cast doubt on the essence of his testimony: that he saw Wessinger as Armentor walked into the restaurant; that Armentor was

33

shortly thereafter shot in the back; and that Wessinger then walked into the office and shot Guzzardo.

The same is true for Alvin Ricks: the fact that his trial testimony was different in some ways from his statement to police and his 911 call does not undermine confidence in the verdict.

Wessinger walked into the restaurant, pointed a gun at him and pulled the trigger—whether he pointed it at his head or his leg first is not as important  If the *Brady* material were of a sort as to raise questions about whether Ricks was there at all, the conclusion might be different.  However, disagreements over details during a crime such as this are not enough to cause doubt as to the confidence of the verdict.  Likewise the absence of the inconsistent statements of Grigsby and the potential suspect vehicle identified by Mercer, do not call into question the jury verdict.

As for the testimony of Tilton Brown, the fact that his criminal record was not turned over would likely have undermined his credibility, but its absence does not call into the question the verdict.  Had Brown been the star witness, this might be different.  The Court is disturbed that the plea agreement between Harden was not disclosed to the defense—even if it would not have been admissible. However, its absence does not undermine confidence in the verdict. The investigative report showing Wessinger's fingerprints were not on the gun or at the scene of the crime would no doubt have helped the defense's case.

34

However, in light of the powerful evidence presented by the State, this absence does not undermine confidence in the verdict.

Wessinger contends the state court unreasonably applied federal law as expressed by *Kyles v. Whitley*, 514 U.S. 419 (1972), by failing to consider the Brady evidence collectively, not item by item. The Court finds that the state court made no express declaration of how it was considering the evidence. And as *Richter* allows for summary determinations, the Court finds that only an express declaration that the state court was not considering the evidence collectively would be contrary to federal law. Otherwise, if an express collective analysis were required on the record, every summary disposition of Brady claims would be violative of *Kyles*.

As Wessinger cannot meet the materiality prong of *Brady*, he also fails on the prejudice prong of his alternate ineffective assistance claim.

The Court is concerned that so much evidence apparently did not make it to the hands of the defense team for trial. It should have. However, under this deferential review, the question is the reasonableness, not the correctness, of the state court's decision. As it was not unreasonable, relief is denied.

## CLAIM VI: IMPROPER EVIDENCE AND ARGUMENT DURING PENALTY PHASE

In his sixth claim Wessinger alleges that multiple instances of prosecutorial misconduct during the penalty phase of his trial warrant reversal of the death sentence. (Doc. 120 at 106-144). The Court will address each in turn.

A) **Non-family members were improperly allowed to give victim impact statements**

In this sub-claim, Wessinger alleges the admission of victim impact statements by individuals who are not family members of the victims violated the Eight and Fourteenth Amendment principles that victim impact evidence must be limited. (Doc. 120 at 106). This claim was first raised on direct appeal. The Louisiana Supreme Court acknowledged this claim as error but dismissed it as harmless error. *Wessinger*, 736 So.2d at 181.

Wessinger complains that non-family members supplied four of the six victim impact statements offered by the state. Louisiana Code of Criminal Procedure article 905.2(A) governs the use of victim impact evidence in capital cases. Although it has since been amended to also allow testimony from "friends, and associates" of the victim, at the time of Wessinger's trial article 905.2(A) only allowed testimony from family members of the victim. Wessinger asserts that victim impact evidence is only admissible under *Payne v. Tennessee*, the Supreme Court case that established the admissibility of victim impact statements in capital cases if permitted by state law. 501 U.S. 808 (1991); (Doc. 120 at 107). Wessinger then alleges that the Louisiana Supreme Court's dismissal of this claim as harmless error was an unreasonable

36

application of Supreme Court law in that it widens the exception for impact evidence created by *Payne.* (Doc. 120 at 111).

In *Payne,* the Supreme Court held in part that:

> . . . if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed.

501 U.S. 808, 827.

Wessinger misapplies *Payne.* The Supreme Court simply said if states want to allow victim impact testimony, the Eighth Amendment does not necessarily stand in the way.[10] Louisiana allowed victim impact evidence at the time of Wessinger's trial, thus there is no Eighth Amendment violation per se. The fact that the trial court allowed the testimony of non-family members in direct violation of the article does not make it a misapplication of *Payne*, for Payne does not say non-family victim testimony is violative of the Eighth Amendment.

And however persuasive the Court may find the reasoning of the Illinois Supreme Court, which found "improper admission of this irrelevant victim impact evidence deprived defendant of a fair capital sentencing hearing," that is not clearly established federal law as interpreted by the United States Supreme Court. (Doc. 120 at 110, citing *People v. Hope*, 702 N.E.2d 1282, 1289 (Ill.

---

[10] The Court notes that, many states, including Louisiana, have since begun to allow non-family members to give victim impact evidence. At present, a majority of states do not limit victim impact evidence to family members. (Doc. 129 at 95); See Blume, Ten Years of *Payne*: Victim Impact Evidence in Capital Cases, 88 Cornell L.Rev. 257, 271-272 (2003).

Case 3:04-cv-00637-JJB-SCR   Document 135   02/23/12   Page 37 of 77

1998)).  As there seems to be no such case law, the Court finds it was not an unreasonable application of Supreme Court law for the Louisiana Supreme Court to find that the admission of victim impact evidence by non-family members was harmless error.[11]

### 2)  Family members' victim impact statements were so highly emotional they were prejudicial

In this sub-claim Wessinger asserts his Fourteenth Amendment right to a fair trial was violated because: (1) the victim impact evidence provided by family members of one of the victims was so highly emotional and prejudicial; and (2) an outburst by one of the victim's parents during closing arguments.  (Doc. 120 at 111).  Wessinger raised these issues on direct appeal.  The Louisiana Supreme Court denied it on the merits.  (Doc. 120 at 114); *Wessinger,* 736 So.2d at 183.

The victim impact evidence Wessinger objects to consists of testimony from the parents of one of the victims to the effect they felt no sympathy for Wessinger.  The outburst came during closing arguments of the penalty phase after the State played an audio tape of the 911 call to the jury, after which someone in the gallery said "son of a bitch" in obvious reference to Wessinger. Tr. R. at 2232.  After this outburst, the courtroom was cleared and the trial judge

---

[11] In making this determination, the Louisiana Supreme Court found that it was error to allow the testimony but that because the testimony in question "would have been proper testimony from family witnesses," it was harmless error.  *Wessinger*, 736 So.2d 162, 181 (citing *State v. Frost*, 97-1771 (La. 12/1/98), 727 So.2d 417). Though the Court notes that this seems to be an exception that swallows the rule, it is not this Court's role to review the correctness of the decision, only whether it was an unreasonable application of federal law.  This, it was not.

Case 3:04-cv-00637-JJB-SCR   Document 135   02/23/12   Page 38 of 77

denied a defense motion for a mistrial. *Id*. at 2233. The trial judge also denied a request to postpone the rest of closing arguments—it was early evening at the time—until the next morning. Instead, the arguments continued and the jury reached a verdict that night. Wessinger asserts that the denial of this claim was contrary to clearly established Supreme Court law.

Two United Stated Supreme Court cases set out the standards in this situation. Generally, *Gardner v. Florida* establishes that a jury's decision to impose the death penalty must "be, and appear to be, based on reason rather than caprice or emotion." 430 U.S. 349, 358 (1977) (opinion of Stevens, J.). Additionally, in the arena of victim impact testimony, only if the testimony is "so unduly prejudicial that it renders the trial fundamentally unfair" will the Due Process Clause of the Fourteenth Amendment provide relief. The Louisiana Supreme Court determined that the "no sympathy" testimony was not prejudicial to Wessinger, due to the credit that is due jurors, these events would be seen as "normal human reactions to the death of a loved one". *State v. Wessinger,* 736 So.2d at 183. After reviewing the transcript, the Court finds it was not unreasonable for the court to make such a finding.

The trial court's refusal to delay closing arguments after the outburst concerns the Court, but the record before the state habeas court shows this was not an unreasonable application of *Gardner*. It surely came as no surprise to the jury that the victim's parents felt very strongly about Mr. Wessinger; further, juries often deliberate into the night without their decision being based on emotion

39

rather than reason. Without more specific case law from the Supreme Court regarding this particular conduct, it was not an unreasonable application of *Gardner* for the state habeas court to determine the jury's decision was not based on emotion rather than reason. Relief on this claim is denied.

### 3) The state improperly interjected irrelevant arguments on the issue of commutation to encourage a death sentence

Wessinger alleges that the state violated his Eighth and Fourteenth Amendment rights to due process and a non-arbitrarily imposed sentence by interjecting irrelevant arguments on commutation which were intended to encourage the jury to impose a death sentence based upon improper grounds. (Doc. 120 at 115). Wessinger first raised this issue on direct appeal and the Louisiana Supreme Court denied it on the merits. (Doc. 120 at 119). Wessinger asserts that the denial of this claim was contrary to federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1).

This claim arises from the State's cross-examination of an expert witness the defense called to testify on how frequently commutation had been granted to prisoners convicted of first degree murder. The State attempted to elicit from the witness information about two unrelated cases and how many times the victim's families had attended pardon board hearings in those cases. (Doc. 120 at 118). The State also questioned the witness about how attending pardon board hearings was very hard on the families of victims. (Doc. 120 at 119). Wessinger

Case 3:04-cv-00637-JJB-SCR   Document 135   02/23/12   Page 40 of 77

argues that the decision of the victims' family and friends on whether to attend pardon board hearings and his decision on whether to exercise his right to seek a pardon were irrelevant to the jury's decision in the penalty phase. Wessinger alleges that the state interjected an arbitrary factor into the penalty phase by turning the cross-examination of this witness into an argument that the imposition of a life sentence would require the victims' friends and family to attend pardon board hearings for the remainder of Wessinger's life. (Doc. 120 at 117).

Wessinger also alleges that multiple other instances of prosecutorial misconduct occurred during testimony on the commutation issue. First, Wessinger contends that the State improperly invited the expert witness to speculate about how pardons could be more common under a future governor. Second, Wessinger argues the prosecutor misled the jury by asking questions about a past case involving a man whose murder sentence was commuted but who committed another homicide once released. (Doc. 120 at 121). Wessinger argues that this case was irrelevant to the instant matter, as the man whose sentence was commuted had not been convicted of first degree murder, and that the State was insinuating that if the death penalty were not imposed under a future governor Wessinger could have his sentence commuted and kill again once released. (Doc. 120 at 122). Lastly, Wessinger alleges that when a second expert witness was called to testify on the commutation issue the State attempted to turn this issue into a proportionality survey by asking how many

individuals who had been convicted of double homicides were given the death sentence. (Doc. 120 at 122-24).

Wessinger cites a Fifth Circuit case, *Byrne v. Butler*, for the principle that the possibility of future release is an arbitrary factor which should not be interjected into capital sentence proceedings. (Doc. 120 at 117, citing 845 F.2d 501, 508 (5th Cir. 1988)). The *Byrne* court only  mentioned this principle in passing, however, and found that the prosecutor's remarks on this subject did not warrant reversal because when the prosecutor referred to the possibility of future relief he was merely attempting to correct what he perceived as an improper statement from defense counsel on the meaning of life imprisonment. *Id.* Likewise, in Wessinger's case the Louisiana Supreme Court found that the testimony on commutation Wessinger complains of was part of a proper cross-examination, as the prosecutor was attempting to make the witness "retreat from his position of virtually guaranteeing the jury that the defendant would never be commuted out of a life sentence." *Wessinger,* 736 So.2d at 185.  Additionally, the Louisiana Supreme Court noted both that the credit which is due jurors indicates that a jury would not impose a death sentence merely to prevent the victims' families from attending commutation hearings and that in his closing argument the prosecutor impressed upon the jury that they were not to use the pardon board hearings as a reason to impose the death penalty. *Id*. at 186.

Wessinger also argues that the Supreme Court has stated that Due Process rights are denied by the creation of a "false choice between sentencing

petitioner to death and sentencing him to a limited period of incarceration" and that the state did so by its questions on the commutation issue. (Doc. 120 at 122, citing *Simmons v. South Carolina,* 512 U.S. 154, 161-62 (1994)). The Court agrees with the Louisiana Supreme Court that such a "false choice" was not created in this case. Additionally, as the Louisiana Supreme Court noted, due to the volume of evidence the state put forth in the penalty phase it is unlikely that the jury imposed the death penalty due to the disputed testimony on commutation. *Wessinger,* 736 So.2d at 186-87. Therefore, the Louisiana Supreme Court's denial of this claim was not contrary to, or an unreasonable application of, federal law as determined by the Supreme Court in *Simmons*.

### 4) The State violated the 'golden rule' in its closing argument of the penalty phase

Wessinger next claims the State improperly asked jurors to put themselves in the victims' shoes when deciding whether Wessinger should be put to death, thereby invoking the forbidden "Golden Rule" argument. (Doc. 120 at 124-29). Specifically, Wessinger objects to the following from the State's penalty phase closing argument, in which the assistant district attorney described the circumstances surrounding the death of one of the victims:

> It wasn't 18 seconds for Stephanie Guzzardo. It was a lot longer than 18 seconds that she realized that she was probably going to die or at least realized that she was in extreme danger. Put yourself in her position. Pretty day, a happy, beautiful person, fine parents, a job. There is no reason to believe that it's going to be any different from any other day working in a restaurant. And then all of a sudden you hear a noise and you hear people running and you hear people

43

probably saying things that don't sound right and then all of a sudden you hear a gunshot. And you're sitting there with that safe open and that money and the fear hits you and hits your heart that somebody is in here, somebody has got a gun, somebody has shot the gun, and your fear is that they'll come for you, and you have to think about that. And that room, which is about as big about as this jury box, has one door and the shot came from the direction you have to go out of and you look around and you're trapped. You're trapped and then within a short period of time, here's your worst fear. Here's Todd Wessinger with this pointed at you and it hits you what he's there for and you glance at that safe and you know what he's there for and you look down the barrel of this. I will hold it to the ceiling, but you look down the barrel of this and you know it was just shot out there. Can you imagine how you would feel? Can you imagine what would go through your mind? And you know the issue because you know him and you know the issue right away is that he's probably going to kill you because he doesn't want you to recognize him and you start begging for your life. Can you imagine being trapped in that room and looking at a full grown healthy, physically fit male that an unarmed female sitting there, looking at that gun and begging for her life. Can you imagine what she felt? You heard it. And then that pain when that bullet tears into her. Dr. Suarez says last 17 or 18 seconds. When that clock comes up on three up there -- see that second hand? Watch it tick off 18 seconds. Longer than you thought, isn't it? Longer than you thought. Is that a heinous and atrocious way to die? I say it is. And when you're the person that inflicts that on someone, I say you deserve the death penalty.

(Doc. 120 at 125).  The Louisiana Supreme Court denied relief on direct appeal, finding that, even if this argument was improper, "an intelligent jury could not reasonably have believed that the prosecutor was urging them to disregard the law as given to it in the instructions of the trial judge."  *State v. Wessinger*, 736 So.2d at 187.

Wessinger asserts this denial was based on an unreasonable determination of the facts in light of the evidence under § 2254(d)(2).  However,

he does not point out what facts he feels were unreasonably determined by the Louisiana Supreme Court.  Rather, this is a situation where Wessinger disagrees with how the court applied the facts to the law and is evaluated under §2254(d)(1). The State correctly points out that there is no clearly established federal law as announced by the United States Supreme Court that use of a golden rule argument in a capital case is impermissible.  Therefore, the unreasonable application provision of § 2254(d)(1) is not available.  And while the Court notes the case law from the Fifth Circuit and other courts that disapproves of this argument, there is no case law from the United States Supreme Court.  Therefore, the express language of §2254(d)(1) forbids the Court from considering this claim.  28 U.S.C. § 2254(d)(1) (relief may be granted where the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States*;).  This statute refers to "holdings, as opposed to dicta, of Supreme Court decisions as of the time of the relevant state-court decision."  *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  As there is no holding from a United States Supreme Court case that the Louisiana Supreme Court unreasonably applied, relief on this claim is denied.


### 5) Prison life at Angola

In the fifth part of this claim, Wessinger alleges that the prosecutor violated his right to a fair trial and his right to reliable sentencing by asking questions and making comments regarding life in Angola Prison during cross-examination of Dean Foster, a university professor called by the defense to testify on the commutation procedure and statistics. (Doc. 120 at 130). The Louisiana Supreme Court has mandated that "[i]mproper or allegedly prejudicial argument requires reversal when it is probable that the jury's verdict was influenced by the remarks." *State v. Deboue*, 552 So. 2d 355, 364 (La. 1989). Most courts that have reviewed a prosecutor's arguments in this context have found that, while some statements made by a prosecutor are improper, they don't amount to reversible error. The State notes, and the Court agrees, that Wessinger has pointed to no Supreme Court case that the state courts' determination violates. (Doc. 129 at 104). Wessinger cites generally to *Zant v. Stephens*, 462 U.S. 862 (1983) but does not explain how its holding is violated. After reviewing the case, the Court finds as it is not violated.[12] Therefore, for the same reasons discussed in the "golden rule" claim, Wessinger has not met his burden under § 2254(d)(1), and relief is denied.

### 6) Verdict as a Recommendation

---

[12] Zant dealt with aggravating factors and whether the later invalidation of one factor called the death sentence into question. The Court held that, where jury found existence of multiple aggravating factors, the later invalidation of one of them by the state supreme court did not require vacation of the death sentence. This case is inapposite.

Next, Wessinger alleges that the prosecutor improperly referred the jury's sentence as a "recommendation" instead of a "verdict." (Doc. 120 at 135). In *Caldwell v. Mississippi*, the U.S. Supreme Court addressed the question of whether a capital sentence is valid where the prosecutors specifically told jurors that their decision would be reviewed by the appellate court in an attempt to convince them that they shouldn't consider themselves the final say on the defendant's life or death. 472 U.S. 320, 325.[13] That Court held that it is "constitutionally impermissible to rest a death sentence on a determination made by a sentence who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 328-29. Subsequent cases have clarified this position by stating that *Caldwell* is only relevant to comments that mislead the jury as to its role in the sentencing process in order to make the jury feel less responsible for imposing a death sentence. *Romano v. Okla.*, 512 U.S. 1, 9 (1994). Specifically, "to establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Id.* (citing *Darden v. Wainwright*, 477 U.S. 168, 184, n.15 (1986)).

Wessinger argues that the prosecutor referred to the jury's sentencing decision as a "recommendation" several times throughout the trial and that this

---

[13] In that case, the District Attorney, following the defense's plea for life imprisonment rather than a death sentence, stated, "they [defense attorneys] would have you believe that you're going to kill this man and they know – they know your decision is not the final decision. My god, how unfair can you be? Your job is reviewable. They know it. . . the decision you render is automatically reviewable by the Supreme Court." *Id.*

improperly influenced the jury's decision by telling them that their decision wouldn't be final. (Doc. 120 at 136). However, one of the cases cited by the petitioner himself directly contradicts this argument. In *Kyles v. Whitley*, the Fifth Circuit held that even though the prosecutor referred to the jury's decision as a recommendation, because the jury was told in the instructions the judge gave them that if they chose to sentence the defendant to death, that a death sentence would indeed be imposed. 5 F.3d 806, 857-58 (5th Cir. 1993). Similarly, in this case, during voir dire, prior to opening statements in the penalty phase, and during the instructions given to the jury, the trial judge in this case made clear that "it will be [the jury's] duty whether the sentence in this matter should be life in prison without benefit of probation, parole, or suspension of sentence or death." *Wessinger*, 736 So. 2d at 189. The prosecutor should not have used such language, however. The Court finds it was not an unreasonable application of *Caldwell* for the state courts to find the instructions cured any misunderstanding the prosecutor may have created. Relief on this claim is denied.

### 7) Cumulative Error During Penalty Phase

In this claim, Wessinger argues that the errors during the penalty phase of the trial, when cumulated, cannot be viewed as harmless error. The law relating to cumulative error claims in the Fifth Circuit is discussed fully below in Claim XII. *Infra* at 71. In short, the errors relating to the allowance of non-family victim-impact evidence are errors of state law. Therefore, they do not meet the *Derden*

test, as discussed below. *Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992).

## CLAIM VII- DENIAL OF RIGHT TO BE PRESENT AT ALL STAGES OF PROCEEDINGS

Wessinger's seventh claim is that he was denied the right to be present at all stages of proceedings in violation of the Due Process Clause of the Fourteenth Amendment (Doc. 120 at 144).

At the heart of this claim are the events surrounding the aforementioned outburst made by the father of one of the victims during the prosecutor's closing statement of the penalty phase. Tr. R. Vol. IX at 2232. Immediately following the outburst, the trial judge removed Wessinger and the jury from the courtroom. The judge then convened a bench conference to discuss the outburst, at which defense counsel requested a mistrial due to the outburst (Doc. 120 at 112). The mistrial was denied and following a bench conference Wessinger and the jury were returned to the courtroom. Tr. R. Vol. IX at 2232-35. Wessinger asserts that his right to be present at all stages of proceedings was violated because he was not present when this bench conference took place.

Supreme Court jurisprudence interpreting the right to be present at all stages of proceedings shows that Wessinger's removal from court during the bench conference was not a violation of this right. The Supreme Court has held that the presence of the defendant is a condition of due process only to the

extent that a fair and just hearing would be thwarted by his absence. Therefore, the presence of the defendant is only essential at proceedings which have a reasonably substantial relation to the fullness of the opportunity of the defendant to defend against the charge. *Snyder v. Commonwealth of Massachusetts,* 291 U.S. 97, 109 (1934). As a result of this principle a general rule has emerged that no claim of error, or at least no claim of prejudicial error, can be based upon the exclusion or absence of a defendant, pending his trial on a criminal charge, from the courtroom, or from a conference between court and attorneys, during argument on or discussion of a question of law. *State v. Kahey,* 436 So.2d 475, 483 (La. 1983) (citing *Snyder*). The bench conference Wessinger complains of related to a motion for a mistrial, an argument or discussion of a question of law. Therefore, it was not an unreasonable application of *Snyder* for the state court to find Wessinger's Fourteenth Amendment rights were not violated by his exclusion from it.[14] Relief on this claim is denied.


## CLAIM VIII- THE FAILURE TO PROVIDE JURORS WITH A BURDEN OF PROOF ON MITIGATION VIOLATED THE EIGHTH AMENDMENT

---

[14] The Court notes that Louisiana law provides criminal defendants with more right to be present than the Supreme Court jurisprudence cited above. Yet Wessinger's absence from the courtroom during the bench conference also did not violate Louisiana law. La. Code Crim. P. art 831 provides times during which a felony defendant must be present. As noted in the state's Opposition to Writ for Habeas Corpus, however, Wessinger's absence during the bench conference does not fall within any of the times set out in article 831 (Doc. 129 at 116). Additionally, La. Code Crim. P. art 834 specifically states the presence of the defendant is not necessary in a criminal prosecution during ". . . (2) The making, hearing of, or ruling on a motion or application addressed to the court during the trial when the jury is not present . . ." As a result, Wessinger's presence during the bench conference was not necessary under article 834 because the jury was not present at that time.

50

Wessinger's eighth claim is that the failure to provide jurors with a burden of proof as to mitigation violated the Eighth Amendment principle that a capital jury's sentencing discretion must be guided (Doc. 120 at 146). This claim was first raised on direct appeal in appellate court and at the Louisiana Supreme Court, which denied it on the merits (Doc. 120 at 147).

Wessinger does not assert that either Louisiana or federal law has actually established a burden of proof for mitigation for capital cases but instead claims that federal law requires that some burden of proof for mitigation must be provided and that the jury must be told about that burden (Doc. 120 at 146). Only one case is cited for this notion that a burden of proof must be provided for mitigation and that jury must be told about it, *Proffitt v. Florida*, 428 U.S. 242 (1976). The portion of *Proffitt* that the petitioner cites for this statement of law, however, does not in any way require that a burden of proof for mitigating factors be provided. Instead, it only addresses what sentencing factors satisfy the *Furman v. Georgia* requirement that the question of whether the punishment for a crime should be death or a lesser punishment cannot be left entirely to the discretion of the judge or jury.[15] The State argues, and the Court agrees, that no federal law or Supreme Court decision can be cited for the requirement that in capital cases a burden of proof for mitigation must be provided and supplied to

---

[15] This portion of *Proffitt* states: "the requirements of *Furman* are satisfied when the sentencing authority's discretion is guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition". *Proffitt* at 258 ; *Furman v. Georgia,* 408 U.S. 238 (1972).

Case 3:04-cv-00637-JJB-SCR   Document 135   02/23/12   Page 51 of 77

the jury (Doc. 129 at 118). As a result, the Court finds that *Furman* and the cases interpreting it should control, as they provide the more general requirement that a capital jury's sentencing discretion must be guided. *Furman v. Georgia,* 408 U.S. 238 (1972). The Supreme Court has interpreted this to mean "[a] capital sentencing scheme must, in short, provide a meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not." *Godfrey v. Georgia*, 446 U.S. 420, 427 (1980).

The record from the state court proceedings provides ample evidence that the sentencing factors used in this matter satisfied this requirement. A Louisiana Code of Criminal Procedure provides specific factors that are to be used by juries in capital cases to determine sentencing. La.C.Cr.P. art. 905.2(A). The Louisiana Supreme Court found that the trial judge's jury instructions at the penalty phase essentially recited the requirements of this article and also noted that the trial judge instructed the jury to consider any other relevant mitigating factors. Therefore, it was not unreasonable for the Louisiana Supreme Court to rule that the jury's instructions for mitigation were adequate.


## CLAIM IX- THE AGGRAVATING CIRCUMSTANCES SUBMITTED TO THE JURY WERE UNCONSTITUTIONAL

Wessinger's ninth claim is that the aggravating circumstances submitted to the jury were unconstitutional due to vagueness and duplicity. (Doc. 120 at 147). This claim was first raised on direct appeal in appellate court and at the

Louisiana Supreme Court. The Louisiana Supreme Court denied this claim on the merits. *Wessinger*, 736 So.2d at 192. Alternatively, Wessinger asserts the failure of his trial counsel to object to the use of these aggravating circumstances constitutes ineffective assistance of counsel. (Doc. 120 at 150).

Wessinger argues that the State's reliance upon the aggravating circumstance that "the offense was committed in an especially heinous, atrocious or cruel manner" violated the Eighth Amendment as an unconstitutionally vague jury instruction in a capital case. (Doc. 120 at 147). As Wessinger argues, a jury instruction of "especially heinous" is unconstitutionally vague if not accompanied by a limiting instruction. *U.S. v. Jones,* 132 F.3d 232 (5th Cir. 1998), (citing *Maynard v. Cartwright,* 486 U.S. 356, 364 (1988)). The Fifth Circuit has held that the vagueness of such an instruction is cured by a limiting instruction that the offense must involve "torture or serious physical abuse". *Id.* at 249, citing *Walton v. Arizona*, 497 U.S. 639, 654-55 (1990). Wessinger maintains that the limiting instruction used at his trial, that there must be evidence of "torture or the pitiless infliction of unnecessary pain of the victims", did not cure the vagueness of the "especially heinous" instruction. (Doc. 120 at 148). Additionally, Wessinger argues that the felony aggravating circumstance was duplicitous because it allowed the jury to find that the murders were committed during a burglary or robbery. (Doc. 120 at 149).

As the State argues, Wessinger only cited state law when he raised the vagueness and duplicity claims on direct appeal and therefore did not put a

53

federal issue before the state courts. (Doc. 129 at 120). This Court cannot hear this claim unless a state court's adjudication of it was based upon federal law. 28 U.S.C. § 2254 (d)(1). The Louisiana Supreme Court's ruling on this claim only considered and addressed state law. *Wessinger,* 736 So.2d at 192. Thus, it is procedurally barred. Additionally, Wessinger does not attempt to argue that he can overcome this procedural bar by showing cause and prejudice.

Even if this claim were not procedurally barred, the limiting instruction used in this case provided an arguably higher bar for jurors to find the existence of the "especially heinous" aggravating circumstance than did the *Jones* instruction. While both include torture, the trial court's instruction requiring "pitiless infliction of unnecessary pain of the victim" seems to go well beyond the standard of "serious physical abuse." It was not an unreasonable application of *Jones* to find this instruction sufficient.

Wessinger's alternative claim that the failure of his trial counsel to object to the vague or duplicitous instructions constituted ineffective assistance of counsel is without merit as this claim cannot pass either prong of *Strickland.* As the Court finds the limiting instruction given provides at least as much protection as the *Jones* instruction, there was neither defective performance for not objecting nor any prejudice caused. Relief is denied on this claim.

## CLAIM X: LETHAL INJECTION PROTOCOL VIOLATES EIGHTH AND FOURTEENTH AMENDMENTS

Wessinger claims the method of lethal injection employed by the state of Louisiana violates the Eighth and Fourteenth Amendments because there is substantial risk of serious, unnecessary pain. (Doc. 120 at 150-55). The State contends this claim is procedurally barred and precluded from review. (Doc. 129 at 122-25). Wessinger admits in a footnote he is raising this claim for the first time in this Court. (Doc. 120 at 155 n. 26). Wessinger does not respond to this argument in his reply. The Court finds Wessinger has not exhausted his state court remedies regarding this claim. As the state court would find this claim barred, it is procedurally defaulted in this Court. *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1 (1991). The Court finds Wessinger does not meet one of the exceptions to this procedural default rule. Therefore, relief is denied on this claim.

As an alternative request for relief, he contends it was ineffective assistance for his trial and appellate counsel to not raise this claim earlier. Even if it were defective, Wessinger cannot meet the second prong of Strickland: objecting to the protocol would not have affected either phase of his trial, it simply would have delayed his execution until the protocol was constitutional. Relief on this claim is denied.

## CLAIM XI: INEFFECTIVE ASSISTANCE OF COUNSEL

Wessinger claims he received ineffective assistance of counsel in the following areas: (1) during voir dire; (2) during the guilt and (3) penalty phases of

55

the trial; (4) for failing to object to incorrect jury instructions; and (5) for failing to obtain a complete transcript of the proceedings. (Doc. 120 at 155-306). To the extent that some of these claims overlap with claims previously discussed, the Court will refer to the prior discussion. The Court notes that all of these claims were adjudicated at the state court level and are therefore subject to review under § 2254(d).

The clearly established law in this claim is *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court established a strong presumption that counsel had acted adequately. To overcome this presumption, the petitioner must show "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Id.* at 687. To prove deficient performance the petitioner must demonstrate that counsel's actions "fell below an objective standard of reasonableness." *Id.* at 688. To prove prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, and that "counsel's deficient performance render[ed] the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1983). In the habeas corpus context, the Supreme Court has stated this review is "doubly deferential" as it takes a "highly deferential look at counsel's performance through the deferential lens of § 2254(d)." *Pinholster*, 131 S.Ct. at 1403 (citations omitted). Therefore, Wessinger must show that it was

necessarily unreasonable for the state courts to conclude both that he had not overcome the strong presumption of competence on the part of his trial attorneys and that he had failed to undermine confidence in the jury's verdicts of guilt and/or death. *Id*. With this in mind, the Court will examine each of Wessinger's claims

## A. Voir Dire

Wessinger claims his trial counsel was ineffective for failing to: (1) question and challenge jurors who demonstrated bias; (2) challenge prospective jurors who obviously could not follow the law; (3) question jurors about whether they knew anyone who was a victim of crime; and (4) challenge jurors who were antagonistic to the case in mitigation. (Doc. 120 at 180-196). The State contends that all claims related to jury selection are procedurally barred as they were either decided on direct appeal, were known by Wessinger but not brought up on appeal, or were raised in the trial court but then not brought up on appeal. (Doc. 129 at 132). Thus, the State maintains these claims are barred from consideration on post-conviction appeal by Louisiana Code of Criminal Procedure art. 930.4(A)-(C). Wessinger does not address this matter in his reply brief. However, the state court did not treat the issue as procedurally barred— indeed there is no mention of a bar at the state court level—and this Court will not recognize a bar that none of the courts below addressed. Therefore, the

Court will address the merits of the claim, which is broken down into specific jurors and general allegations of ineffectiveness.

Trial counsel is ineffective during voir dire if he allows a biased jury to be seated such that it leaves "the determination of whether a man should live or die to a tribunal organized to return a verdict of death." *Witherspoon v. Wainwright*, 391 U.S. 510, 520 (1968). Also, criminal defendants are entitled to a jury of "impartial, indifferent jurors." *Irvin v. Dowd*, 366 U.S. 717 (1961).

Wessinger was not allowed to appeal any of the trial court's denial of challenges for cause due to a procedural rule in Louisiana that states where a party does not use all of his peremptory challenges, he may not object to denial of challenges for cause. *State v. Koon*, 704 So.2d 756, 768 (La. 1997). Therefore, he was not allowed to appeal the denial of challenges for jurors Bagur, McDonner, Harville, Lee, Dewitt, Mercier, and Yarborough. The defense used peremptory strikes on the last five; Bagur and McDonner were on the jury. Another, Nesom, was an alternate and will not be discussed here as no prejudice can be shown.

As Wessinger used peremptory strikes on Harville, Lee, Dewitt, Mercier, and Yarborough and had strikes left over, he was not prejudiced by any deficiency on the part of his trial attorneys relating to these jurors. The same is true for Nesom, who did not ultimately deliberate in either phase of the trial.

As for Bagur and McDonner, who were on the jury, Wessinger points to no authority for the position that failing to use the full allotment of peremptory strikes—thereby preserving the right to challenge denial of strikes for cause—can be ineffective assistance of counsel. Further, while these two jurors could have been questioned more thoroughly, nothing in their stated answers indicates they were not impartial and indifferent during the trial. Juror Bagur stated she thought she could put aside her preconceptions and follow the law. Tr. Vol. V at 1100. This is not indicative of someone who is not partial.[16] Regardless, none of the Supreme Court case law Wessinger cites holds that such a response is per se bias. As to her testimony about alcoholism, Bagur stated she felt it was less a disease and more of a personal choice. *Id.* at 1159-60. She also said she thought alcoholism did not affect a person's judgment when they were sober. As the defense strategy in the penalty phase was to claim Wessinger was intoxicated and therefore unaware of what he was doing, this attitude would not necessarily be a bad one for a juror. It was not unreasonable for the state court to find it was not ineffective assistance not to strike Bagur.

Juror McDonner is closer, but Wessinger has not met his burden. McDonner was a chef at a local restaurant who knew many of the employees and the owners of the restaurant where the killings took place. Tr. R. Vol. V at 1067. McDonner stated that as a result of this crime, he changed certain

---

[16] Like many, Bagur had been exposed to pretrial publicity and testified she remembered thinking at the time that Wessinger was probably guilty.

Case 3:04-cv-00637-JJB-SCR   Document 135   02/23/12   Page 59 of 77

procedures where he worked and also acknowledged he had been threatened by a disgruntled employee before. Tr. R. Vol. VI at 1299-1300. He also stated that he did not think his associations would prevent him from being fair and that he would not give favor to the State's evidence. Tr. R. Vol. V at 1068. McDonner's longest answer came in response to the question about whether he had formed an opinion about Wessinger's guilt or innocence through the pretrial media coverage: "No sir, not really, just basically you go to work the next day and you start taking, you know, you just think this could happen here, you know. So you start locking things and making sure everybody is happy." *Id*. at 1300. While it might have been advisable to find out more about McDonner, the record does not indicate that he was actually impartial, it was not unreasonable for the state court to find no violation of *Wainwright* and *Dowd*.

Wessinger also points to the voir dire of Juror Daniel as problematic. When asked her opinion of a defendant who chooses not to testify, she responded, "I think in all honesty I would wonder why, you know, I don't know that much about the courts and how they operate, but I would wonder why that person would not, if there was something to be hidden, not to be questioned about." Tr. R. Vol. VI at 1483. After the court instructed her on the law, she said she would not hold his silence against him. (*Id*. at 1488). Defense Counsel Rome tried to ask her how it would make her feel if the defendant chose not to take the stand. The trial court sustained the State's objection to this. During a

bench conference on this objection, the prosecutor said the question was not allowed "because there's a case that says you can't do it."  *Id*. at 1487-88. Wessinger faults Rome for not pressing this point further.  (Doc. 120 at 186-187). However, after reviewing the full transcript, the Court finds Rome rigorously pursued this line of questioning, abandoning it only after the trial court twice sustained the State's objections—the second coming immediately after the "because there's a case" argument.  His performance was not deficient.

Likewise, for three of the remaining jurors, the Court finds trial counsels' performance was not defective during voir dire.  Although juror Hotard was a witness in another case in the same judicial district and had a "good friend" who worked for the district attorney's office, allowing him to sit on the jury does not rise to the level of defective performance.  *Brooks v. Dretke* is inapposite as in that case, the juror had criminal charges pending at the time: in no way could it be said Hotard's fate was in the district attorney's hands, as the Fifth Circuit held was the case in *Dretke*.  418 F.3d 430, 435 (5th Cir. 2005).  The failure to challenge Hemba, who said when she initially heard the news of Wessinger's arrest recalled thinking he must be guilty, is not defective.  She stated she recalled thinking he must be guilty at the time of his arrest.  She also stated that, "that was a long time ago."[17]  Tr. R. Vol. VI at 1404-1405.  As for Motichek, the fact that she was a waitress at a nearby restaurant does not, in and of itself,

---

[17] In his brief, Wessinger left out this part of Ms. Hemba's answer. The Court advises counsel to provide the entire answer when block–quoting questions and answers in the future.

disqualify her from service.  Based on the entirety of her voir dire colloquy, it was not unreasonable for the state court to find counsels' performance effective regarding her selection.

The voir dire of juror Waguespack is the only one the approaches ineffective assistance. Under questioning from the State, Waguespack said she thought she could return a verdict of death.  Tr. R. Vol. VII at 1694.  When pressed, she said, "Well, I think it's hard to be the one to say to put this person, you know, to die."  *Id*.

> But then again, if all the evidence proves that he's definitely guilty I just feel like the system today so many people are sent for a life sentence and they eventually get off on parole or come up for parole and then they get out or something.  And I just feel like if they're there and its been proven that they're guilty and that they did do the crime then they should be put to death.

*Id*. at 1694-96.   While Waguespack's first answer seems to indicate a hesitance to vote for the death penalty, Wessinger claims her second answer indicates a predisposition to imposing it.  (Doc. 120 at 188-89).  She then replied in the affirmative twice when asked if she could in fact return a verdict of death. Tr. R. Vol. VII at 1695.   On questioning by the defense, Waguespack was asked if she could return a not guilty verdict if the State did not prove its case.  "Well, if it was proven that he's not guilty," was her reply.  (*Id*. at 1697).   After it was explained to her that the burden was on the State to prove Wessinger guilty—not the other way around—Waguespack said she understood.  Then, she was asked to answer the question again:

A: Would I have any problem with a not guilty if [the State] didn't prove it is what you're asking me?

Q: Yes, that's right.

A: I guess, no.

Q: You guess?

A: No.

Tr. R. at 1696-97. The defense attorney moved on to the other prospective juror being questioned with Waguespack. Later, defense counsel returned to Waguespack and clarified that a sentence of life in prison would not carry the possibility of parole. She said she understood that. (*Id*. at 1704).

While the Court is certain that more questions could have been asked Waguespack on this topic, this is not a forum to second guess trial counsel's performance during jury selection. The Court finds this does not fall below an objective standard of reasonableness. The attorneys addressed the concerns that were raised by Waguespack, a registered nurse, and were apparently satisfied with her responses. It is possible that they thought that, after clearing up her misunderstanding of the law regarding parole, her initial hesitance to impose the death penalty would prevail. It did not, but this does not fall below the objective standard for reasonableness.

Wessinger also claims trial counsel was ineffective for failing to litigate the manner in which the State used its peremptory strikes. (Doc. 120 at 193).

63

Specifically, he asserts the State used them to discriminate against black jurors. There were three black prospective jurors. The record shows that the state used three of its 12 allotted strikes. Two of those three were used on black jurors. The defense struck the third black juror. The defense did not make a Batson challenge to any of the State's strikes. Wessinger presents some statistics to back his assertion that it is virtually impossible to have an all-white jury in a parish with a population that is one-third black. (Doc. 120 at 193-94). He provides no source for these statistics. He then string cites cases showing it is ineffective not to challenge where one group is almost absent from the jury. Wessinger seems to ask the Court to declare counsel ineffective simply because there were no black jurors. He contends that the state court's decision, as it did not provide reasons, is not entitled to deference and should be reviewed de novo. *Richter* clearly negates this argument. Thereafter, Wessinger cites no Supreme Court case who's holding is directly violated by the state court's ruling that failing to challenge excusal of the majority of a small number of minority jurors is ineffective assistance where the defense itself struck members of that same minority. Therefore, this claim fails under § 2254(d)(1).

Based on the state court record, the Court finds the state court did not unreasonably apply the federal law or make unreasonable factual determinations relating to Wessinger's voir dire claims.

### B. Guilt Phase

Wessinger next claims counsel was ineffective during the guilt phase of his trial. (Doc. 120 at 196-216). He lists sixteen (16) specific complaints, many of which are also discussed as alternative grounds of relief in other claims above. The State contends none of these complaints amount to defective performance and further that Wessinger can show no prejudice even if they were. (Doc. 129 at 140-150). The Court agrees with and adopts and incorporates the State's argument, finding that the overwhelming evidence against Wessinger argues against a finding of unreasonableness by the state courts, especially under this "doubly deferential" review. *Pinholster*, 131 S.Ct. at 1403. The Court agrees with the state that the record either clearly belies Wessinger's claims or indicates a "virtually unchallengeable" strategic decision by trial counsel. *Strickland*, 466 U.S. at 690-91. Relief is denied on this claim.

## C. Penalty Phase

Wessinger also alleges trial counsel was ineffective during the penalty phase of his trial. (Doc. 120 at 232). The main thrust of this argument is that trial counsel did not adequately investigate or present mitigating evidence to the jury. As the state court record shows otherwise, relief on this claim is denied.

At the penalty phase, defense counsel put on seventeen witnesses in mitigation. They included Wessinger's former employers, the mothers of his children, his brother, a preacher, his sister, his aunt, a cousin, a psychologist, a psychiatrist, a commutation expert, and a friend. The testimony of these

65

witnesses painted a picture of Wessinger as a caring and present father, a brother who cared for his handicapped sister growing up, and a hard worker from a stable family. Testimony also revealed Wessinger had a drinking problem and that he was "a totally different person" when drinking. Tr. R. Vol. IX at 2132. None of the friends or family members could believe he had committed the crime. The expert testimony revealed Wessinger had an I.Q. of 90, placing him in the 25th percentile. Both mental experts testified that in a controlled environment such as prison Wessinger was not a danger to others; Dr. Cenac testified Wessinger would be a "model prisoner" in Angola. (*Id*. at 2180).

Wessinger faults trial counsel for not investigating further into his childhood and upbringing, which he claims would have led to evidence of a physically and mentally abusive childhood, possible mental defects, and an alienation from society that led him to feel he did not belong. (Doc. 120 at 232-256). This is little more than a narrative of Wessinger's life. Further, it is contradicted by the witnesses called by the defense, who testified as discussed above. Wessinger points to no documentary evidence his attorneys overlooked that would have led a reasonable attorney to investigate further. Further, the cases Wessinger cites to bolster his claim are inapposite.[18] In short, it is not the quality or thoroughness

---

[18] *Rompilla v. Beard* dealt with failure to investigate records of prior convictions that counsel knew would be used as aggravating factors. 125 S.Ct. 2456 (2005). No such prior convictions were used here, nor are there any records at all the counsel should have but did not investigate. In *Wiggins v. Smith*, the Supreme Court found it unreasonable for trial counsel not to further investigate their client's background where a prior pre-sentence report indicated misery in his youth and foster care placements. 539 U.S. 510 (2003). Here, no such prior knowledge is alleged or evidenced. Finally, in *Williams v. Taylor*, the Court found counsel's failure to uncover

of the investigation Wessinger is attacking, he essentially does not like the way his story was spun for the jury.  This is not ineffective assistance.

Wessinger also faults his attorneys for failing to prepare his mental health expert witnesses.  As noted by the state, he does not say what this additional preparation would have yielded.  Additionally, the Court finds the record indicates this was a strategy on the part of the defense team.  Mr. Hecker asked both Dr. Rostow and Dr. Cenac if they had had any prior conversations about the questions they were to be asked on the stand.  Tr. R. at 2147, 2174.  Rather than failure to prepare, the Court finds the record shows the defense was using this to show the jury they had not scripted the testimony in an attempt to make it seem a totally impartial opinion.  This seems to have backfired, and while Wessinger is correct that some of the most damaging testimony came from Dr. Cenac, who testified that Wessinger had confessed to the killings to him and also classified contradictory stories told by Wessinger as lies, that is one peril of that strategy.

Overall, defense counsel seems to have bet heavily on a strategy of painting Wessinger as a good person who suffered from alcoholism and was not his normal self when he committed the murders and that a life sentence would not endanger the lives of other inmates.  Defense put on multiple witnesses to that effect and painted a compelling picture.   The fact that the jury rejected this

voluminous mitigating evidence ineffective.  529 U.S. 362 (2000). Here, mitigating evidence was uncovered. Wessinger now contends it was not interpreted correctly by counsel.

67

theory does not make counsel ineffective.  Thus, the state courts' application of *Strickland* was not unreasonable.

### D. Incorrect Jury Instructions During the Guilt Phase

Wessinger claims that his defense counsel was ineffective in failing to object to erroneous jury instructions. Specifically, he claims that trial counsel failed to object to (1) an instruction that witnesses are presumed to tell the truth; (2) the disjunctive wording of the instructions; (3) the instruction on the "reasonable doubt" standard; (4) an instruction that the jury had a duty to convict; and (5) the instruction on flight evidence. (Doc. 120 at 223). The State did not brief this issue.  It is unclear from the briefs if the claim was adjudicated at the state court level.  The Court will assume it was adjudicated.  As the Court finds the instructions given were not erroneous, it does not need to evaluate counsel's performance using *Strickland*.

In a federal habeas corpus review context, the standard for reviewing jury instructions is "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citation omitted).  In other words, the primary question for the Court is whether the instruction itself "so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72; *see also Donnelly v. DeChrisoforo*, 416 U.S. 637, 643 ("It must be established not merely that the instruction is undesirable, erroneous, or even 'universally

condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment.").

The first instruction Wessinger finds fault with concerns the presumption of truth given to every witness. (Doc. 120 at 223). The trial court gave the following instruction:

> Although under the law, it is presumed that every witness has told the truth, that presumption is rebuttable and if you believe that any witness has deliberately testified falsely to you, or attempted to mislead you on a material fact at issue in this, you have the right to disregard what that witness has told you, to disbelieve it, and to reject any part of or the entire testimony of that witness, as untrustworthy of belief and as proving nothing. You can accept as true or reject as false, any part of or all of the testimony of a witness, depending on whether or not you believed it to be true or not.

Tr. R. Vol. IX at 2066.

The Fifth Circuit has stated instead that while it disapproves of such an instruction, it does not amount to reversible error. *Knapp v. United States*, 316 F.2d 794, 795 (5th Cir. 1963). While this Court also disapproves of this instruction, it finds the last sentence especially negates any harmful affect: the judge specifically instructed the jury that they could reject any or all of any witnesses testimony if they did not believe it. Therefore it is unlikely that the instruction, on its own, so infected the entire trail such that the conviction violates due process.

The next instruction error Wessinger alleges is that trial counsel was ineffective in failing to object to instructions delivered in the disjunctive. (Doc. 120 at 226). In this regard, the instructions delivered to the jury stated that in order to find the defendant guilty, the jury must find that the defendant had the specific intent to kill or inflict great bodily harm in the process of perpetrating or attempting to perpetrate an aggravated burglary *or* armed robbery. Tr. R. Vol. IX at 2070. He complains that because there is evidence his entry into the restaurant was authorized, the evidence did not support one of the disjunctive theories and therefore the instruction was improper.

The Supreme Court has held that where a conviction was obtained by a general verdict where one possible basis for a finding of guilt was legally or constitutionally invalid, the conviction cannot stand. See *Stromberg v. California*, 283 U.S. 359 (1931); *Yates v. United States*, 354 U.S. 298 (1957). However, the Court has specifically refused to extend this general rule to cases in which a general verdict is rendered but one of the possible theories of conviction is "merely" unsupported by sufficient evidence. *Griffin v. United States*, 502 U.S. 46, 56 (1991). Even if Wessinger's contention that he did not enter the premises without authorization is valid, it is specifically foreclosed by Griffin. Relief on this claim is denied.

The next jury instruction error Wessinger alleges is that the trial court lessened the state's burden of proof by giving a dubious instruction on

70

reasonable doubt. (Doc. 120 at 228). Wessinger claims that the following instruction was erroneous:

> Reasonable doubt is a doubt based on reason and common sense, and is present, when, after you have carefully considered all of the evidence, you cannot say that you are convinced of the truth of the charge. A reasonable doubt is not a mere slight misgiving or a possible doubt. You may say it is self-defining; it's a doubt that a reasonable person could entertain; it's a sensible doubt.

Tr. R. Vol. IX at 2064. Without explaining how, Wessinger claims the instruction was flawed and the failure to object by trial counsel weakened the burden of proof the jury employed.

The Supreme Court has held that certain reasonable doubt instructions are unconstitutional. *Cage v. Louisiana*, 498 U.S. 39, 40 (1990), *overruled on other grounds.* Specifically, both the Supreme Court and the Louisiana Supreme Court have found the following instruction unconstitutionally limiting a defendant's right to due process:

> This doubt, however, must be a reasonable one; that is one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture. *It must be such doubt as would give rise to a grave uncertainty*, raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. *It is an actual substantial doubt*. It is a doubt that a reasonable man can seriously entertain. What is required s not an absolute or mathematical certainty but a *moral certainty*.

*Id.* (emphasis in original); see also *State v. Smith*, 600 So. 2d 1319, 1325 (La. 1992). Although there is some overlap between the two instructions, specifically that a reasonable doubt is not a possible doubt, it is the "grave uncertainty" and "actual substantial doubt" and "moral certainty" that the Supreme Court found offensive. None of that offensive language is present in the disputed instruction and the Court finds the phrase, "it's a doubt that a reasonable person could entertain; it's a sensible doubt" does not create a higher burden of proof. Relief is denied on this claim.

The next jury instruction error Wessinger alleges is that the jury was erroneously told that it had a duty to convict Wessinger. (Doc. 120 at 228). Wessinger charges that the following instruction violated his constitutional right to due process and a trial by jury: "If after you have deliberated you are convinced that the state has proven beyond a reasonable doubt that the defendant is guilty of first degree murder, your verdict should be guilty." (Trial Tr. at 2074). While this Court has found case law indicating it is improper for a *prosecutor* to suggest that a jury has a civic duty to convict, it can find no case law establishing that jury instructions directing the jury to convict if it is convinced that the state has proven the defendant is guilty beyond a reasonable doubt are erroneous. Further, the petitioner himself has not cited any Supreme Court law in support of this proposition. Therefore, the this claim does not meet the requirements of § 2254(d)(1) and is denied.

72

Finally, Wessinger objects to the flight instruction given by the trial court. (Doc. 120 at 229). The instruction at issue states:

> "If you find that the defendant fled immediately after a crime was committed or after he was accused of a crime, the flight alone is not sufficient to prove that the defendant is guilty. However, flight may be considered along with other evidence. You must decide whether such flight was due to consciousness of the guilt or to other reasons unrelated to guilt."

(Tr. R. Vol. IX at 2067-68).

Specifically, Wessinger argues that flight instructions are, in general, "frowned upon" and that the flight instruction in this case unconstitutionally shifted the burden from the prosecutor to Wessinger to explain why he fled. (Doc. 120 at 229). The Fifth Circuit has held that the inherent unreliability of evidence of flight makes flight instruction improper unless the evidence supports it. *United States v. Myers*, 550 F.2d 1036 (5th Cir. 1977). That is, a flight instruction is proper where evidence supports the reasonable inference that the defendant fled. *Id.*; see also *Wong Sun v. United States*, 371 U.S. 471, 484 (1963). In this case, the defendant hasn't argued that the evidence didn't support the fact that he fled (in fact, a review of the evidence supports a finding that he did leave the state immediately after the crime occurred), but rather that the flight instruction was improper. The Court can find no case law, however, to support the proposition that a flight instruction is per se improper. The Court finds this claim to be without merit.

### E. Obtaining a Complete Transcript

Wessinger claims that trial counsel was ineffective for failing to obtain a complete transcript of the proceedings. (Doc. 120 at 305-307). He argues that trial counsel's motion to withdraw was dealt with in Chambers. The transcript discloses that the motion was decided and that trial counsel asked if he should put anything on the record, in which the court replied, "no." Tr. R. Vol. IV at 827-28. Additionally, there are references to other conferences held in chambers in the record, but no discussion of what was said in the transcript. *Id*. at 897, 988, 991. There are off the record discussions throughout the trial and there is no record of what was said during these discussions or any reference to what these discussions were about. *Id*. at 926, 934, 973. In addition, when new counsel was appointed for Wessinger, all parties agreed that the trial date would have to be continued and a status conference was set, however, nothing was transcribed.

The State does not address this particular claim. Assuming the issue was litigated at the state court level, the claim will be analyzed under § 2254(d)(1) for unreasonable application of federal law.

The law as interpreted by the Supreme Court states that a defendant "has a right to a record on appeal which includes a complete transcript of the proceedings at trial." *Hardy v. United States*, 375 U.S. 277 (1964). Meetings and conferences in chambers are not proceedings at trial. Likewise, off the record conversations are not proceedings at trial. Therefore, Wessinger has no

74

complaint that they were not transcribed, much less that it was his counsel's fault.

## CLAIM XII: CUMULATIVE ERROR

In his final claim, Wessinger contends the errors that occurred at trial, when considered together, necessitate a new trial or sentencing phase.

Federal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and, (3) the errors so infected the entire trial that the resulting conviction violates due process. *Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir. 1995). The cumulative error doctrine provides relief only when the constitutional errors committed in the state trial court so fatally infected the trial that they violated the trial's fundamental fairness. *Spence v. Johnson*, 80 F.3d 989, 1000 (5th Cir. 1996). In order to satisfy the cumulative error rule in the Fifth Circuit, a federal habeas petitioner must show that (1) the state trial court actually committed errors, (2) the errors are not procedurally barred, (3) the errors rise to the level of constitutional deprivations, and (4) the record as a whole reveals that an unfair trial resulted from the errors. *Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992).

75

For the reasons explained in claims one through eleven, the Court finds that any errors that occurred at trial do not meet the *Derden* test. Relief on this claim is denied.

## CONCLUSION

For the reasons discussed above, Wessinger's petition for writ of habeas corpus (Doc. 120) is DENIED.

Signed in Baton Rouge, Louisiana, on February 22, 2012.

_____
**JUDGE JAMES J. BRADY**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

77