**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

**TODD KELVIN WESSINGER,**
**Petitioner,**

**v.**

**BURL CAIN, Warden,**
**Louisiana State Penitentiary,**
**Angola, Louisiana,**
**Respondent.**

**CIVIL ACTION No. 04CV637-JJB-SCR**

**THIS IS A DEATH PENALTY CASE WITH AN EXECUTION DATE OF MAY 9, 2012**

**MR. WESSINGER'S MEMORANDUM IN SUPPORT OF MOTION TO ALTER OR AMEND JUDGMENT DENYING PETITION FOR WRIT OF HABEAS CORPUS WITHOUT A HEARING**

NOW INTO COURT, through undersigned counsel, comes TODD KELVIN WESSINGER, who moves this Court, pursuant to Federal Rules of Civil Procedure Rule 59(e), to alter or amend its judgment denying his petition for a writ of habeas corpus without an evidentiary hearing. In support, Mr. Wessinger submits the following memorandum.

## I. BECAUSE THE COURT MISUNDERSTOOD THE STATE POST-CONVICTION COURT'S DETERMINATION, THE COURT ERRED IN ITS APPLICATION OF 28 U.S.C. § 2254.

### A. This Court Misunderstood The State Court Process

All of Mr. Wessinger's claims in post-conviction relief were dismissed. The state court never reached a review on the merits of Mr. Wessinger's claims as set forth in the LOUISIANA CODE OF CRIMINAL PROCEDURE.

In Louisiana, the process for post-conviction relief begins with the filing of a petition for post-conviction relief. The petition must allege, along with other required information, a "statement of the grounds upon which relief is sought, specifying with reasonable particularity the factual basis for such relief LA. C. CR. P. ART. 926B(3). "Inexcusable failure of the petitioner

to comply with the provisions of this Article may be the basis for dismissal of his application." LA. C. CR. P. ART. 926E.

Upon receipt of the petition, the state court judge must first determine whether claims may be dismissed without an answer from the State, "if the application fails to allege a claim which, if established would entitle the petitioner to relief." LA. C. CR. P. ART. 928. If the judge finds that the petition alleges facts that if true would entitle the petitioner to relief, the court **shall** "order . . . the district attorney . . . to file any procedural objections he may have, or an answer on the merits if there are no procedural objections" LA. C. CR. P. ART. 927A. The state court in making such an order will dismiss "any claim which, if established as alleged, would not entitle the petitioner to relief, and shall order a response only as to such claim or claims which, if established as alleged, would entitle the petitioner to relief." LA. C. CR. P. ART. 927B. In Mr. Wessinger's case the state was never ordered to respond.[1]

If the judge identifies claims that state facts, which if true, could lead to relief, and the state has raised procedural defenses and/or answered on the merits, the court may grant or deny those claims that "can be resolved based upon the application and answer, and supporting documents." LA. C. CR. P. ART. 929A. The court shall hold evidentiary hearings on claims that involve "questions of fact which cannot properly be resolved pursuant to Articles 928 and 929" then the court shall order an "evidentiary hearing for the taking of testimony or other evidence" LA. C. CR. P. ART. 930.

[1] Although the state, *sua sponte*, filed an answer to Mr. Wessinger's initial petition, the judge never ordered it to do so. At the status conference of September 4, 2003, the state court commented that "the state has filed a response . . . I don't know if I actually ordered the state to respond to anything yet. I don't think I have." Status Conference on Postconviction, September 4, 2003, p. 3. The state never responded to the amended petition. As such, this is not determinative of whether the judge found Mr. Wessinger's claims sufficient to survive dismissal on the pleadings.

The state district court in Mr. Wessinger's case never proceeded beyond a dismissal on the pleadings under LA. C. CR. P. ART. 926B(3) and 928. The judge issued no order, as required, indicating that he found allegations which, if true, would provide the basis for relief. He did not even issue a written judgment but rather simply ruled from the bench, musing about the claims that spanned three petitions, over 200 pages, and incorporated hundreds of pages of exhibits. His treatment of the petition, however, clearly reveals that he was dismissing claims upon the pleadings. *See e.g.* Status Conference on Postconviction, September 4, 2003 p.13 ("And that's not ineffective assistance of counsel. And based on what you've said in the petition, I don't think any further hearing is necessary on that, and that will be dismissed."); p.19 ("Well the problem is the defendant does have an obligation to make specific allegations and I think your allegation is very vague."); p.27 (". . . the petition doesn't allege any specific facts that would indicate that, so that will also be dismissed.").

The state court Commissioner's Preliminary Report also underscores the fact that the state judge was reviewing claims for dismissal upon the pleadings. After reviewing the first petition, the Commissioner recommended relying on LA. C. CR. P. ART. 926B(3) and 926E to dismiss for "failure to factually support a claim." Doc. No. 120, Exhibit M, p.2. Shortly before the status conference, the Commissioner reviewed the *Second Amended Petition for Post Conviction Relief* and provided a memo to the state court judge. That memo notes that the court was assuming the facts, as alleged, to be true and makes clear that the court was reviewing the case to determine if the claims alleged, if proven, would support relief—the standard for dismissal upon the pleadings pursuant to LA. C. CR. P. ART. 928.

All of the claims raised in the *First Amended Petition* were recommended for dismissal under Articles 926, 928, 930.3, and 930.4. For many of the claims the Commissioner's Preliminary Report was the one and only time these claims were mentioned. The Judicial Commissioner wrote in her memo on the *Second Amended Petition* that "I have only listed the issues that I feel may now (based on additional facts in the amended petition) warrant a hearing. . . . Otherwise, I maintain that the facts added by the supplement do not change my opinion that a hearing is warranted." *Wessinger –Amended Petition Memo*. The state court then never addressed these claims in the status conference on September 4, 2003. As the state court is silent on several claims, and the Commissioner does address them, this Court must look through to the Commissioner's comments.[2]

Numerous claims were raised in the *Second Amended Petition* with additional factual support provided that are never addressed in the supplemental Commissioner's report. As stated above the Commissioner explicitly incorporated her first report into her supplement, unless she

---

[2] This category of claims includes: Cumulative error; Ineffective assistance of counsel (IAC) for not being qualified to litigate a capital case; IAC for failing to develop a meaningful relationship with his client; IAC for failing to get adequate funds for experts and investigation; IAC for failing to investigate guilt, mental state, possible lesser included; IAC for failing to have a fact investigator; IAC for failure to ensure that sufficiently familiar with the law; IAC for failure to move for a continuance; IAC for failure to litigate discovery in a meaningful manner; IAC for failure to move for the suppression of all evidence prior to trial; IAC for failure to adequately litigate pretrial writ on jury pool selection and discrimination; IAC for failure to vigorously pursue plea negotiations; IAC for failure to object to inadmissible expert evidence; IAC for failure to challenge erroneous or questionable results by state's experts; IAC for failure to object to inadmissible questions and evidence presented by the state; IAC for failure to object to improper closing remarks; IAC for opening the door to prejudicial evidence; IAC for failure to subpoena witnesses crucial to the defense; IAC for failure to pursue discovery of exculpatory evidence; IAC for misadvising client about taking the stand; IAC for inadequate closing argument; IAC for failure to challenge sufficiency of state's evidence; IAC for failure to challenge jury instructions during the culpability phase; IAC for not being qualified to handle the penalty phase; IAC for failure to object to prosecutor's misconduct during penalty phase; IAC for failure to present meaningful closing argument at penalty phase; IAC for failing to tell the client he could testify at penalty phase; IAC for failure to object to incorrect jury instructions during penalty phase; IAC for failure to secure adequate *voir dire* conditions; IAC for alienating the jury during *voir dire*; IAC for failure to prevent improper cause challenges and for failure to rehabilitate jurors to prevent successful cause challenges; IAC for failure to prevent *Batson* violation; IAC for failure to challenge discrimination in selection of grand jury foreperson; IAC for failure to make motion for new trial; IAC for creating a conflict of interest; IAC of appellate counsel; IAC of post-conviction counsel; *Brady* violation with evidence that goes toward mitigation; juror misconduct.

noted otherwise. These claims, therefore, remain dismissed under Articles 926, 928, 930.3, and 930.4 from the first recommendation.[3]

This Court mistakenly believed that Mr. Wessinger's claims in his *Second Amended Petition* were denied on the merits under LA. C. CR. P. ART. 929, when in truth they were dismissed under LA. C. CR. P. ART. 928 for failing to allege a claim, which, if established, would entitle Mr. Wessinger to relief.

### B. Because Of The Misunderstanding, This Court Answered The Wrong Question.

The effect of this Court's misunderstanding is that it identified the correct standard but applied it to the wrong issue. Although a state court's dismissal is an adjudication for the purposes of 28 U.S.C. § 2254(d), the dismissal poses a different federal question for this Court than a denial on the merits.

Instead of asking whether the state court's denial of each claim on the merits was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or…resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(1) and (2), this Court should have asked whether the state court's **dismissal** of Mr. Wessinger's claims under LA. C. CR. P. ART. 926 and 928 was unreasonable in light of 28 U.S.C. § 2254(d)(1) or (2).[4]

[3] This category of claims includes: IAC for failure to investigate and find witnesses who could have testified for the defense; IAC for failure to investigate evidence to impeach the state's witnesses; IAC for failure to file pretrial motions; IAC for failure to present a meaningful opening statement; IAC for failure to introduce and argue forensics report; IAC for ineffectively preparing own defense witnesses; IAC for failure to investigate circumstances around photo lineup ID; IAC for failure to conduct mitigation investigation; IAC for failure to present significant mitigation information; IAC for failure to present meaningful opening statement at penalty phase; IAC for failure to use peremptory challenges.

[4] See e.g. *Rivera v. Quarterman*, 505 F.3d 349 (5th Cir. 2007) (finding 2254(d) satisfied because state court's decision dismissing for failure to state claim was unreasonable).

Stated plainly: the decision this Court should have reviewed through the lens of § 2254(d) was whether the state judge was reasonable in determining Mr. Wessinger failed to allege claims which, if true, would entitle him to relief. If Mr. Wessinger's petition sufficiently pled claims entitling him to relief, the state court decision was unreasonable, § 2254(d) is satisfied, and this Court should have reviewed his claims de novo. Because this Court erred in its analysis, it should reopen Mr. Wessinger's case to properly make this determination.[5]

**C. The State Court's Dismissal On The Pleadings Was Unreasonable**

Whether a federal claim was well-pleaded to the state court is itself a federal question, which this Court must answer.[6]

In *Herman v. Claudy*, 350 U.S. 166 (1956), the Supreme Court reversed the summary dismissal of a state habeas petition containing properly pleaded claims that petitioner's Federal Due Process rights were violated because his confession was coerced and he did not make a valid waiver of his right to counsel. 350 U.S. at 118. In remanding for a hearing, the Court stated:

> Our prior decisions have established that . . . where a denial of these constitutional protections is alleged in an appropriate proceeding by factual allegations not patently frivolous or false on a consideration of the whole record, the proceeding should not be summarily dismissed merely because a state prosecuting officer files an answer denying some or all of the allegations.

---

[5] Moreover, as the Fifth Circuit has recently held, *Pinholster* does not preclude this Court from holding an evidentiary hearing to determine whether alleged claims are in fact true. *See Morris v. Thaler*, 425 Fed.Appx. 415 (5th Cir. 2011) (finding an abuse of discretion where district court failed to hold hearing because "in this case a hearing is necessary not to evaluate the state court's decision, but to determine whether Morris's allegations are true.").

[6] See, e.g., *Carter v. Texas*, 177 U.S. 442, 447 (1900) ("[T]he question whether a right or privilege, claimed under the Constitution or laws of the United States was distinctly and sufficiently pleaded and brought to the notice of a state court, is itself a Federal question, in the decision of which this court, on writ of error, is not concluded by the view taken by the highest court of the state."); *Staub v. City of Baxley*, 355 U.S. 313, 318 (1958) ("'Whether a pleading sets up a sufficient right of action or defense, grounded on the Constitution or laws of the United States, is necessarily a question of federal law and, where a case coming from a state court presents that question, this court must determine for itself the sufficiency of the allegations displaying the right or defense, and is not concluded by the view taken of them by the state court.'") (quoting *First National Bank of Guthrie Center v. Anderson*, 269 U.S. 341, 346 (1926)). *See also, Davis v. Wechsler*, 263 U.S. 22, 24 (1923); *Schuylkill Trust Co. v. Pennsylvania*, 296 U.S. 113, 122-123 (1935); *Lovell v. City of Griffin*, 303 U.S. 444, 450 (1938).

*Id.* at 118-119; *Palmer v. Ashe*, 342 U.S. 134, 137-138 (1951) (reversing summary dismissal of state habeas petition and remanding for hearing; observing that the trial "record does not even inferentially deny petitioner's charge that the officers deceived him, nor does the record show an understanding plea of guilty from this petitioner, unless by a resort to speculation and surmise. The right to counsel is too valuable in our system to dilute it by such untrustworthy reasoning.").

Moreover, as a matter of federal law, a state court is not free to summarily dismiss a well-pleaded federal claim merely because the respondent's answer denies the allegations. In *Herman*, the Court specifically rejected this argument:

> The chief argument made by the State here in support of the [state] court's summary dismissal of the petition is this: 'Counsel for petitioner argues that since facts are alleged in the petition, a hearing must be held. Since our answer contradicted the allegations in the petition, the lower court was not required to grant a hearing. This contention was sustained by the Superior Court.' We cannot accept this argument. Under the allegations here petitioner is entitled to relief if he can prove his charges. He cannot be denied a hearing merely because the allegations of his petition were contradicted by the prosecuting officers.

350 U.S. at 123; *see also, Palmer*, 342 U.S. at 137. Instead, disputed material facts must be resolved through a fact-finding process.[7]

---

[7] See *Smith v. O'Grady*, 312 U.S. 329, 334 (1941) (reversing state court summary dismissal and remanding for a hearing where "[t]he state court erroneously decided that the petition stated no cause of action. If petitioner can prove his allegations the judgment upon which his imprisonment rests was rendered in violation of due process and cannot stand."); *Herman*, 350 U.S. at 120-121 (finding "the allegations in the petition and the answer reveal[] a sharp dispute as to the facts material to determining the constitutional questions involved . . . the very kind of dispute which should be decided only after a hearing."); *McNeal v. Culver*, 365 U.S. 109, 117 (1961) (reversing summary dismissal where "[o]n the present record it is not possible to determine [the] truth [of petitioner's allegations]. But the allegations themselves made it incumbent on the Florida court to grant petitioner a hearing and to determine what the true facts are."). Implicit in each of these principles is the requirement that the allegations in a well-pleaded complaint be taken as true for purposes of determining how to proceed. See *Pinholster*, 131 S.Ct. at 1402; see also, Smith, 312 U.S. at 331 ("[I]n denying the writ the Nebraska court necessarily held that petitioner's allegations – even if proven in their entirety – would not entitle him to habeas corpus, even if the petition showed a deprivation of federally protected rights."); *Ex parte Hawk*, 321 U.S. 114, 116 (1944) ("From our examination of the papers presented to us we cannot say that [petitioner] is not entitled to a hearing on these contentions."); *see also*, *Tompkins v. Missouri*, 323 U.S. 485 (1945); *House v. Mayo*, 324 U.S. 42 (1945).

The state court's dismissal of Mr. Wessinger's claims contained in his *Second Amended Petition* under LA. C. CR. P. ART. 928 was clearly an unreasonable determination in light of the evidence presented. To avoid dismissal under LA. C. CR. P. ART. 928 all Mr. Wessinger had to do was "allege a claim which, if established would entitle the petitioner to relief." A review of Mr. Wessinger's post-conviction pleadings shows that he did.

Even the state court Commissioner indicates that, "taking the facts asserted and the transcript references to be true" further factual development is necessary and the Commissioner "listed the issues that [she] feel[s] may now (based on the additional facts in the amended petition) warrant a hearing." Doc. No. 120, Exhibit N, p.1. In total the Wessinger –Amended Petition Memo recommends that five of the claims state facts that, if true would require relief,[8] and recommends further hearings. Doc. No. 120, Exhibit N.

Based on the pleadings before it, it was unreasonable for the state court to dismiss Mr. Wessinger's claims for failing to state a claim. Because this decision was unreasonable, 2254(d) was met and this Court should have held a hearing and reviewed Mr. Wessinger's claims *de novo*.

## II. THIS COURT MADE ADDITIONAL LEGAL AND FACTUAL ERRORS IN DENYING MR. WESSINGER'S CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL AT PENALTY PHASE & SHOULD REOPEN THE CASE TO ALLOW AN EVIDENTIARY HEARING FOR THE NECESSARY FACTUAL DEVELOPMENT

### A. This Court Erroneously Evaluated Mr. Wessinger's Claim XI, That Trial Counsel Provided Ineffective Assistance In The Penalty Phase, Under 2254(d)

[8] The claims being: (1) Ineffective assistance in the guilt phase for failing to object to Dr. Suarez's testimony; (2) Ineffective assistance of counsel with regards preparing for the testimony of Drs. Cenac and Rostow; (3) Ineffective assistance of counsel based on the personal problems faced by trial counsel, Mr. Hecker; (4) *Brady* violation as to "Hearn's" (this actually Randolph Harden) plea agreement, if the court finds the record to support that a deal was made, and the deal was not made known to trial counsel; (5) Ineffective assistance of counsel for failure to file a motion to quash the indictment due to racial and gender discrimination in the selection of a grand jury foreperson.

This Court determined that Mr. Wessinger's claim of ineffectiveness of trial counsel in the penalty phase was adjudicated on the merits in state court and therefore subject to review under 28 U.S.C. § 2254(d). Doc. No. 135, p.56. This Court then found the claim lacking in merit, without an evidentiary hearing, and applied AEDPA's doubly deferential standard. Because it is incorrect that the state court adjudicated the sentencing ineffectiveness claim, it was error for this court to apply AEDPA double deference and error to deny the claim without further factual development.

### 1. Mr. Wessinger's *Wiggins* Claim Was Not And Could Not Have Been Adjudicated In State Court Because the Claim Before This Court Was Never Presented To The State Court

The *Wiggins* claim Mr. Wessinger presented to this Court was fundamentally different than any claim presented to the state court and therefore should have been found to be unexhausted. Where a habeas petitioner presents material additional evidentiary support to the federal court that was not presented to the state court which fundamentally alters the claim, the claim is considered to be unexhausted and subject to a procedural default.[9] As discussed below, Mr. Wessinger's claim of ineffective assistance of counsel at penalty phase presented to this Court was so strikingly different from the claims raised in state court that it strains belief to suggest it was the same claim adjudicated by the state courts.

In the *First Amended Petition*, Mr. Gisleson outlined the meager mitigation investigation before his trial, "Counsel never hired a mitigation investigator, never obtained a single medical record, never hired a sociologist, only met with Mr. Wessinger twice before trial, did not investigate Mr. Wessinger's school record, and only engaged in investigation efforts for five months." *First Amended Petition*, p.93. At this time Mr. Wessinger's attorney, Mr. Gisleson,

[9] See *Joyner v. King*, 786 F.2d 1317; *Kunkle v. Dretke*, 352 F.3d 980; *Dowthitt v. Johnson*, 230 F.3d 733; *Brown v. Estelle*, 701 F.2d 494 (5th Cir.1983).

had done no more himself, he had conducted no investigation to allege any specific facts, he simple rattled off guesses at what *might* be out there and listed what trial counsel hadn't done.

By the *Second Amended Petition*, the claims regarding mitigation factors contain some information and focus. However, evidentiary support is confined to two affidavits: one of Daphne Walker and one of James Sullivan, both only addressing the deficiency prong of *Strickland*. Ms. Walker testified during the seventeen-witness merry-go-round of the defense's penalty phase presentation, and Mr. Sullivan was present when defense counsel stepped outside the courtroom on the day of penalty phase and "asked if anyone would testify." Affidavit of James Sullivan, 7-20-03. Mr. Gisleson, again, compiles a laundry of list of areas of mitigation that might have existed and were *completely* unexplored by trial counsel. *Second Amended Petition*, p.45-51.

In order to make an ineffective assistance of counsel claim under *Strickland*, Mr. Wessinger had to show how that deficient performance prejudiced him. Mr. Gisleson completely failed to investigate, develop and present the mitigation available at the time of Mr. Wesssinger's trial, thus leaving the claim unexhausted.

For the first time leading up to the federal habeas petition, Mr. Wessinger had constitutionally-mandated effective assistance of counsel in performing a complete mitigation investigation. This included gathering all available medical, school, institutional, psychological, employment, and other records for Mr. Wessinger, his children, his parents, and his grandparents. A team of mitigation specialists interviewed over fifty of Mr. Wessinger's family, friends, coworkers, employers, teachers, and childhood acquaintances. A team of experts,

including psychiatrists, doctors, and neuropsychologists analyzed Mr. Wessinger's records and, in some instances, performed evaluations.

In stark contrast to the eleven pages of generalities and two affidavits cited in the state post-conviction petition's section on ineffectiveness at penalty phase, the section in Mr. Wessinger's *Amended Petition for Habeas Corpus* on ineffectiveness of counsel at penalty phase takes up 74 pages. *Amended Petition for Habeas Corpus*, p.232-305.

A full discussion of the mitigation evidence investigated and developed in federal habeas is contained below, but with regards exhaustion, Mr. Wessinger provided material additional evidentiary support to, and/or raised the following sub claims for the first time in federal habeas:

**Neuropsychological Evaluation & Testing:** neuropsychological testing that shows that shows "signs of significant psychomotor impairment, right hemisphere abnormality that may implicate Mr. Wessinger's subjective experiences as well as academic performance, deficits associated with fetal alcohol spectrum disorder, and other signs of cerebral dysfunction." *Amended Petition for Habeas Corpus*, p.256. No neuropsychological testing was conducted prior to federal habeas and this issue was not raised in state post-conviction.

**Psychiatric Evaluation:** an evaluation in federal habeas showed that Mr. Wessinger suffers and "has since childhood suffered . . . from severe and debilitating mental impairments, including strong diagnostic indicators of mental retardation . . . [and] a cognitive disorder or developmental disability." Doc. 120, Exhibit, *Affidavit of Dr. Rahn Bailey, M.D.* No psychiatric evaluation was conducted before federal habeas and it was not raised in state post-conviction.

**Low Intellectual Functioning:** in addition to the psychiatric and neuropsychological evaluations, other material additional evidentiary support of Mr. Wessinger's low intellectual

functioning was raised in federal habeas for the first time. This includes school records and information from life witnesses to Mr. Wessinger's limitations in adaptive behavior deficits. Doc. 120, Exhibit, *Affidavit of Dr. Elizabeth Vartkessian.* Doc. 120, p.293.

**Isolation & Abuse:** Mr. Wessinger was on the receiving end of physical and emotional abuse from his father that was reserved for only him. This evidence has never been presented until federal habeas. Doc. 120, p.240.

While the information in Mr. Wessinger's *Second Amended Petition* was alleged by his attorney absent compensation or funding for auxiliary services, the biological, psychological, and social history and assessment in the *Amended Petition for Habeas Corpus* is the result of a comprehensive investigation conducted by a trained team of lawyers, mitigation specialists, doctors, and psychologists, and Mr. Wessinger's claim in his *Amended Petition for Habeas Corpus* of ineffective assistance of counsel during the penalty phase of his trial is "significantly different and stronger" than the one raised in his state post-conviction petitions. *Brown v. Estelle*, 701 F.2d at 496.

The evidence that Mr. Wessinger presented to this Court in federal habeas to support his ineffectiveness of trial counsel at penalty is additional and material to the evidence submitted in state court and this Court erred by deferring to a state court judgment issued without access to any of this material. Because the claim Mr. Wessinger presented to this Court was so fundamentally altered, this Court should have deemed it unexhausted and questioned whether Mr. Wessinger could show cause to overcome the procedural default. *See* Section B, supra,

**2. Even If This Court Were Correct In Applying 2254(d), It Was Error To Treat The State Dismissal As A Denial On The Merits.**

In the alternative, if this Court finds that Mr. Wessinger's ineffective assistance of counsel at penalty phase *was* exhausted in post-conviction proceedings, this Court, nevertheless, erred by treating the state court decision as a merits denial rather than a dismissal upon the pleadings under LA. C. CR. P. ART. 928 as discussed supra.

In response to the first state habeas petition, the Commissioner's Preliminary Report on Procedural Bars recommended dismissal without prejudice for the IAC at punishment claims, recognizing that though the petition lacked sufficient factual support pursuant to La. C.Cr.P. Art. 926, additional facts may change the calculus:

> Because the Defendant has not apparently obtained the records to support [allegations that Defendant suffered from convulsions and head trauma] either, dismissal without prejudice is appropriate to allow him to obtain evidence to show that there was substantial mitigating evidence available that was not produced. Until further facts are presented, this claim is not sufficiently supported to warrant any relief.

*Commissioner's Preliminary Report*, p.36.

Subsequent pro bono counsel amended the claim, pleading with more specificity and providing some additional records. He alleged IAC for failure to investigate and present evidence of head trauma and childhood seizures, turmoil over losing a child, turmoil over losing his father, substance abuse history, trauma from losing three best friends to murder, and disadvantaged childhood in a poor, crime-infested neighborhood in south east Baton Rouge. *Second Amended Petition*, p.43-49.

Mr. Wessinger also highlighted several of the seventeen character witnesses trial counsel shuffled on and off the stand, and the utter lack of adequate (or, at times, any) preparation or conversations they had with defense counsel prior to their testimony. *Second Amended Petition*,

p.39-41. He also specifically listed many of the problems with the "defense experts" who testified: Dr. Cenac and Dr. Rostow. Dr. Cenac, a defense expert, actually testified that his client was a liar and a very impulsive and dangerous person. *Second Amended Petition*, p.42. Dr. Rostow's testimony misstated and mischaracterized his own client's social history, borne out of only meeting with his client once. *Second Amended Petition*, p.42-43.

At the status hearing, the judge explicitly ruled on only a handful of these issues. It is clear, however, from those that he did discuss, that he was dismissing the claims upon the pleadings for failure to state a claim. *See e.g.* Status Conference on Postconviction dated September 4, 2003, Tr. 13 ("And that's not ineffective assistance of counsel. And **based on what you've said in the petition**, I don't think any further hearing is necessary on that, and that will be dismissed.") (emphasis added). This decision was unreasonable in light of the pleadings before the state court and this Court should have found that 2254(d) was satisfied.

Perusal of the Commissioner's recommendation demonstrates that even the judicial commissioner believed that Mr. Wessinger's pleading sufficiently presented claims which needed further factual development and some reliable fact-finding procedure. For example, the Commissioner recommended an evidentiary hearing on the claim that Drs. Cenac and Rostow were so inadequately and poorly prepared that their testimony hurt the defense:

> There is really no way to decide deficient conduct regarding whether Counsel knew or should have known what his witnesses would say or might say unless counsel is given the opportunity to explain his knowledge thereof prior to the testimony given. I think it goes without saying that you would not put a witness on if you had reason to know he would call your client a liar and a dangerous person.

Wessinger—Amended Petition Notes, p.2.

Commissioner Morgan's supplemental report also found the pleadings sufficient to mandate further factual development regarding IAC claim due to trial counsel's personal difficulties. The Commissioner believed that, if further fact development was allowed, it is possible trial counsel "would testify that his preparation was deficient in some particular manner." Wessinger—Amended Petition Notes, p.2.

Mr. Wessinger alleged IAC claims which, if established, would entitle him to relief. *See Strickland v. Washington*, 466 U.S. 668 (1984). The state court decision dismissing those claims for failing to allege a claim which would entitle him to relief, was clearly unreasonable and should have satisfied the strictures of 28 U.S.C. 2254(d) leaving this Court free to review the merits of Mr. Wessinger's claims de novo.[10]

Mr. Wessinger respectfully requests this Court reopen his case and review his *Wiggins* claim *de novo*. In the alternative, should this Court have questions about whether the state court dismissal was unreasonable, Mr. Wessinger requests that this Court reopen his case and conduct an evidentiary hearing on the issue as the Fifth Circuit demands.[11]

**B. Mr. Wessinger Can Overcome The Procedural Bar To His Unexhausted Ineffective Assistance Of Trial Counsel Claim**

As previously discussed, Mr. Wessinger's claim of ineffective assistance of trial counsel at penalty phase was unexhausted. Mr. Wessinger, however, can show cause to excuse that default in two ways: 1) Mr. Wessinger can demonstrate that that the default occurred because of the ineffective assistance of his state habeas counsel and 2) he can demonstrate that exhaustion should be excused because the state post-conviction proceedings during the period of time Mr.

[10] *See e.g. Rivera v. Quarterman*, 505 F.3d 349 (5th Cir. 2007) (finding 2254(d) satisfied because state court's decision dismissing for failure to state claim was unreasonable).
[11] *See Morris v. Thaler*, 425 Fed.Appx. 415 (5th Cir. 2011) (finding an abuse of discretion where district court failed to hold hearing because "in this case a hearing is necessary not to evaluate the state court's decision, but to determine whether Morris's allegations are true.").

Wessinger was in state court were so inadequate they rendered the process ineffective to protect his rights.

### 1. Mr. Wessinger's Claim Of Ineffectiveness of Trial Counsel At Penalty Phase Is Not Defaulted As Unexhausted Because Mr. Wessinger Can Show Cause And Prejudice Based On The Ineffectiveness Of Post-Conviction Counsel

Mr. Wessinger can show cause and prejudice to overcome the hurdle of exhaustion. The Supreme Court's decision in *Martinez v. Ryan*, 566 U.S. ___, 2012 WL 912950 (Mar. 20, 2012), makes clear that Mr. Wessinger has the required cause to raise his unexhausted ineffective assistance of trial counsel at penalty phase claim for the first time in federal habeas.

Prior to the decision in *Martinez*, in order to reach federal habeas review of an otherwise procedurally defaulted claim, the petitioner must establish "cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). *Martinez* created an exception in certain limited circumstances to the established *Coleman* limitation that "an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default." *Martinez*, 566 U.S. ___ (citing *Coleman*, 501 U.S. 722). The Court relied on principles of equity to hold: "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id.*

Under the first prong of the *Martinez* analysis the cause of Mr. Wessinger's failure to properly raise the ineffective assistance of counsel at penalty phase claims was the ineffective assistance of his post-conviction counsel for failing to conduct the investigation necessary. *Martinez* established that:

> [. . . a] prisoner may establish cause for a default of an ineffective-assistance claim in two circumstances. The first is where the state

> courts did not appoint counsel in the initial-review collateral proceeding for a claim of ineffective assistance at trial. The second is where appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.

*Id.* (citing *Miller–El v. Cockrell*, 537 U.S. 322 (2003) (describing standards for certificates of appealability to issue)). In Mr. Wessinger's case, the cause falls under the second *Martinez* circumstance. Mr. Wessinger's post-conviction counsel failed to properly raise the claim in his post-conviction petition that trial counsel provided ineffective assistance of counsel.

On March 16, 2001, Mr. Wessinger filed his first of many formal requests for funding. *Ex Parte Motion and Incorporated Memorandum on the Need for Investigative Funding in Order to File an Amended Petition for Post-Conviction Relief*. Mr. Wessinger laid out the general nature of the investigation and needed expertise and attached affidavits from seasoned investigators and counsel on the typical cost and scope of experts and investigative funding. *Id.* The trial court denied the funding.

On April 6, 2001, Mr. Wessinger moved the trial court to continue the deadline for filing an amended petition until the issue of funding could be properly decided. *Motion and Incorporated Memorandum to Continue April 10, 2001 Deadline for Filing Amended Petition and for Post Conviction Relief*. Mr. Wessinger again detailed the need and support for funding. Although the court granted an extension on filing the amended petition until June 2001, the court denied any and all requested funding.

On April 16, 2001, Mr. Wessinger filed a *Notice to Court of Funding Issues* in which his counsel informed the court that the Louisiana Indigent Assistance Board through Ed Greenlee, the Capital Post Conviction Project of Louisiana through Denise LeBoeuf, and the Baton Rouge Indigent Defense Board through Michael Mitchell all refused to provide any funding for any portion of the Mr. Wessinger post-conviction claims. *See Notice to Court of Funding Issues*, April 16, 2001, p.1.

On April 23, 2001, Mr. Wessinger submitted yet another pleading moving to continue the latest deadline for the hearing of his funding motion and articulating the need for funding:

> Unfortunately, Petitioner has been patently unable to secure the testimonial of necessary experts or provide experts with the time to review bare-boned facts and evidence of the case in order for them to determine (1) whether a particular expert's services would be needed in this case, (2) the extent of the necessary services that a particular expert would need to engage in, and (3) the cost of that service. At this time, Petitioner is attempting to solicit a sentencing phase investigator, a forensic pathologist, a crime scene technician, a ballistics expert, a sociologist, a psychiatrist, a psychologist, and additional guilt and sentencing phase investigative assistance. In fact, at this time, Petitioner has been unable to arrange for a single expert to appear or for any affidavits.

*Motion to Continue the April 24, 2001 Hearing and Motion for Reconsideration of the Denial of Proceedings Ex Parte*, April 23, 2001, p.1.

On June 5, 2001, Mr. Gisleson filed an *Ex Parte Motion to Withdraw as Counsel of Record* in the Louisiana Supreme Court, seeking to withdraw as counsel based on his failure to obtain funding, investigative assistance, time to prepare the claims, and litigation assistance.[12] *Ex Parte Motion to Withdraw as Counsel of Record*, p.2-4. In the motion, Mr. Gisleson represented as follows:

[12] The motion was filed in the state Supreme Court, as opposed to the state trial court, because Gisleson was appointed to represent Mr. Wessinger by the Supreme Court. *See Ex Parte Motion for Substitution of Counsel*, at 1 (12/18/00), attached to *Motion to Withdraw* (substituting Gisleson for Mr. Rice).

> He is unable to provide competent representation in post-conviction to Todd Kelvin Mr. Wessinger under the time and resource constraints, and his continued representation of Mr. Wessinger will be a breach of his ethical and professional duties to his client under Rule 1.1 of the Rules of Professional Conduct, ultimately resulting in ineffective assistance of counsel.

*Id.* p.1.

After detailing the specifics of the need for funding, the need for time, and the need for professional assistance, Mr. Gisleson tried to avoid just the argument that is being made herein:

> Above all, Mr. Wessinger's right to counsel and right to post-conviction itself would be violated if undersigned remained involved under the current litigation schedule. There is simply too much at stake to permit undersigned to conduct litigation under the circumstances. Without resources to fund investigation and hire experts, without additional time to conduct the investigation himself, and without assistance from additional counsel, Mr. Wessinger's right to counsel in post-conviction is violated. Further involvement by undersigned in this particular case would result in prolonged litigation of the standards, duties, rights, and responsibilities of capital post-conviction in Louisiana <u>before</u> even addressing the merits of Mr. Wessinger's claims from the trial court proceedings. With Mr. Wessinger's life as the "cost" of the litigation, there is no room to allow undersigned to continue representation in this manner.

*Id.* p.4 (emphasis in original).

On June 20, 2001, the Supreme Court denied the motion without explanation and without any kind of analysis.[13] *See June 20, 2001 letter from Supreme Court*.

At this point, it appeared that all avenues of relief were closed to Mr. Wessinger and his post-conviction counsel. The trial court had ordered that any and all amendments to the petition for post conviction were due on June 11, 2001. When Mr. Wessinger filed his *First Amended Petition for Post Conviction Relief*, all motions for funding had been denied, the latest motion to

[13] Then Chief Justice Pascal Caloger did mention in a one sentence statement in the letter that "counsel for petitioner may seek assistance of counsel of LADAB if he deems that advisable." *Id.* at 1.

continue the deadline to file any amendments had been denied, and Mr. Gisleson's motion to withdraw had also been denied.[14]

Mr. Wessinger's *First Amended Petition for Post Conviction Relief* raised an ineffective assistance of counsel claim against himself and Mr. Rice. The commissioner's report dated July 3, 2003, cited law, which while correct then, is now contrary to *Martinez,* which is newly existing Supreme Court precedent:

> "I am not sure of the relief he seeks in this claim, nor am I certain that the bedrock of all IAC claims—[the 6th Amendment right to counsel)—is even applicable to collateral proceedings such as this. The right to Counsel in a post conviction proceeding, [attacking the conviction). is purely a statutory right. It does not emanate from the Sixth Amendment of the Constitution, which is the basis for the right to "effective" counsel:
>
>> **"We have never held that prisoners have a constitutional right to counsel when mounting collateral attacks upon their** convictions, see *Johnson* v. Avery, 393 U.S. 483, 488, 89 S.Ct. 747,750,21 L.Ed.2d 718 [1969), and we decline to so hold today. **Our cases establish that the right to appointed counsel extends to the first appeal of right, and no further.** Thus, we have rejected suggestions that we establish a right to counsel on discretionary appeals. *Wainwright* v. *Torn* a, 455 U.S. 586, 102 S.C!. 1300, 71 L.Ed.2d 475 [1982); Ross v.*Moffitt,* 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 [1974). **We think that since a defendant has no federal constitutional right to counsel when pursuing a discretionary appeal on direct review of his conviction, a *fortiori,* he has no such right when attacking a conviction that has long since become final upon exhaustion of the appellate process,** See *Boyd* v. *Dutton,* 405 U.S. 1. 7, n. 2, 92 S.Ct. 759, 762, n. 2, 30 L.Ed.2d 755 (1972)".118 (emphasis mine)."

Commissioner's Preliminary Report dated July 3, 2003, p.45 (emphasis in original).

This failure constitutes ineffective assistance of counsel under the standard elaborated in *Strickland v. Washington*, 466 U.S. 668 (1984). Under the first prong of *Strickland*, "the

[14] Mr. Wessinger also contemporaneously filed a motion to continue the June 11, 2001 deadline for filing Amended Petition with his motion to withdraw. *See Ex Parte Motion and Order to Continue June 11, 2001 Deadline for Filing Amended Petition for Post-Conviction Relief Pending Motion to Withdraw Filed with the Supreme Court*

defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

By not investigating, discovering and presenting Mr. Wessinger's case in mitigation as outlined above at trial, Mr. Wessinger's trial counsel provided him with ineffective assistance. Compounding the problem, Mr. Wessinger's post-conviction counsel failed to properly investigate, discover and present his case in mitigation as outlined above in post-conviction pleadings. Simply listing what trial counsel did *not* do at trial does not even come close to meeting the requirements of *Strickland*; it makes him no more competent than trial counsel. Mr. Gisleson's petition does not cite to any medical records. It does not cite to any school records. It does not cite to any records of, or affidavits from, Mr. Wessinger's family members or life history witnesses. It does not cite to any reports by mental health professionals or other evaluators. Nor is there any indication that counsel investigated these areas. Simply listing claims without evidentiary support does not mean the claims were exhausted, and simply listing what trial counsel did not do at penalty phase is ineffective assistance of post-conviction counsel. Under *Martinez*, the failure of Mr. Wessinger's post-conviction counsel to properly raise these claims is sufficient cause to establish cause.

The second prong requires Mr. Wessinger show that the error "worked to his actual and substantial disadvantage." *U. S. v. Frady*, 456 U.S. 152, 170 (1982). The prejudice requirement is met by the strong mitigation case that has been developed and presented, albeit not fully as an evidentiary hearing not held, to this Court. The strength of Mr. Wessinger's claim and the errors that this Court made in reviewing it, are fully discussed below.

Because of the new law established under *Martinez*, Mr. Wessinger respectfully requests this Court reopen his case and order briefing or hearings to determine whether Mr. Wessinger's post-conviction counsel meets the cause and prejudice requirements for ineffective assistance of counsel. If Mr. Wessinger proves successful in said hearing, he then requests a separate hearing to determine whether his trial counsel was ineffective subject to a *de novo* review.

**2. Mr. Wessinger's *Wiggins* Claim Is Not Defaulted As Unexhausted Because Circumstances Existed That Rendered The State Corrective Process Ineffective To Protect The Rights Of The Applicant**

Although the *Wiggins* claim Mr. Wessinger presented to this Court was fundamentally different from that pled in state court, this Court should excuse Mr. Wessinger's lack of exhaustion because "circumstances exist[ed] that render[ed] [the state corrective process] ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(B)(ii). For a state to provide an effective process, the state remedies must be available to the petitioner at the time he files his federal petition, and the remedies must be meaningful in that the outcome is not preordained or otherwise futile.[15] One of the reasons for Mr. Wessinger's post conviction counsel's ineffectiveness is the lack of funding his counsel received for any type of experts, including mitigation specialists. As discussed supra, Mr. Gisleson, Mr. Wessinger's post-conviction counsel sought funding for experts in 2001 from numerous sources including the

[15] *Duckworth v. Serrano* 454 U.S. 1, 3 (1981) ("[E]xhaustion is not required if it would plainly be futile. 'An exception [to the exhaustion requirement] is made only if there is no opportunity to obtain redress in state court or if the corrective process is so clearly deficient as to render futile any effort to obtain relief.'") (quoting Graham *v. Johnson*, 94 F.3d 958, 969 (5th Cir. 1996)); see *Smith v. Estelle*, 562 F.2d 1006 (5th Cir. 1977); *Fay v. Noia*, 372 U.S. 391,399 (1963); *Galtieri v. Wainwright*, 582 F.2d 348 (5th Cir. 1978) (holding that exhaustion of state remedies ought not to be required when state procedural snarls or obstacles preclude effective state remedy); *Carter v. Estelle*, 677 F.2d 427, 445 (5th Cir. 1982) ("At very core of exhaustion doctrine as applied in habeas corpus cases is requirement that state procedures be adequate and effective."); *Morris v. Dretke*, 413 F.3d 484 (5th Cir. 2005) (holding that a procedural default of lack of exhaustion is overcome if the petitioner can show that failure to consider the claims will result in "a fundamental miscarriage of justice") (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).

Louisiana Indigent Defense Assistance Board, the Capital Post Conviction Project of Louisiana, and the Baton Rouge Indigent Defense Board. All denied him.

Every capital petitioner faced the same dearth of resources until finally a petitioner named Jimmie Ray Williams filed suit seeking funding of experts for petitioners with pro bono counsel. On December 1, 2004, the Louisiana Supreme Court ordered the trial court in Mr. Williams's case to conduct further evidentiary hearings on the funding matter. These proceedings resulted in a finding that "the Louisiana Indigent Defense Assistance Board (LIDAB) violated La. R.S. 14:151.2E2 and 15.151.2F" when it passed a resolution denying funding for expert witnesses to pro bono counsel. State of *Louisiana ex re. Williams v. State*, No. 07-94-0871 (Feb. 4, 2005). See attached Exhibit A. It also held that "to permit the State to proceed forward would be a **fundamentally unfair** proceeding at this time. The petitioner has a right to reasonable necessary funds to assist him for effective representation of his claims." *Id.* (emphasis added). A subsequent ruling on March 18, 2005, laid out a detailed timeline for the mandated creation of a separate fund by LIDAB to provide funding to pro bono counsel. See attached Exhibit B. These newly created funds were eventually made available to all pro bono counsel in Louisiana capital post-conviction cases beginning in August of 2006. Notably, Mr. Wessinger was unable to benefit from this protracted funding litigation, as the state district court had denied him post-conviction relief on September 4, 2003, nearly three years before this Williams funding litigation proved fruitful.

In post-conviction, Mr. Wessinger was one of 16 death row inmates in Louisiana denied post-conviction counsel due to lack of funding. However, because of the alacrity with which his case was proceeded, Mr. Wessinger was the sole capital petitioner who failed to receive the

benefit of state-mandated funds to develop claims and litigate in post-conviction. Mr. Wessinger was forced to proceed forward in what the Louisiana courts later recognized to be "a fundamentally unfair proceeding." Under such circumstances, this Court should reopen Mr. Wessinger's case and hold that the Louisiana state corrective process was ineffective to protect Mr. Wessinger's rights.

### C. This Court Incorrectly Characterized The Merits of Mr. Wessinger's Claim XI, That Trial Counsel Provided Ineffective Assistance In The Penalty Phase, And Relied Upon An Inaccurate Summary Of The Evidence Unsupported By The State Court Record

To the extent that this Court addressed the merits,[16] the judgment must be reopened due to errors of fact. This Court incorrectly found that Mr. Wessinger "points to no documentary evidence his attorneys overlooked that would have led a reasonable attorney to investigate further" and that his penalty phase claim did not attack the "quality or thoroughness of the investigation" but merely the way his "story was spun for the jury." Doc. No. 135, pp. 66-67. This is a clear factual error inconsistent with the record which must be revisited.

Mr. Wessinger attached nine affidavits to his *Amended Petition for Writ of Habeas Corpus* setting out a detailed life history that was never investigated or developed by trial counsel.[17]

In his petition, Mr. Wessinger was required only to allege and plead the claims for relief. When the petition was filed, on November 1, 2010, this Court had already scheduled an evidentiary hearing for May 16, 2011 to hear claims relying upon extraneous evidence, which

[16] "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2).

[17] Attached to Mr. Wessinger's *Amended Petition For Writ of Habeas Corpus*, were the following, regarding Mr. Wessinger's ineffective assistance of counsel claim: Affidavit of Dr. Rahn Bailey (07.15.05); Affidavit of Elizabeth Vartkessian (07.21.05); Affidavit of Horace Wessinger (03.28.03); Affidavit of John Williams (03.28.03); Affidavit of Joseph William P. Hecker (08.08.05); Affidavit of Mary Morgan (nee Wessinger) (03.28.03); Affidavit of Sherrlynn Wessinger (04.25.03); Affidavit of Sidney Trevillion (06.07.05); Expert Report of Dr. Louis Cenac; Magnolia Woods School Records - Todd Wessinger.

was later cancelled. Doc. No. 116 & 128. Mr. Wessinger relied upon the expectation that he would be given an opportunity to prove his claims by presenting lay witnesses, documentary evidence and experts, regarding his seizure disorder as a child, his multi-generational family history of intellectual disabilities, mental illness and congenital neurological disorders, his own neuropsychological deficits, the abuse he suffered at the hands of his father, his devastation at the deaths of his children and other aspects of his life history never developed by trial counsel, as well as experts regarding the standard of care for capital defense counsel and the impact of different types of evidence on capital, death-qualified jurors that was or should have been known to trial counsel. The petition set forth a detailed account of the evidence to be presented at an evidentiary hearing which tells a dramatically different story than that presented at trial.

At penalty phase, trial counsel generally painted a rosy picture of Mr. Wessinger as "a caring and present father, a brother who cared for his handicapped sister growing up, and a hard worker from a stable family." Doc. No. 135, p. 66. Because trial counsel had not hired a mitigation specialist nor conducted any independent life history investigation, the presentation was an incomplete and inaccurate view of Mr. Wessinger. It is not the case, as this court suggests, that trial counsel conducted the investigation and made strategic choices about what to present. The investigation was never conducted so no strategic decision could have been made.

The entire penalty phase of Mr. Wessinger's trial occurred on June 25, 1997, including the testimony of 12 life history witnesses (7 family, a teacher, a job placement staffer and 3 friends or acquaintances), 2 mental health experts, and 3 professionals who testified regarding his jail adaptation and the low probability of release on parole.

The testimony of the life history witnesses was brief and superficial. Counsel presented

the conclusions of these witnesses that Todd is a "hard worker" (TR. 2115, 2197), "courteous" (TR.2112, 2115), "normal" (TR.2114), "caring" (TR. 2137, 2169, 2195) and that he loved his children (TR. 2120), but failed to elicit the stories, examples and descriptions that would demonstrate these traits. The witnesses vouched for him rather than giving evidence about him.

These life history witnesses were never asked about the struggles Todd faced. His father's death was vaguely mentioned as having taken a toll, but with no description or explanation of what that meant or the impact of that trauma on his functioning and behavior. (TR. 2124, 2167, 2196)

Worse, counsel then contradicted these superficial characterizations with expert testimony describing him as a "paranoid personality with anti-social features" (TR. 2150), "deviant and somewhat self-serving" (TR.2151), who "sees the world as a place that is there to meet his needs" (TR. 2151), and a person who could be "moody", "socially inappropriate", "angry" and "resentful" (TR. 2148). It can never be strategy that an attorney put on a witness whose testimony is unknown.

Psychiatrist Dr. Cenac's testimony was meant to explain to the jury the extent of Todd Wessinger's consumption of alcohol during the night and morning before the incident. He interviewed Todd on two occasions. On the first visit, Todd denied that he committed the murders and during the second visit he admitted responsibility. During cross, the state was able to elicit from Dr. Cenac that Todd could have lied about the amount he had drunk before the incident took place as he had given conflicting accounts to both him and Dr. Rostow (TR. 2186-2187).

An entirely different picture emerged when Mr. Wessinger's federal habeas team

conducted a thorough, multi-generational bio-psycho-social history through the collection of records and interviews with life history witnesses as required by ABA Guidelines 6.1, 10.3, and described in Guideline 10.11 of the Mitigation Guidelines, and found extensive and readily available documentary, testimonial and expert evidence that was not presented at trial. These facts were plead in Mr. Wessinger's federal habeas petition in great detail, pp. 232-256, 288-294, notifying this Court of what would be proved at an evidentiary hearing.

Todd Wessinger's life was shaped by factors over which he had no control or choice. Born into a family with a significant history of seizure disorders, mental retardation, and cerebral palsy, Todd struggled with confusing neurologic and psychiatric symptoms that derailed and confounded his ability to function and succeed over the course of his life. He experienced repeated and severe seizures as a toddler and child for which he was medicated with Phenobarbital, a powerful and addictive opiate, fell behind his peers academically, suffered ridicule and humiliation by his father who singled Todd out for cruel treatment, and won friends by trying to hide his deficits by placing others' interests above his own. As he passed through critical developmental stages, Todd fell further behind and grew bewildered by his inability to do well in school, keep pace with his peers and brothers, or earn his father's respect, but he never abandoned his deep affection for his family and friends.

Todd's parents brought to their marriage a worldview shaped by the hardships of life on Louisiana's plantations where they survived by will, backbreaking work, and self-reliance. Todd's mother and father's families for generations worked and lived on plantations little changed since slavery. Todd and his three older siblings, Cynthia, Troy and Darin, are the first generation of their family not to be born into plantation life.

Records collected for the first time by federal habeas counsel show that infant mortality in the Wessinger family was very high. Three of Todd's father Horace's siblings died early. Todd's parents also experienced loss once they had their own children: their first child was stillborn, and their next, Cynthia, had pronounced cerebral palsy. Todd Wessinger then went on to lose three of his own children when they were young. These deaths may indicate birth defects and/or genetic abnormalities within the family. Regardless of the cause of these deaths, multiple family members experienced the distress of losing their children.

Documentary and anecdotal evidence shows signs of academic and neurological deficits in the family. Todd's mother and siblings struggled academically, performing below grade level. Todd's maternal uncle, Junius Kelly, was never able to even sign his own name, and he has three daughters who are mentally retarded.

Records show that by the time Todd Wessinger was born, his family was living in deep poverty. Notes written by a social worker detail how the family struggled financially and how much stress this caused Todd's mother, to the point of medically affecting her pregnancy. Because the home was overcrowded, Cynthia had no room to practice walking and failed to progress. Throughout Todd's life, making ends meet was a constant struggle that periodically reached a crisis point. The family supplemented their income by hunting game like rabbits and raccoons and they picked weeds and grasses to eat.

Records also show that Todd's mother Linda was ashamed of Cynthia's disability; she had unrealistic expectations about her chances for recovery, and she expressed concern about her daughters stuttering in front her to the point that the doctor suggested she stop.

Todd's father singled him out for emotional abuse and denigration at a young age. Todd

had significant psychomotor deficits and could not successfully follow his father's instructions. He was a slower learner than his brothers, which frustrated Horace, who responded to Todd's inabilities by ridiculing, hitting, and humiliating him.

Todd struggled academically. More than one teacher classified him as "special needs" or wondered if he had a learning disability. He needed extra time to complete assignments and fell behind. His parents couldn't help him with his learning problems as they were unable to understand the schoolwork. At a time when Todd's peers did not socialize with younger children, Todd spent the majority of his time with Duke Johnson, several years younger than he. A friend of Todd's felt insecurity made him reach out to someone so much younger. Not only was Duke younger, he was also a special education student. Todd knew Duke was embarrassed about being in special education. Todd had several friends that were mildly mentally retarded or in special education.

Todd's children have also developed psychological and neurological problems. One son was in special education classes and suffers from cognitive impairment, while two daughters have been diagnosed with depression and behavioral disturbances. One daughter presents with staring spells in the same way Todd has and has performed very poorly in school.

Todd left school before graduating, having fallen behind and feeling pressure to earn a wage. His employment history was a series of low-paying, low-skill and low-status jobs. One of Todd's first jobs was working in a hospital buffing floors. The fact that Todd worked in a hospital around doctors and nurses made him feel he was a part of something valuable. Todd was devastated when he was fired from this job, accused of stealing equipment. Eventually other workers were determined to be the culprits, but Todd had left the job, unable to defend himself

against the accusations and humiliated by the experience.

Alcohol abuse was rife on the sugar cane plantations and continued after the family relocated to Baton Rouge. Trauma, poor health and widespread poverty caused profound strain and stress. Many coped by abusing alcohol. A disproportionate number of Todd's family members have and still do abuse alcohol, with several dying of alcohol-related causes. Todd's father was a loud, belligerent alcoholic who frequently cursed and humiliated others.

The Wessinger family had hoped that Mayfair would afford them a level of safety and privilege many family members did not enjoy. However, as white families left the area in the 1970s and 1980s, the Wessingers saw facilities and services decline and disappear. Mayfair became notorious for the violence and drug presence in the area. Todd witnessed several other shootings in his neighborhood. On one occasion, Todd and his cousin were walking to the store when they came upon a dead body lying in the street.

Three friends fell victim to the drug-related violence that had become rife in Mayfair. Duke Johnson, Todd's childhood best friend, had fallen into a heroin addiction. Todd made efforts to try and get Duke out of Mayfair and away from the drugs. After he moved to Dallas, he asked Duke to come, too, telling him there were more opportunities there, but in 1993 Duke was shot in the back of the head during a drug deal. Earlier that year Todd's two other closest friends were murdered while taking part in a drug deal. Their bodies were found, dumped in a ditch, decomposed beyond recognition several days after they went missing. These were also friends that Todd had tried and failed to get out of Mayfair.

Results of recent neuropsychological testing show signs of significant psychomotor impairment, right hemisphere abnormality that may implicate Mr. Wessinger's subjective

experiences as well as academic performance, deficits associated with fetal alcohol spectrum disorder, and other signs of cerebral dysfunction. Difficulty picking up social cues appropriately also confounds Mr. Wessinger's ability to function effectively and is another part of his moderate brain impairment. Psychiatric assessment of neuropsychological data and Mr. Wessinger and his family's social history took into account the family history of neurologic, psychiatric, and cognitive impairments, including seizure disorders, mental retardation, alcohol and drug addiction and trauma and concluded that Mr. Wessinger suffers multiple neurologic and psychiatric symptoms that affected his development and functioning over the course of his life including his gullibility, naiveté, and other social development deficits, his ability to aid and assist counsel at both stages of the proceedings against him, the reliability of his statements to law enforcement and other authority figures, and his behavior surrounding the offense. Mr. Wessinger's medical history of early childhood seizures, skeletal malformation in his legs, and a malformed skull may be the result of exposure to toxins in utero or genetic factors that also affect brain function.

Not only did trial counsel fail to investigate and develop this history, but they retained mental health experts to provide impressions of Mr. Wessinger without a thorough bio-psycho-social history to inform them. And, worse, they put these experts on the stand without knowing what they would say. In his federal habeas petition, Mr. Wessinger alleged the facts in support of this aspect of his counsel's ineffectiveness and expected to present at the previously scheduled May 2011 evidentiary hearing the testimony of trial counsel regarding their own lack of preparation and investigation as well as the testimony of expert capital defense counsel and mitigation specialists as to the standard of care for providing background data to evaluating

experts in capital cases and their expert opinions as to whether calling a mental health expert in a capital sentencing trial without knowing what they were going to say could ever be consistent with the standard of care for capital representation.

This Court incorrectly assumed, without hearing evidence, that trial counsel's lack of preparation at penalty phase was strategy, and that that strategy failed:

> Mr. Hecker asked both Dr. Rostow and Dr. Cenac if they had had any prior conversations about the questions they were to be asked on the stand. Tr. R. at 2147, 2174. Rather than failure to prepare, the Court finds the record shows the defense was using this to show the jury they had not scripted the testimony in an attempt to make it seem a totally impartial opinion. This seems to have backfired…that is one peril of that strategy."

Doc. No. 135, p. 67.

This is unsupported by the state court record. As the state court commissioner noted in her recommendation that a hearing be held on this claim:

> "There is really no way to decide deficient conduct regarding whether counsel knew or should have known what his own witnesses would say or might say unless counsel is given the opportunity to explain his knowledge thereof prior to the testimony given. I think it goes without saying that you would not put a witness on if you had reason to know he would call your client a liar and a dangerous person."

*Wessinger –Amended Petition Memo* p. 2 (Doc. No. 120, Exhibit N).

A fuller reading of the record clearly indicates that because the trial proceeded more quickly than anticipated, the expert witnesses were testifying a day earlier than originally scheduled. Mr. Hecker states on the record in his direct examination of Dr. Rostow that he had called him to come to court a day early as the trial had been moving faster than he anticipated. Tr. 2144. The same is true of Dr. Cenac. Mr. Hecker asked him if they had spoken regarding his testimony and followed immediately with the fact that he had told Dr. Cenac he would be

testifying the next day. Tr. 2174. Thus the failure of trial counsel to prepare and speak with the expert witnesses prior to testifying was not strategic but the result of the trial moving faster than anticipated and trial counsel waiting until the last minute to discuss testimony with the experts.

At an evidentiary hearing, Mr. Wessinger would prove the allegations made in his petition – that trial counsel were actually unprepared and not merely posturing as such: Billy Hecker was solely responsible for Mr. Wessinger's penalty phase; no mitigation specialist was hired; Mr. Hecker's personal circumstances prevented him from adequately preparing, that Mr. Hecker sought a continuance so that he could prepare, and that continuance was denied.

As set forth in the Affidavit of Billy Hecker already on file with this Court, Mr. Hecker's personal circumstances prior to, and during, Mr. Wessinger's trial severely limited the amount of time Mr. Hecker was able to spend preparing. Mr. Hecker's father suffered a stroke on March 12, 1997, an event that was both sudden and unexpected and just three months before the scheduled trial date. For the next 26 days, Mr. Hecker spent almost all of his time at the Baton Rouge General Hospital tending to his father, feeding him, caring for him and meeting with doctors about his treatments. Mr. Hecker's father died on April 7, 1997, approximately two months before Mr. Wessinger went on trial for his life. Mr. Hecker describes this as the most traumatic experience of his entire life. The loss of his father was so devastating to him that during this time he was effectively not a lawyer, just a son. Mr. Hecker "was completely dazed and incapacitated by grief for months after his death." Doc. No. 120, Exhibit SS.

Mr. Hecker was then forced to become a single parent just two weeks after the death of his father when his ex-wife sent his daughter to live with him. He "was already overwhelmed with the loss of [his] father and trying to help [his] seventy-three year old mother cope. Then

just seven weeks before Mr. Wessinger's trial, [he] suddenly became the single parent of a fourteen year old girl." Doc. No. 120, Exhibit SS.

The effect that Mr. Hecker's personal circumstances had on his ability to effectively represent Mr. Wessinger cannot be understated. Mr. Hecker has submitted a sworn affidavit to this Court indicating that he was distracted, barely coping and that the time he had available to spend on Mr. Wessinger's case was severely limited due to his personal circumstances:

> This series of events in my personal life distracted me from Mr. Wessinger's defense. Even after returning to work I was grief-stricken, exhausted and pre-occupied. My new family obligations toward both my mother and my daughter took me away from the office and greatly reduced the amount of time I had available to prepare for this case. On top of this, I had a full criminal defense practice that had been completely neglected for six weeks and needed my attention. Looking back I don't know how I managed to even participate in the trial under these circumstances. I was barely coping on a day-to-day basis. Ever since then, I have thought of that period as the worst time of my entire life.

Doc. No. 120, Exhibit SS.

All of the information alleged by Mr. Wessinger in his *Amended Petition for Writ of Habeas Corpus* can be proven through documentary evidence, expert testimony and lay witnesses that were available to trial counsel had they hired a mitigation specialist and/or conducted an investigation into Mr. Wessinger's social history as required of capital counsel. Mr. Wessinger requests that this Court hold a hearing to consider his claim of ineffective assistance of trial counsel at penalty phase.

## III. THIS COURT MADE ADDITIONAL LEGAL AND FACTUAL ERRORS IN DENYING MR. WESSINGER'S CLAIM XI, THAT TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE IN *VOIR DIRE* WITH REGARDS JUROR WAGUESPACK & SHOULD REOPEN THE CASE TO ALLOW AN EVIDENTIARY HEARING FOR THE NECESSARY FACTUAL DEVELOPMENT

This Court also erred in the analysis of the claim that trial counsel was ineffective in *voir*

*dire* and completely failed to meaningfully *voir dire* the venire. While the entire *voir dire* is marked by absence and ineptitude, trial counsel's ineffectiveness during the *voir dire* of Juror Michele Waguespack is particularly troubling. Competent trial counsel would have made a motion to strike Waguespack for cause or would have at least asked a follow-up question to her stated belief in mandatory imposition of the death penalty. Instead, Mr. Wessinger's counsel was silent and Ms. Waguespack became the twelfth juror impaneled on the jury (Tr. 1708). As laid out above, this claim was dismissed by the state court rather than denied on the merits, and so the correct analysis under 28 U.S.C. 2254(d)(2) is whether it was reasonable for the state court to dismiss the claim for failure to "allege a claim which, if established, would entitle the petitioner to relief." LA. C. CR. P. ART. 928.

Mr. Wessinger properly raised a claim of ineffectiveness of trial counsel at *voir dire*, alleged that trial counsel failed to assert cause challenges for jurors who demonstrated obvious bias and failed to utilize strikes for cause or peremptory challenges for jurors who obviously could not follow the law. *Second Amended Petition*, p.*53*. The standard for excusing a juror for cause because of his views on capital punishment is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (citing *Adams v. Texas*, 448 U.S. 38, 45 (1980)). Mr. Wessinger's trial counsel's failure to engage in adequate *voir dire* to develop a cause challenge or even make a cause challenge entrusted "the determination of whether a man should live or die to a tribunal organized to return a verdict of death." *Witherspoon v. Illinois*, 391 U.S. 510, 520 (1968).

Mr. Wessinger specifically alleged facts of ineffectiveness as to Juror Waguespack's *voir*

*dire* that, if established, would require relief. When asked whether she could impose the death penalty, Waguespack explicitly admitted that she would vote for the death penalty automatically upon a verdict of guilt. "If all the evidence proves that he's definitely guilty I just feel like the system today so many people are sent for a life sentence and they eventually get off on parole or come up for parole and then they get out or something. And I just feel like if they're there and it's been proven that they're guilty and that they did do the crime then they should be put to death." (Tr. 1694-95). Counsel never followed up on her belief that first-degree murder should always be punished by death. Nor did counsel ever make a challenge for cause under *Morgan v. Illinois*, 504 U.S. 719, 728-29 (1992) (holding that a capital defendant may challenge for cause any juror who would automatically vote for the death penalty), or used a peremptory strike.

The state court's finding that Mr. Wessinger failed to allege a claim which, if established, would entitle him to relief is clearly unreasonable. If an impaneled juror's honest responses to questions on *voir dire* would have given rise to a valid challenge for cause, the defendant is entitled to a new trial. *Hughes v. U.S.,* 258 F.3d 453, 457 (6th Cir. 2001).

## IV. THIS COURT MADE ADDITIONAL LEGAL AND FACTUAL ERRORS IN DENYING MR. WESSINGER'S CLAIM V, THAT THE STATE WITHHELD MATERIAL EXCULPATORY EVIDENCE IN VIOLATION OF *BRADY V. MARYLAND,* & SHOULD REOPEN THE CASE TO ALLOW AN EVIDENTIARY HEARING FOR THE NECESSARY FACTUAL DEVELOPMENT

This Court erred in its disposition of the claim that the State withheld material exculpatory evidence in violation of *Brady v. Maryland*. There were 13 different items of evidence that the State withheld despite numerous discovery motions and purported open file discovery by the State. This Court found that the arguments regarding eleven of the items were exhausted and treated the state court's statements at the "status conference" as a denial.

However, as laid out above, the *Brady* claim covering those 11 items was dismissed by the state court rather than denied on the merits, and so the correct analysis under 28 U.S.C. 2254(d)(2) is actually whether the state court was reasonable in dismissing the claims for failure to "allege a claim which, if established, would entitle the petitioner to relief." LA. C. CR. P. ART. 928.

The first 11 items of evidence that the State withheld can be conceptually divided into three groups: witness statements, criminal histories and plea agreements, and forensics. There are seven witness statements that Mr. Wessinger never received before or at trial: Eric Armentor's November 19, 1995 statement to police, Eric Armentor's November 22, 1995 statement to police, Alvin Ricks's November 19, 1995 statement to police, Alvin Ricks's 911 phone call, Eric Mercer's November 19, 1995 statement to police, Willie Grigsby's November 19, 1995 statement to police, and Tilton Brown's November 29, 1995 statement to police. Mr. Wessinger also never received Tilton Brown's criminal records, a report showing that Tilton Brown had been arrested prior to giving his interview, or any information on Randolph Harden's plea agreement. Mr. Wessinger also never received a state forensics report showing that his fingerprints were not on the murder weapon.

Mr. Wessinger properly raised a *Brady* claim in post-conviction proceedings, alleging facts that, if established, would clearly entitle him to relief. *Second Amended Petition* at 60-61.

Mr. Armentor and Mr. Ricks are the only eyewitnesses who identified Mr. Wessinger as the shooter. Both testified at trial. The withheld statements given to police shortly after the incident conflict both with their own trial testimony and the statements by the other. At trial, Mr. Armentor stated that he had looked over his shoulder at the shooter immediately after being shot, while in both the November 19, 1995 statement and the November 22, 1995 statement he

asserted that he didn't look back after being shot. In both undisclosed statements, Armentor admits that he doesn't remember much after being shot and that he "may have imagined the second [shot]." Statement of Eric Armentor (11/22/95). The State *did* disclose a Supplemental Report from November 23, 1995 that purports to summarize Mr. Armentor's statement from November 22, 1995. However, this Supplemental Report's description matches neither the undisclosed November 22, 1995 statement or reality. The result of the nondisclosure left Mr. Wessinger's attorneys no meaningful way to cross-examine Mr. Armentor.

Mr. Ricks testified at trial that he called 911 after the shooting and told the operator that the shooter was "Todd." (Tr. 1891) However, the undisclosed transcript of the 911 call demonstrates that no name was ever mentioned. When Mr. Ricks's undisclosed statements are read in conjunction with Mr. Armentor's undisclosed statements, there are irreconcilable inconsistencies; Mr. Ricks cannot be where he stated and see what he saw if Mr. Armentor was where he stated.

Both Tilton Brown and Randolph Harden testified as key post-robbery witnesses. Mr. Brown's statement on November 29, 1995 includes uncorroborated information that Mr. Brown abandoned by the time of his testimony. Without the previous statement, however, Mr. Wessinger could not cross-examine him about his changing story. Mr. Brown's criminal history was also undisclosed, even though impeachment evidence is also governed by *Brady*. *United States v. Bagley*, 473 U.S. 667, 674-78 (1985). Neither was Mr. Harden's plea agreement, despite the requirements of *Giglio v. United States*, 405 U.S. 150 (1972).

A fingerprint report which demonstrated that in spite of forensic processing of prints taken from the crime scene and from the murder weapon, Mr. Wessinger's fingerprints could not

be identified, was withheld from the defense, thereby depriving his trial counsel of an invaluable tool to negate the suggestions that Mr. Wessinger was the shooter. The report, prepared by Carol Richard of the State Police in February, 29, 1996, was unequivocal in stating "Comparison Disposition: Negative."

The state court's finding that Mr. Wessinger failed to allege a claim which, if established, would entitle him to relief is clearly unreasonable. Undisclosed evidence is not to be evaluated piecemeal.[18] If the court finds a *Brady* violation, then the defendant is entitled to a new trial. Mr. Wessinger's claim, if established, entitled him to relief, and the state court's dismissal without getting to the merits of the claim was premature and clearly unreasonable.

## V. THIS COURT ERRED IN FINDING THAT TWO SUBSECTIONS OF MR. WESSINGER'S CLAIM V, THAT THE STATE WITHHELD MATERIAL EXCULPATORY EVIDENCE IN VIOLATION OF *BRADY V. MARYLAND*, WERE UNEXHAUSTED AND THAT THEREFORE IT COULD NOT HEAR THE CLAIM

Mr. Wessinger alleged in the federal court, as well as the state courts, that certain evidence was withheld from his trial counsel by the state prosecutors in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Doc. No. 120, pp. 82-104. This Court agreed that "it is clear that certain information did not make it into the hands of the defense team for use at trial." Doc. No. 135, p. 31. With respect to two pieces of evidence—a letter from Capital One Credit indicating $2,500.00 was withdrawn from Ms. Guzzardo's account in California three days after her death and supplemental police reports regarding Mr. Wessinger's contact with Randolph Harden in Texas—this Court concluded that "the two issues were not litigated at the state court level and may not be heard by this Court." Doc. No. 135, pp.31, 33. With regard to the remaining

[18] *See Kyles v. Whitley*, 514 U.S. 419, 421-22 (1995) (holding that the proper inquiry is whether the "net effect" of the nondisclosures "raises a reasonable probability that its disclosure would have produced a different result at trial").

evidence, this Court concluded that the failure to disclose it did not undermine confidence in the verdict and, thus, was not material. Doc. No. 135, pp.34-35.

The Supreme Court's recent decision in *Martinez v. Ryan*, 566 U.S. ___, 2012 WL 912950 (Mar. 20, 2012), makes clear that Mr. Wessinger has cause to excuse his unexhausted *Brady* claims heard for the first time in federal habeas proceedings, and also to have the *Martinez* analysis applied directly to Mr. Wessinger's *Brady* claims because *Brady* is a "bedrock principle in our justice system" at the same level of importance as the right to effective counsel. *See Martinez*, 566 U.S. ___.

### A. Mr. Wessinger's Post-Conviction Counsel's Ineffectiveness Provides Sufficient Cause Under *Martinez* To Entitle Him To Raise His Unexhausted *Brady* Violations For The First Time In Federal Habeas Review

Mr. Wessinger's post-conviction counsel was ineffective for failing to raise the abovementioned *Brady* materials. This claim was not raised in post-conviction, but can now be raised in federal habeas because Mr. Wessinger is able to meet the cause and prejudice requirements to overcome this procedural bar by showing post-conviction counsel's ineffectiveness for failing to raise it during post-conviction proceedings. In this case this Court should review *de novo* Mr. Wessinger's ineffective assistance of counsel claim for failure to locate and present the *Brady* material.

Under the first prong of the *Martinez* analysis, discussed above, the cause of Mr. Wessinger's failure to properly raise the unexhausted *Brady* claims was the ineffective assistance of his post-conviction counsel for failing to discover the *Brady* documents and submit them as part of Mr. Wessinger's state habeas petition.

The second prong requires Mr. Wessinger show that the error "worked to his actual and substantial disadvantage." *U. S. v. Frady*, 456 U.S. 152, 170 (1982). The Capitol One statement showing that another person was using Ms. Guzzardo's credit card in California after her death at the same time Mr. Wessinger was in Texas is exculpatory because it indicates another individual was involved in the crime. Likewise, the supplemental police report relates circumstances relevant to Mr. Harden's status as agent of law enforcement, and his motivation for testifying and is therefore potentially exculpatory.

Because of the law established under *Martinez*, Mr. Wessinger respectfully requests this Court reopen his case and order briefing or hearings to determine whether Mr. Wessinger's post-conviction counsel meets the cause and prejudice requirements for ineffective assistance of counsel.