UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

TODD KELVIN WESSINGER

VERSUS

BURL CAIN, WARDEN

CIVIL ACTION

NO. 04-637-JJB-SCR

## RULING

In 2012 this Court issued a Ruling and Order granting Petitioner's Motion to Alter or Amend Judgment ordering an evidentiary hearing as to the sole remaining habeas claim (doc. 156). The evidentiary hearing, held in January and March of 2015, was set to consider two issues. First, the Court considers whether this federal habeas court is barred from considering the unexhausted claim for habeas corpus relief. Second, should this Court find that the claim is subject to this Court's review, the underlying claim is to be considered *de novo* by this Court. The underlying habeas claim is that of ineffective assistance of counsel ("IAC") at the penalty phase of trial in violation of Petitioner's Sixth Amendment right. Before reaching the underlying claim, the Court must first consider Petitioner's initial review proceedings in state court, as well as the performance of initial review counsel ("IRC"), Mr. Gisleson.

### I. CONSIDERATION OF *COLEMAN* AND *MARTINEZ*

This Court's previous ruling determined Petitioner's remaining habeas claim is procedurally defaulted (doc. 156, at 4). The Court reached this determination based on the *Coleman v. Thompson* rule: "[i]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred." 501 U.S. 722, 750, 111 S. Ct. 2546, 2565 (1991). In *Coleman*, the Court went on to limit the rule barring federal habeas review of such defaulted

1

claims when the prisoner can demonstrate (1) cause for the default and (2) actual prejudice as a result of the failure to exhaust the claims in state court. *Id*.

Prior to the Supreme Court's ruling in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), the negligence of an attorney in post-conviction proceedings did not suffice as "cause" under *Coleman*. However, *Martinez* served as a significant exception when it held the following:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Id*. at 1320. This Court has already noted the jurisprudential rule in Louisiana that ineffective assistance claims are generally best suited for post-conviction proceedings (doc. 156, at 4, citing *State v. Hamilton*, 699 So.2d 29, 31 (La. 1997)).[1] *Martinez* sets forth two more conditions that must be satisfied in order for the procedurally defaulted claim to be heard by this federal habeas court: (1) IRC was ineffective in the initial-review proceeding and (2) the underlying habeas claim of IAC at penalty phase must be a substantial claim.

### EFFECTIVENESS OF IRC IN THE INITIAL REVIEW PROCEEDING

Petitioner claims his IRC, Mr. Gisleson, was prejudicially ineffective during state initial review proceedings in pursuing Petitioner's habeas claim that trial counsel, Mr. Billy Hecker, was ineffective during the penalty phase of Petitioner's trial (doc. 211, at 2). Petitioner is correct

---

[1] The State urges that *Martinez* holding is satisfied here because the Petitioner was afforded the right to bring and did assert several IAC claims (doc. 212, at 5). As this Court has already stated, *Martinez* makes no distinction between whether IRC's ineffectiveness is measured by failure to present a claim of ineffective assistance of trial counsel or in connection with the ineffective prosecution of such a claim, the latter being what Petitioner argues herein (doc. 156, at 5). The Fifth Circuit's ruling in *Escamilla v. Stephens* "that *Martinez* does not apply to claims that were fully adjudicated on the merits by the state habeas court," does not change our Court's finding that *Martinez* applies to the instant case. 749 F.3d 380, 394-95 (5th Cir. 2014). In our previous ruling, this Court found that the claim of ineffective assistance at the penalty phase presented to this Court was a new claim, and therefore not adjudicated on the merits in state court, in light of the additional evidentiary support that was not presented to the state habeas court, including psychiatric evaluation, neuropsychological testing, evidence of low intellectual functioning, and evidence of isolation and abuse (doc. 156, at 3).

2

that the effective assistance of counsel at trial is a fundamental principle of our justice system. *Id*. Furthering this point, the Supreme Court in *Martinez* emphasized a prisoner's ability to pursue a substantial claim of ineffective assistance of counsel with the aid of effective counsel at the initial review proceeding. *Martinez*, 132 at 1317. The Court also made clear that when the prisoner is claiming IRC was ineffective, prisoner has the burden under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). *Martinez*, 132 at 1318-1319. In trying to satisfy "cause" by claiming ineffective IRC under *Martinez*, AEDPA does not apply because the alleged error of IRC is not a "claim." *Id*. at 1320.

Petitioner points to *Canales v. Stephens*, 765 F.3d 551, 569 (5th Cir. 2014), a case applying *Martinez*, where the Fifth Circuit found that defendant established that his state habeas counsel's performance fell below an "objective standard of reasonableness" when state habeas counsel did not conduct a mitigation investigation due to a mistaken belief that his funding was capped and did not make a strategic choice to forego a mitigation investigation. *See also Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052 (1984); (doc. 211, at 4).

The evidentiary hearing held before this Court in January and March of 2015 considered, in part, Petitioner's argument for why his IRC was ineffective in prosecuting the claim of ineffective assistance of trial counsel at the penalty phase of trial. Mr. Gisleson, with limited legal experience of his own, was appointed as Petitioner's state post-conviction counsel in January 2001 (doc. 211, at 9). In December of 2000, Mr. Gisleson received a file from Petitioner's previous *pro bono* counsel who apparently suffered a mental breakdown and had done no work on the case. *Id*. at 9. To avoid an impending one-year deadline for filing a petition, Mr. Gisleson filed a three-page shell petition in December of 2000. *Id*. He was then granted sixty days to file an amended petition, during which time he sought funding and assistance from

that the effective assistance of counsel at trial is a fundamental principle of our justice system. *Id*. Furthering this point, the Supreme Court in *Martinez* emphasized a prisoner's ability to pursue a substantial claim of ineffective assistance of counsel with the aid of effective counsel at the initial review proceeding. *Martinez*, 132 at 1317. The Court also made clear that when the prisoner is claiming IRC was ineffective, prisoner has the burden under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). *Martinez*, 132 at 1318-1319. In trying to satisfy "cause" by claiming ineffective IRC under *Martinez*, AEDPA does not apply because the alleged error of IRC is not a "claim." *Id*. at 1320.

Petitioner points to *Canales v. Stephens*, 765 F.3d 551, 569 (5th Cir. 2014), a case applying *Martinez*, where the Fifth Circuit found that defendant established that his state habeas counsel's performance fell below an "objective standard of reasonableness" when state habeas counsel did not conduct a mitigation investigation due to a mistaken belief that his funding was capped and did not make a strategic choice to forego a mitigation investigation. *See also Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052 (1984); (doc. 211, at 4).

The evidentiary hearing held before this Court in January and March of 2015 considered, in part, Petitioner's argument for why his IRC was ineffective in prosecuting the claim of ineffective assistance of trial counsel at the penalty phase of trial. Mr. Gisleson, with limited legal experience of his own, was appointed as Petitioner's state post-conviction counsel in January 2001 (doc. 211, at 9). In December of 2000, Mr. Gisleson received a file from Petitioner's previous *pro bono* counsel who apparently suffered a mental breakdown and had done no work on the case. *Id*. at 9. To avoid an impending one-year deadline for filing a petition, Mr. Gisleson filed a three-page shell petition in December of 2000. *Id*. He was then granted sixty days to file an amended petition, during which time he sought funding and assistance from

entities with experience in habeas legal work, filed motions for funding and to continue the amended petition deadline, all to no avail. Mr. Gisleson testified that his efforts to seek funding and assistance were not part of a strategy. Instead, they were out of frustration for his own lack of experience. *Id*. After sixty days passed and Mr. Gisleson appeared before the court without an amended petition, the judge continued the filing deadline to June 11, 2001. *Id*. at 10.

While Mr. Gisleson was granted more time, he was still without direction and without training on how to proceed with post-conviction or habeas corpus work. To satisfy the continued deadline, Mr. Gisleson used a master petition template for post-conviction relief that comprised every conceivable issue that could be raised and some limited factual information from the previous *pro bono* counsel's file. This first amended petition did include a claim of ineffective assistance of trial counsel at the penalty phase. *Id*. Mr. Gisleson did no investigation and did not hire an investigator, mitigation specialist or mental health expert to assist him in investigating and preparing his amended petition alleging penalty phase counsel's ineffectiveness. *Id*. at 11. Mr. Gisleson did not obtain any medical records, school records, employment records or family history records of Petitioner. *Id*. He did not conduct interviews of any witnesses, friends, teachers, coaches, or family members of Petitioner. *Id*. He had only one or two conversations with Petitioner's mother and brother about guilt-related issues and a few conversations with Petitioner himself. *Id*.

It was Mr. Gisleson's impression that trial counsel's "lack of due diligence" was "astounding" and reflected in the trial records and transcript. Mr. Gisleson thought there was more to be discovered with regard to this claim, but he could not do what was necessary without investigative assistance and without being adequately familiar with post-conviction law and procedure. Mr. Gisleson stated that it was not a strategic decision to not put in time or energy or

effort to pursue the claim of ineffectiveness of penalty trial counsel. In light of his realized limitations, Mr. Gisleson, shortly before the first amended petition was due in June 2001, filed a motion with the Louisiana Supreme Court to withdraw based on his inability to provide competent representation to Petitioner and that it would be a breach of his ethical and professional duty, resulting in ineffective assistance, to continue as counsel in the case. *Id*.

After filing his motion to withdraw with the Louisiana Supreme Court, Mr. Gisleson heard nothing for the next year and a half. He testified that he "couldn't imagine being kept on the case after filing" to withdraw and took that silence as his removal from the case. In February of 2003, Mr. Gisleson received the state's opposition to the first amended petition that was filed in June of 2001. Mr. Gisleson went to the Louisiana Supreme Court only to discover that his motion to withdraw had been denied in June 2001 but was sent to an old address. From the time he filed the motion to withdraw and until he received the state's opposition, Mr. Gisleson did no work on Petitioner's case. *Id*. at 12.

Mr. Gisleson believed he had the opportunity now to submit a second amended petition. He again reached out to many of the same groups and was then put in contact with Danalynn Recer of Gulf Regional Advocacy Center for consultation, provided Mr. Gisleson's firm paid Ms. Recer $5,000. *Id*. at 13. The managing partners agreed to pay this amount. Mr. Gisleson did work on a second amended petition from March 2003 until he filed it in August of 2003. The second amended petition, in relevant part, restructured the guilt phase portion and added some discrete allegations regarding penalty phase ineffectiveness based on the trial court record. Ms. Recer reviewed the final draft of the second amended petition and provided the assistance of two unpaid, college-student interns, who did question some people who had testified at the guilt phase, but not at the penalty phase.

Mr. Gisleson did not view his second amended petition as a cure to his inadequacies. After all, despite drafting a second amended petition, Mr. Gisleson still did not hire a mitigation specialist to do a social history or mitigation investigation, nor did he or Ms. Recer conduct their own mitigation investigation. Mr. Gisleson did not direct anyone to conduct interviews of family, friends, coaches, teachers and the like or conduct a comprehensive records collection. Mr. Gisleson did not consult any mental health experts or any other experts. *Id.* at 13.

During the evidentiary hearing before this Court, post-conviction expert, Gary Clements, testified to his expert opinion of what the standard of performance of state post-conviction death penalty work was in Louisiana from 2001 to 2003. *Id.* at 14. It was Clements' opinion that it was standard to have a core team working on the case that included two attorneys, with one typically more experienced with capital post-conviction work, a mitigation specialist, and a paralegal. A mitigation specialist often had training in social work, knowledge as to mental health issues, and a set of investigative skills that would aid in the collection of documents and interviews on subjects relative to mitigating factors. Clements' understanding of ABA guidelines led him to conclude that investigation in every post-conviction case involved massive data and records collection, including medical, criminal, and family history going back at least two generations. *Id.* Interviews, in Clements opinion, conducted in a death penalty post-conviction case were extremely sensitive and difficult to be done over the phone, making the process lengthy in time. *Id.* at 15. Additionally, Russell Stetler, an expert in the investigation and presentation of mitigation evidence in death penalty cases, testified that Mr. Gisleson did not perform the thorough mitigation investigation required under professional norms. Mr. Gisleson echoed a similar opinion since his attempt at investigation of the claim of ineffective assistance of trial counsel at the penalty phase did not go beyond the trial court record. *Id.*

Both experts, Mr. Stetler and Mr. Clements, emphasized the importance of conducting a mitigation investigation, either with the aid of a mitigation specialist or by counsel conducting an investigation beyond the trial court record. It is undisputed that Mr. Gisleson conducted no investigation into mitigation evidence and did not hire a mitigation specialist during his time as counsel for Petitioner's post-conviction proceedings. Mr. Gisleson may have preserved the claim of ineffective assistance of trial counsel at the penalty phase simply by asserting it in his various amended petitions, but his failure to conduct mitigation investigation prevented him from providing any support for these claims. This lack of a mitigation investigation to even determine the merit of Petitioner's claim of ineffective assistance of trial counsel at the penalty phase is below the standard for capital post-conviction proceedings. Under the guidance of the Fifth Circuit in *Canales v. Stephens*, 765 F.3d 551, 569 (5th Cir. 2014), this Court finds that Petitioner's state initial-review counsel's performance fell below an "objective standard of reasonableness" by failing to conduct any mitigation investigation, particularly when the underlying claim is one of ineffective assistance of trial counsel at the penalty phase.

### *WHETHER CLAIM INEFFECTIVE PURSUED BY IRC WAS "SUBSTANTIAL"*

Upon finding that IRC was ineffective, *Martinez* directs this Court to next consider if the underlying claim is a "substantial claim of ineffective assistance at trial[.]" *Martinez*, 132 S. Ct. at 1320. In *Canales*, after finding that the defendant's state habeas counsel was deficient, the Fifth Circuit considered whether there was some merit to the underlying habeas claim that the defendant's trial counsel was ineffective at sentencing. 765 F.3d at 569. The defendant's own trial counsel admitted that he failed to conduct any mitigation investigation, hire a mitigation specialist, interview family members or others who would have known the defendant growing up, or collect records on the defendant's life. Further, during sentencing, trial counsel's only

mitigation evidence was that defendant was a "gifted artist" and a "peacemaker in prison." *Id*. The Fifth Circuit noted that had the trial attorneys conducted a mitigation investigation, they would have discovered a history of physical and verbal abuse from the defendant's family, financial struggles for the family, and a history of substance abuse. *Id*. Based on the information that could have been discovered if a mitigation investigation had taken place, the Fifth Circuit found that the defendant's underlying claim of ineffective trial counsel during the sentencing phase did have merit. *Id*.

Six months prior to Petitioner's trial, Mr. Hecker was appointed as counsel for Petitioner at the penalty phase (doc. 211, at 16). Prior to Mr. Hecker's appointment, Petitioner was represented by former attorney, Orscini Beard, who had not done any investigation on the case or sought any funds for experts and had been removed because of his own arrest. The six months of Mr. Hecker's appointment leading up to trial were personally trying on Mr. Hecker. His father has been suffering from a serious illness that ended with his father's death in April of 1997. *Id*. at 17. Only two weeks after his father's death, Mr. Hecker was forced to take custody of his fourteen year old daughter. It is unsurprising and also undisputed that Mr. Hecker's ability to properly prepare for the penalty phase of the Petitioner's trial was limited. *Id*.

Mr. Hecker did not hire a mitigation specialist to investigate and, as a result, only presented character witnesses to speak of Petitioner as a good person, who struggled with alcoholism. Mr. Hecker did not work closely with the two experts he hired, yet put them on the stand in the penalty phase without discussing their testimony. Their testimony was shocking to him, and he was unprepared with how to handle it. While Mr. Hecker is now deceased, he asserted to as much in an affidavit filed by Petitioner. He further denied that it was part of any strategy to deliberately abandon any area of investigation or to put important witnesses on the

stand without knowledge of the content of that testimony. *Id*. Based on what Mr. Hecker's acknowledged shortcomings in preparing for the penalty phase of Petitioner's trial, this Court finds that the underlying ineffective assistance of counsel at the penalty phase claim has merit and satisfies the "substantial" element of *Martinez*.

This Court has determined that IRC was ineffective in pursuing a substantial claim. Therefore, *Martinez* provides the equitable remedy of having the "cause" element under *Coleman* satisfied. The Court next asks whether Petitioner can demonstrate "actual prejudice" as a result of IRC's failure to exhaust the substantial underlying claim. *Coleman*, 111 S. Ct. at 2565. With regard to the initial review proceeding, it is clear that Mr. Gisleson's ineffectiveness in failing to conduct any mitigation investigation caused actual prejudice to Petitioner's habeas claim of ineffective assistance of trial counsel at the penalty phase.

## II. FEDERAL HABEAS COURT'S REVIEW OF UNDERLYING HABEAS CLAIM

The equitable holding of *Martinez* does not decide Petitioner's underlying claim for habeas relief.[2] Instead, in the interest of equity, it allows this federal habeas court to consider a federal habeas claim that would have otherwise been procedurally defaulted. As this Court stated in its 2012 ruling, the underlying habeas claim of ineffective assistance of counsel at penalty phase claim was a new claim in that it went "way beyond what Petitioner presented to the state courts for consideration of this claim below" (doc. 156, at 3). It was the following additional evidentiary support for Petitioner's ineffective assistance at the penalty phase claim that led this Court to find the claim presented to federal court was significantly different and stronger than what was before the state court and therefore an unexhausted, new claim: psychiatric evaluation, neuropsychological testing, evidence of low intellectual functioning, and evidence of isolation

---

[2] *Martinez*, 132 S. Ct. at 1320 ("'Cause,' however, is not synonymous with 'a ground for relief.' A finding of cause and prejudice does not entitle the prisoner to habeas relief. It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted.").

and abuse. As a new claim, this Court will review the habeas claim of ineffective assistance of trial counsel at the penalty phase *de novo*.³

The evidentiary hearing held before this Court in January and March of 2015 considered, in part, Petitioner's underlying claim of IAC at the penalty phase of trial. This underlying IAC claim considers the assistance of counsel, Mr. Hecker. Some of the facts with regard to Mr. Hecker's assistance are addressed above in our *Martinez* analysis and determination that the underlying claim is a substantial one.

First, the Court asks whether Mr. Hecker's performance in the penalty phase of trial was deficient as compared to an "objective standard of reasonableness" and "under prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668, 687; *see also Wiggins v. Smith*, 539 U.S. 510, 521 (2003). In a capital trial, the Supreme Court has considered the norms for a penalty phase by stating it as "defense counsel's job [] to counter the State's evidence of aggravated culpability with evidence of mitigation." *Rompilla v. Beard*, 125 S. Ct. 2456, 2462 (2005). At the time of Petitioner's trial in 1996, the American Bar Association Standard for Criminal Justice understood that the standard mitigation investigation duty of capital defense

---

³ State argues that this Court is barred from considering new evidence to support the underlying IAC at penalty phase claim that was raised in state post-conviction proceedings (doc. 212, at 12-13, quoting *Escamilla v. Stephens*, 749 F.3d 380, 394-95 (5th Cir. 2014)(considering *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011))). The Fifth Circuit determined that "once a claim is considered and denied on the merits by the state habeas court, *Martinez* is inapplicable, and may not function as an exception to *Pinholster*'s rule that bars a federal habeas court from considering evidence not presented to the state habeas court." *Id*. at 395. In *Escamilla*, the Fifth Circuit found that the defendant's underlying IAC of trial counsel claim due to "his attorneys' failure to investigate and present mitigating evidence was considered and denied by the state habeas court." *Id*. In *Escamilla*, defendant's IRC did procure a mitigation investigator who conducted an investigation into that defendant's records and social history. Notably, in the instant case, Petitioner's IRC, Mr. Gisleson, did not make these same efforts. Further, the Fifth Circuit found that "the new evidence presented to the district court did not 'fundamentally alter' his claim…but merely provided additional evidentiary support for his claim that was already presented and adjudicated in the state court proceeding." *Id*. at 395, quoting *Dickens v. Ryan*, 740 F.3d 1302, 1320. This Court's previous ruling addressed this very issue in finding that the additional evidentiary support presented before this federal habeas court made the IAC at penalty phase claim a new claim (doc. 156, at 3). The additional evidence presented to this Court "is material and significantly different and stronger than what [Petitioner] presented to the state court." *Id*.; relying on *Dickens*, 740 F.3d at 1317. In the words of the Ninth Circuit's *Dickens* case, as relied on by the Fifth Circuit in *Escamilla*, the additional evidentiary support presented to this Court "fundamentally alters" the claim that was presented to the state court such that this Court considers the claim anew.

counsel could not "effectively be done on the basis of broad general emotional appeals or on the strength of statements made to the lawyer by the defendant. Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant[.]" Standard 4-4.1 (3rd ed. 1993). The Supreme Court has made clear that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91.

Already this Court has considered some facts surrounding Mr. Hecker's representation of Petitioner at the penalty phase: Mr. Hecker was appointed six months before the trial following previous counsel who had done no mitigation investigation, during the six months Mr. Hecker was dealing with his own personal struggles, Mr. Hecker did not hire a mitigation specialist to conduct a mitigation investigation during the six months, Mr. Hecker did not conduct his own mitigation investigation, Mr. Hecker presented only character witnesses who spoke of Petitioner as a "good person," and Mr. Hecker did not closely work with the experts who he then blindly allowed to testify. Finally, Mr. Hecker filed affidavits acknowledging his own shortcomings in preparing for the penalty phase of the trial and asserted that it was not part of a strategy to abandon any part of the investigation. These facts are not disputed.

Petitioner's brother, Troy, testified at the evidentiary hearing about what he observed leading up to Petitioner's trial. Troy testified to having one, hour-long meeting with Mr. Hecker during the six months leading up to the trial where Troy and six other family members attended (doc. 211, at 18). At this meeting, Mr. Hecker sought character witnesses for Petitioner, who were called as such at the penalty phase. *Id*. Several other character witnesses testified after Troy asked them to come to court to talk to the attorney about being a character witness. *Id*. At most,

11

Troy understood Mr. Hecker's preparation with these additional witnesses as a conversation in the courthouse hallway and then calling them to testify as character witnesses. *Id*. Ultimately, there were seventeen witnesses called by Mr. Hecker at the penalty phase, but there is no evidence to suggest that these were quality witnesses for the purposes of mitigation.

Mr. Stetler, an expert in the investigation and presentation of mitigation evidence in death penalty cases, testified that Mr. Hecker's duty as penalty phase counsel was not satisfied by the family meeting described by Troy. *Id*. In Mr. Stetler's opinion, Mr. Hecker was responsible for providing the experts with independent and objective information regarding Petitioner's development and function; yet, there is no evidence suggesting this was provided. Michele Fournet, capital defense expert, testified that the record does not suggest that Mr. Hecker's two experts were provided with any social history of Petitioner or his family, nor did he explain the purpose of their testimony or the idea of mitigation evidence. *Id*. at 19.

Mr. Hecker's did not conduct a mitigation investigation. He did not provide anything more than a large number of unprepared witnesses at the penalty phase of trial. None of this was done as part of any strategy according to Mr. Hecker. Mr. Hecker's representation of Petitioner at the penalty phase was deficient and fell below the objectively reasonable norms of capital counsel at a penalty phase.

Second, the Court asks if Mr. Hecker's deficient performance at the penalty phase of trial prejudiced Petitioner such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 692. In the context of penalty phase of a capital case, that requires the Court ask if the defendant might not have been sentenced to death. In determining if there was prejudice, the Supreme Court has required re-weighing of "evidence in aggravation against the totality of

available mitigating evidence," both from trial and habeas proceedings. *Wiggins*, 539 U.S. at 594.

As the State points out, there was no hearing on the IAC at penalty phase claim in the state post-conviction proceedings (doc. 212, at 26). At the penalty phase of trial, Mr. Hecker presented character witnesses and two experts. The evidentiary hearing before this federal habeas Court explored areas that would have been available to present at the penalty phase had a mitigation investigation been conducted by Mr. Hecker. Dr. George Woods, a physician with a specialty in neuropsychiatry, testified at the evidentiary hearing after having examined Petitioner three times, reviewed testing of Dr. Dale Watson, reviewed brain imaging of Petitioner, interviewed Petitioner's mother and two cousins, reviewed reports of the two experts Mr. Hecker did call, reviewed transcripts from previous proceedings, heard lay testimony at the evidentiary hearing, and reviewed a number of other records regarding Petitioner and his family, as well as relevant scientific articles (doc. 211, at 21). In Mr. Woods' expert opinion, Petitioner suffers from a major neurocognitive disorder. *Id.* at 22. In reaching this opinion, Dr. Woods considered family history and genetics, environmental history, and medical and psychological information gathered by Petitioner's federal habeas counsel's mitigation investigation. Dr. Woods concluded that at some point in his young life, Petitioner suffered from a pediatric stroke, which presented a significant problem with how Petitioner's left and right sides of his brain were able to communicate. *Id.* Additionally, Dr. Woods considered the brain images that showed a hole in Petitioner's brain that occurred due to some cerebrovascular illness. *Id.* at 23. Dr. Woods explained that the motor skills affected by a childhood stroke go away to a degree, the part of the brain handling a significant amount of decision-making remains impaired. *Id.* The brain imaging

and neuropsychological testing relied on by Dr. Woods, as well as the relevant social history of Petitioner and his family, were available in 1997 when Mr. Hecker represented Petitioner. *Id*.

A number of lay witnesses testified at the evidentiary hearing about the family history of poverty, alcoholism, violence, and struggle. *Id*. The drinking habits of Petitioner's father nearly seven days a week often lead to domestic violence as often as three times a week, according to Petitioner's brother, Troy. *Id*. Family-friends and cousins testimony confirmed Petitioner's father's habits of drinking and verbal abuse, particularly directed at Petitioner. *Id*. Petitioner's father's drinking led to his own improprieties, including getting his sons drunk and giving beer and marijuana to kids in the house. *Id*. at 24-25. Petitioner's personal struggles continued into his teenage and young adult life when he struggled in school and was often exposed to other's opinion of his own self-worth; including his father's demeaning comments, described as slow by his counterparts, easily manipulated to do things not in his best interest. *Id*. at 26.

Not one of the witnesses presented at the evidentiary hearing, other than Petitioner's brother, who still had limited interaction with Mr. Hecker, were previously contacted or interviewed regarding Petitioner for purposes of mitigation. *Id*. Mr. Stetler's testimony discussed a large empirical study that found "evidence of brain damage and impairments and developmental difficulties including violence in the home, domestic violence, child maltreatment and poverty is very powerful evidence that resonates with capital jurors." *Id*. at 27. As Ms. Fournet noted at the hearing, under Louisiana law, "all you need is one juror to hold out on the issue of penalty and you get a life sentence." *Id*. at 28.

The question remains, had these witnesses been contacted and had a mitigation investigation been done to reveal these lay and expert opinions, is there a reasonable probability that the result of the sentencing proceeding would have been different? The Court does not

consider the question before it lightly. After considering the mitigation evidence presented at the evidentiary hearing before us, which was not presented to the sentencing jury, this Court finds there is a reasonable probability that the evidence of Petitioner's brain damage and other impairments, as well as his personal and family history would have swayed at least one juror to choose a life sentence.

## **CONCLUSION**

For the foregoing reasons, the Court grants Petitioner's claim for habeas relief based on ineffective assistance of trial counsel at the penalty phase in violation of the Sixth Amendment.

Counsel for Petitioner is to submit an order in conformity with this ruling within five (5) days of this ruling.

Signed in Baton Rouge, Louisiana, on July 23, 2015.

**JUDGE JAMES J. BRADY**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**