**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

**TODD KELVIN WESSINGER,**
**Petitioner,**

**CIVIL ACTION No. 04CV637-JJB-SCR**

**v.**

**DARREL VANNOY, Warden,**
**Louisiana State Penitentiary,**
**Angola, Louisiana,**
**Respondent.**

# PETITIONER'S STATEMENT OF UNCONTESTED MATERIAL FACTS IN SUPPORT OF RULE 56 MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR RELIEF FROM JUDGMENT UNDER RULE 60(b)(6)

NOW INTO COURT through undersigned counsel comes the petitioner TODD KELVIN WESSINGER, who hereby submits the following statement of uncontested material facts in support of his motion for summary judgment pursuant to Fed. R.Civ. Proc. 56 or, in the alternative, for relief from judgment pursuant to Fed.R.Civ.Proc. 60(b)(6), on the basis of his Sixth Amendment claim of ineffective assistance of trial counsel at the penalty phase, found meritorious by the Honorable James J. Brady after presiding over a federal evidentiary hearing at which Wessinger presented five days of uncontroverted testimony and evidence in support.

## THE UNCONTESTED MATERIAL FACTS

1. **State Capital Trial Proceedings.** Petitioner was charged in state court in Baton Rouge, Louisiana with two counts of first degree murder for the November 19, 1995 shooting deaths of Stephanie Guzzardo and David Breakwell. At the time of his first-degree murder trial on these charges, which began on June 16, 1997, petitioner was represented by Baton Rouge attorneys Greg Rome and Joseph

William "Billy" Hecker, who is now deceased, both of whom were appointed as counsel for petitioner on January 7, 1997, less than six months prior to trial. State Appellate Court Record ("SAR") 7, 11 (minutes of court) (made a part of the federal court record as Doc. No. 39). Jury selection began on June 16, 1997, and eight days later, on June 24, 1997, petitioner was convicted on both counts. SAR 12-25 (minutes of court).

**2.** The next day, June 25th, the same jury returned death sentences on both counts following a defense penalty phase presentation that lasted less than four hours, including cross-examination by the prosecution. SAR 25-28 (minutes of court). Hecker, who was solely responsible for the penalty phase of the trial, did not conduct a mitigation investigation, nor did he employ someone to do so. Affidavits of William P. Hecker, Pet. Exs. 62 and 63 (exhibit numbers reference petitioner's federal evidentiary hearing exhibits), attached herein as Exhibits A and B. The Louisiana Supreme Court affirmed the convictions and sentences. *State v. Wessinger*, 98-1234 (La. 5/28/99), 736 So.2d 162.

**3.** **State Post-Conviction Proceedings.** On January 3, 2001, the Louisiana Supreme Court formally appointed Soren Gisleson, a first-year associate at the New Orleans, Louisiana law firm of Herman, Herman, Katz & Cotlar, LLP, to represent petitioner in state post-conviction proceedings following the firm's agreement to accept *pro bono* representation of a death row inmate. Doc. 121, p. 84, ROA.1848; Doc. 209, pp. 11-12, p. 21, ROA.3822-3823, 3832; Pet. Ex. 7, attached as Exhibit K.

**4.** Prior to formal appointment, on December 27, 2000, Gisleson filed a three-page shell petition in an effort to stop the one-year clock from running. Doc. 121, p. 86,

ROA.1850; Doc. 209, p. 16, ROA.3827; Pet. Ex. 2, attached herein as Exhibit C. At a status conference in February of 2001, the state post-conviction trial court gave Gisleson 60 days, until April 10, 2001, to file a more complete, amended petition. Doc. 209, p. 19, ROA.3830.

**5.** On March 12, 2001, Gisleson filed a motion with the state post-conviction trial court requesting funding for investigative assistance to establish the factual basis for claims of ineffective assistance of counsel at the guilt and penalty phases of Wessinger's trial. Doc. 209, p. 20, ROA.3831; Doc. 209, pp. 25-26, ROA.3836-3837; Pet. Ex. 3, attached herein as Exhibit D. The motion included general allegations that trial counsel's preparation of the penalty phase was "woefully inadequate" and "there is every reason to believe that such investigation would produce information that should have bene [sic] presented to Mr. Wessinger's jury." Pet. Ex. 3, p. 5.

**6.** On April 5, 2001, Gisleson filed a motion in the state post-conviction trial court to continue the April 10, 2001, filing deadline for the state post-conviction petition. Doc. 209, pp. 28-29, ROA.3839-3840; Pet. Ex. 4, attached herein as Exhibit E.

***7.*** On April 10, 2001, the state trial court extended the deadline an additional 60 days, until June 11, 2001, to file an amended state post-conviction petition. State Court Post Conviction Record (SPCR) Vol. X, Transcript of Motion to Continue April 10, 2011 Deadline for Filing Amended Petition for Post-Conviction Relief and Ex Parte Motion on the Need for Investigative Funding in Order to File an Amended Petition for Post-Conviction Relief, p. 29, attached herein as Exhibit G. Also on April 10, 2001, the state trial court ordered Gisleson to petition the Louisiana

Indigent Defender and Assistance Board (LIDAB), which the court found to be responsible for funding the post-conviction investigation, to determine if the board would actually fund the investigation and report back to the court. *Id*., pp. 25, 29. Further, the state trial court set an April 24, 2001 hearing date if there were "any problems with getting funding," at which time the court told Gisleson, "if you have any evidence to present, you better have it that day because it won't be continued to another day. That issue will be resolved that day." *Id.*, pp. 29-30.

***8.*** On April 16, 2001, Gisleson notified the state trial court that the Louisiana Indigent Defense Assistance Board (LIDAB), the Capital Post-Conviction Project of Louisiana (CPCPL) and the Baton Rouge Indigent Defender Board, all of whom he reached out to for funding and assistance, took the position that they were not responsible for providing funding for investigation in state post-conviction for petitioner. Notice to Court of Funding Issues, SPCR, Vol. II, attached herein as Exhibit H. The Director of the local Baton Rouge Indigent Defense Board stated that if the state trial court ordered him to pay for investigative and expert expenses for Wessinger, as the state trial court did in *State ex rel. Jimmy Ray Williams v. Burl Cain*, No. 7-94-871, 19th Judicial District Court, "nothing would be provided, as his office currently *has no funds available*." *Id.* (emphasis in original).

***9.*** By letter to the state trial court dated April 11, 2001, the director of LIDAB wrote that "[t]he only funds available in the LIDAB budget for Capital Post-Conviction cases have been fully dedicated to the Capital Post Conviction Project of Louisiana (CPCPL). Unfortunately, the available funds are insufficient to enable CPCPL to assist financially in any cases where the client is already represented. The funding

of the backlog of cases is the responsibility of the local Indigent Defender Boards." Letter of Edward R. Greenlee, SPCR, Vol. II, attached as Exhibit I. Mr. Greenlee also referenced his testimony to this effect in the case of Jimmy Ray Williams. *Id.*

**10.** On April 23, 2001, Gisleson filed a motion to continue the April 24th hearing for three weeks because petitioner "has been patently unable to secure the testimony of necessary experts or provide experts with the time to review 'bare-boned' facts and evidence of the case" to determine what expert services are needed, the extent of the services needed, and the cost. Pet. Ex. 5, p. 1, attached herein as Exhibit F. Gisleson further stated that "Petitioner has been unable to arrange for a single expert to appear or for any affidavits," and, at the time the April 24, 2001, hearing date was set, "undersigned counsel did not appreciate that this much time and difficulty would be encountered." *Id.*, pp. 1-2.

**11.** The state trial court went forward with the April 24, 2001 hearing. SPCR, Vol. X, Transcript of Status Conference, Motion to Continue April 24, 2001 Hearing and Motion for Reconsideration of the Denial of Proceeding Ex Parte, p. 2, attached herein as Exhibit J. The state court denied the request for funding for experts. *Id.*, pp. 13-14.

**12.** On June 5, 2001, a week before the June 11th state post-conviction petition filing deadline, Gisleson filed a motion to withdraw with the Louisiana Supreme Court, seeking to be relieved of the representation based on his admitted inability "to provide competent representation in post-conviction" proceedings in state court "under the time and resource constraints" with which he was presented. Pet. Ex. 7, p. 1, attached herein as Exhibit K. This motion was denied by the Louisiana

Supreme Court, with one justice concurring and suggesting that counsel for petitioner "may seek assistance of counsel of LADAB if he deems that advisable," Pet. Ex. 7.

**13.** Gisleson filed an amended state post-conviction petition by the June 11, 2001, deadline set by the state trial court. Doc. 209, p. 46, ROA.3857; Pet. Ex. 6.

**14.** Following the State's filing of its response in February of 2003, Gisleson filed a second amended petition in August of 2003. Doc. 209, pp. 58-59, ROA.3869-3870; Pet. Ex. 8.

**15.** At a September 3, 2003 status conference, the state trial court denied relief, dismissing all claims in the first amended post-conviction petition as procedurally barred due to lack of factual support, and denying relief on the merits on the ineffective assistance of trial counsel claims in the second amended post-conviction petition. Doc. 121-1, p. 59, ROA.1919; Doc. 209, p. 64, ROA.3875; Pet. Ex. 9, attached herein as Exhibit L. The Louisiana Supreme Court affirmed. *State ex rel. Wessinger*, 2003-3097 (La. 9/3/04), 882 So.2d 605.

**16.** **Federal Habeas Proceedings.** On September 4, 2004, a day after the adverse state post-conviction ruling by the Louisiana Supreme Court, Gisleson filed a habeas petition in federal district court raising the same claims that he raised in the state courts. Doc. 1, p. 1, ROA.28. This habeas petition included the penalty phase ineffective assistance of trial counsel claim that was presented to the state post-conviction courts and that was based on trial counsel's penalty phase failures as reflected in the transcript of the penalty phase of the trial. Doc. 1, pp. 45-47, ROA.72-74.

**17.** After additional counsel was appointed by Judge Brady, petitioner, through new counsel, filed an Amended Petition for Writ of Habeas Corpus. Doc. 120, p. 1453, ROA.1453. The amended petition included a claim, Claim XI-C, that trial counsel was ineffective at the penalty phase of Wessinger's first degree murder trial. Doc. 120, p. 232, ROA.1684. The claim alleged that trial counsel failed to secure the services of a mitigation specialist and did not conduct a social history investigation of petitioner, and instead called witnesses counsel met for the first time in the hallway outside the courtroom and presented damaging testimony through counsel's own unprepared expert witnesses. Doc. 120, p. 232, ROA.1684.

**18.** Claim XI-C also alleged what trial counsel would have discovered had he conducted a proper mitigation investigation, including powerful mitigation regarding petitioner's family history of mental illness, alcohol abuse and violence and petitioner's own mental illness, none of which ever had been presented to the state courts. Doc. 120, pp. 232-256, ROA.1684-1708. This mitigation included that petitioner's maternal and paternal families have a significant history of seizure disorders, mental retardation, cerebral palsy and other neurologic and cognitive impairments and alcohol abuse; that petitioner struggled with neurologic and psychiatric symptoms that adversely affected his ability to function over the course of his life; that petitioner experienced repeated and severe seizures as a child and was medicated with Phenobarbital; that petitioner, who faced great difficulty in school and fell behind his peers academically, suffered ridicule, humiliation and physical abuse by his father, who singled him out for cruel treatment; that neuropsychological testing of petitioner shows signs of significant psychomotor

impairment, right hemisphere abnormality, deficits associated with fetal alcohol spectrum disorder and other signs of cerebral dysfunction and moderate brain impairment; that petitioner was raised by parents whose world view, handed down to their children, was shaped by the circumstance that they grew up on Louisiana plantations that remained little changed since slavery, and who constantly struggled to make ends meet in raising their children in poverty in segregated Baton Rouge; that petitioner was raised by a father, an alcoholic, who was a violent man who hit, pushed, and threatened his wife when he was drunk. *Id.*

**19.** In its Memorandum in Opposition to Petition for Writ of Habeas Corpus, Doc. 129, p. 1, ROA.2447, respondent alleged that in this penalty phase ineffective assistance of counsel claim "petitioner goes way beyond what he presented to the state courts for consideration of this claim below. As such, he should not be permitted to alter the habeas record by including items and discussions that he did not present to the state courts." Doc. 129, p. 151, ROA.2597.

**20.** The district court initially denied habeas relief on all claims. Doc. 135, p. 1, ROA.2651. However, following the Supreme Court's decision in *Martinez v. Ryan*, 566 U.S. 1 (2012), petitioner filed a timely motion pursuant to Rule 59(e) of the Federal Rules of Civil Procedure to alter or amend the judgment denying the petition with respect to Claim XI-C. Doc. 139, p. 1, ROA.2732; Doc. 141, p. 1, ROA.2746.[1] While acknowledging that the penalty phase ineffectiveness Claim XI-C was not fairly presented to the Louisiana state courts and, thus, was procedurally defaulted, petitioner argued that this was no barrier to review by the

---

[1] Petitioner appealed the district court's denial of relief and a certificate of appealability on the remaining claims, which judgment was affirmed on appeal, *Wessinger v. Vannoy*, No. 12-70008 in the U.S. Fifth Circuit.

federal courts because state post-conviction counsel Gisleson had failed to provide effective representation in state post-conviction proceedings, thereby excusing any procedural default under *Martinez*. Doc. 141, pp. 16-22, ROA.2761-2767. Petitioner also argued that the procedural default should be excused because the state refused to provide the requested necessary funding for mitigation and other expert assistance in state post-conviction proceedings, despite post-conviction counsel's request for funding from multiple sources, including the state post-conviction court, such that the state corrective process was ineffective to protect petitioner's rights, citing to 28 U.S.C. § 2254(b)(1)(B)(ii). Doc. 141, pp. 22-24, ROA.2767-2769.

**21.** The district court granted the Rule 59(e) motion, concluding that the evidence alleged in support of the penalty phase ineffectiveness claim was materially and significantly different and stronger than what was presented to the state court. Doc. 156, p. 3, ROA.3226. As a result, Judge Brady concluded that Claim XI-C had not been fairly presented to the state courts during state post-conviction proceedings and was therefore procedurally barred. Doc. 156, pp. 3-4, ROA.3226-3227. Judge Brady also concluded that petitioner's procedural default would not bar merits review if petitioner could show cause and prejudice as contemplated in *Martinez v. Ryan*, 132 S.Ct. 1309 (2012). Doc. 156, pp. 4-5, ROA.3227-3228; *see also* Doc. 156, pp. 5-6, ROA.3228-3229. Judge Brady ordered that the Court would handle both inquiries – initial-review counsel's ineffectiveness and trial counsel's penalty phase ineffectiveness – at one hearing. Doc. 156, p. 6, ROA.3229.

**22.** A federal evidentiary hearing was held before Judge Brady on January 12-13, 2015, Doc. 186, ROA.3546; Doc. 187, ROA.3547; and March 18-19, and 23, 2015. Docs. 202-204, ROA.3568, ROA.3569, ROA.3570. Petitioner presented the testimony, along with supporting documentation, of *pro bono* state post-conviction counsel Soren Gisleson; Louisiana state post-conviction expert Gary Clements, Director of CPCPL; Wessinger family members and friends Joseph Kelly, Troy Wessinger, Leroy Helire, Jr., John Williams, Demetric Alexander, and Sharon Alexander; neuropsychatrist Dr. George Woods; mitigation expert Russell Stetler; and capital defense expert Baton Rouge attorney Michele Fournet. *See id.* Respondent did not present any witnesses.

**23. The inadequacies of the State corrective process to protect petitioner's rights.** Gisleson's firm, through Russ Herman, agreed to accept a *pro bono* appointment as counsel for a death row inmate in the fall of 2000 after federal Judges Berrigan and Barbier visited Mr. Herman and requested that his firm take on such representation. Doc. 209, pp. 11-12; ROA.3822-3823.

**24.** The firm's *pro bono* commitment – and the need for Wessinger to file a state post-conviction petition – arose during the period between June of 1999 and March of 2001, when no state-funded entity existed to represent Louisiana's death row inmates needing the assistance of counsel for the filing of state post-conviction petitions and a Louisiana State Bar Association committee was formed to fill this gap by recruiting civil law firms to help in these cases. Doc. 210, pp. 41-42; ROA.3986-3987.

**25.** Just before Christmas in December of 2000, Gisleson received a file on the case from previous state post-conviction *pro bono* counsel, Winston Rice, who had been appointed by the Louisiana Supreme Court on June 2, 2000, to represent Wessinger, but who had suffered a mental breakdown and had not done any work on the case. Testimony of Soren Gisleson, Doc. 209, p. 12, ROA.3823; Doc. 209, p. 23, ROA.3834.

**26.** Gisleson had no capital, post-conviction, habeas or criminal law training or experience, or any other experience as a practicing lawyer, and there were no lawyers in his firm with any criminal experience whatsoever. Doc. 209, p. 21, ROA.3832; Doc. 209, p. 34, ROA.3845.

**27.** In anticipation of a filing deadline set by the trial court of April 10, 2001 for filing the state post-conviction petition, Gisleson reached out to various state actors and entities for funding, expertise and help. Doc. 209, p. 22, ROA.3833. Gisleson went to the Louisiana Indigent Defense Assistance Board (LIDAB), and was told that they had no funding or expertise that they could provide him in representing Wessinger. Doc. 209, p. 23-24, ROA.3834-3835. Gisleson contacted the East Baton Rouge Indigent Defense Board, who told him that they had no funding for him and no manpower to provide expertise to him. *Id.* Gisleson reached out to the Louisiana Crisis Assistance Center (LCAC) and was told that they could not provide him with any money or expertise. Doc. 29, p. 24, ROA.3835.

**28.** Gisleson also contacted Denise LeBoeuf, the director of the newly-formed and state-funded Capital Post-Conviction Project of Louisiana (CPCPL), who told him, "We don't have it for you. That's not how our funding structure works. We can't

give you any money." Doc. 209, p. 26, ROA.3837. Beyond funding, Gisleson asked CPCPL for help and expertise and was told "[w]e can't give it to you." *Id.* LeBoeuf explained that "by giving you our resources and our time, we are in effect giving you our money." *Id.*

**29.** The director of CPCPL was only willing and able to give Gisleson a general affidavit, without looking at Wessinger's file, that presented a "20,000-foot- high-level general structure in the most general terms of the rabbit holes you need to run through to make sure that you are doing your due diligence." Doc. 209, p. 25, ROA.3836.

**30.** In the spring of 2001, when Gisleson sought funding and assistance from various state entities, the LIDAB had contracted with CPCPL to "implement the appointment of counsel and representation of death-sentenced inmates in post-conviction proceedings," including providing resource assistance to *pro bono* lawyers and providing direct representation. Affidavit of Denise LeBoeuf, Exhibit B to Pet. Ex. 3, attached herein as Exhibit D. Even though CPCPL opened for business on March 8, 2001, "no funds [were] currently budgeted for experts or investigators in cases where *pro bono* counsel are appointed," it does not have staff to give investigative assistance to *pro bono* counsel except as determined on a "case-by-case basis," a determination that could not be made in Mr. Wessinger's case "for at least another month"; and CPCPL "categorically is not a funding source for experts or contract investigators." *Id.* Further, it is "not currently anticipate[d] that any funds will be expended by CPCPL for the representation of Mr. Wessinger in post-conviction." *Id.*

**31.** Also during the period that Gisleson sought funding and assistance, and since the dissolution of the Loyola Death Penalty Resource Center in 1999, "no system has existed for appointing or compensating counsel, investigators or experts in Louisiana once a person under a sentence of death is denied certiorari by the United States Supreme Court," until the creation and state funding of CPCPL in 2001. Affidavit of LeBoeuf, p. 3, Pet. Ex. 4, attached herein as Exhibit D. To address the backlog of capital post-conviction cases during the 1999-2001 period, the Louisiana State Bar Association's Committee on Post-Conviction Representation "actively recruited *pro bono* counsel from major law firms to represent clients in capital post-conviction proceedings." *Id.*, pp. 3-4. However, CPCPL "is not permitted, and does not have sufficient funds, to pay for experts' fees or investigative costs in cases where the client is represented by outside counsel," including Wessinger's case. *Id*, p. 4.

**32.** On the April 10, 2001, filing deadline for the state post-conviction petition, Gisleson, having gotten no relief from the state trial court on either motion and having been denied assistance from every state actor, entity and source of state funding that he pursued, appeared before the state court "with hat in hand and no petition" and stated "I just can't do it. I don't have anything." Doc. 209, p. 33; ROA.3844.

**33.** The state post-conviction court granted Gisleson another 60 days to file the state post-conviction petition on June 10, 2001, and Gisleson once again reached out to state entities and agencies for funding assistance, and, as he notified the state court, his efforts were unsuccessful. *See* Exhibits H and I. LIDAB director Ed Greenlee

stated that "LIDAB is not responsible for any funding of capital post conviction, with the exception of those cases handled by" CPCPL and that the "only funds in the LIDAB budget for Capital Post-Conviction cases have been fully dedicated to" CPCPL. *Id.* CPCPL Director LeBoeuf confirmed that the agency was "not responsible for funding of capital petitioners not represented by her office." Exhibit H. Baton Rouge state public defender Mitchell, director of the Baton Rouge Indigent Defense Board, stated that his office "is not responsible for providing funding for capital post-conviction petitioners," and has no fund available even if ordered to pay by the state court. *Id.*

**34.** On June 5, 2001, Gisleson filed a motion to withdraw with the Louisiana Supreme Court, seeking to be relieved of the representation based on his admitted inability "to provide competent representation in post-conviction" proceedings in state court "under the time and resource constraints" with which he was presented. Pet. Ex. 7, p. 1, attached herein as Exhibit K. Gisleson alleged that, as a civil lawyer with little criminal law experience, he "does not possess the level of knowledge or skill necessary to seek post-conviction relief in a criminal capital case under the current time and resource constraints." Gisleson explained that "he is working alone, as the resources of the firm have been absorbed by other litigation," he is providing his services *pro bono* and, despite his motions for funds for investigative assistance, "no such funds have been forthcoming." *Id.* This motion was denied by the Louisiana Supreme Court, with one justice concurring and suggesting that counsel for petitioner "may seek assistance of counsel of LADAB if he deems that

advisable," Pet. Ex. 7, which, as set forth above, Gisleson had sought to do more than once with no assistance forthcoming from the state pursuant to state policy.

**35.** In preparing the state post-conviction petition, Gisleson did not obtain medical records, school records, employment records or family history records of petitioner, Doc. 209, p. 41, ROA.3848, and did not interview witnesses, friends, teachers, coaches, or family members of petitioner beyond one or two conversations over the phone with petitioner's mother and brother about guilt-related issues and a few conversations with his client. Doc. 209, p. 28, ROA.3849; Doc. 209, p. 49, ROA.3860.

**36.** While Gisleson concluded, based on his review of the penalty phase trial transcript, that trial counsel's performance was "awful" and a "rank failure" and a penalty phase ineffective assistance of counsel claim should be raised, he did not have the assistance of a mitigation investigator, sociologist or even a "regular gumshoe fact" investigator to conduct a mitigation investigation in support of that claim and never made any strategic decision not to pursue such an investigation prior to filing the amended petition. Doc. 209, pp. 36-37, 41, ROA.3847-3848, ROA.3852; Doc. 209, p. 96, ROA.3907.

**37.** Nor was Gisleson able to hire any mental health experts or get any kind of records pertaining to Wessinger such as medical, school, employment or family history records. Doc. 209, p. 37, ROA.3848. As a result, besides references to the trial transcript, the ineffectiveness of penalty phase trial counsel claim raised by Gisleson in the amended state post-conviction petition included only an additional allegation that petitioner suffered from convulsions and head trauma as a child,

information that Gisleson may have found in the file or from a general phone conversation with petitioner's mother. Doc. 209, p. 48, ROA.3859; Pet. Ex. 6, p. 96.

**38.** The 136-page pleading Gisleson filed on petitioner's behalf in June of 2001 in state post-conviction proceedings was the product of a template of a master petition that included every conceivable issue that could be raised in state post-conviction as well as canned statements of law, which Gisleson had been given by LCAC attorneys, and it was based only on Gisleson's reading of the state court record "with the exception of a couple of discrete facts" that he may have found in a file or from a couple of general telephone conversations he had with Wessinger's mother. Doc. 209, pp. 34, 38, ROA.3845, ROA.3849; Doc. 209, pp. 47-48, ROA.3858-3859.

**39.** The resulting post-conviction petition was "inadequately investigated, rushly put together based on a civil lawyer's understanding of what to do, a first-year civil lawyer's understanding of what to do." Testimony of Soren Gisleson, Doc. 209, pp. 53-54, ROA.3864-3865.

**40.** After Gisleson's June 2001 filings of the petition in the state trial court and his request to be relieved of the representation in the state supreme court, he heard nothing from any court, or anyone else, and did nothing else on the case for the next 20 months, assuming that he was "out of the case, that they are just looking for some other lawyer to replace me." Doc. 209, p. 50, ROA.3861.

**41.** When, in February of 2003, Gisleson was served with the State's opposition to his amended state post-conviction petition, he literally ran to the Louisiana Supreme

Court building in New Orleans, where he found in the court record a letter dated June 20, 2001, which had been mailed to his old home address and which he had never seen before, denying his motion to withdraw. *Id.*; Pet. Ex. 7; SPCR Vols. I and II, State's Response to Application for Post-Conviction Relief, with a service date of February 26, 2003.

**42.** Upon learning that the state trial court had not issued a ruling on the amended petition he filed in June of 2001 and had referred the case to a commissioner for review, Gisleson felt that he had "an opportunity to try to do something," since the case was still alive, and he decided to file a second amended state post-conviction petition. Doc. 209, p. 54, ROA.3865.

**43.** Gisleson once again reached out to CPCPL seeking assistance and was told, once again, that the organization could not help and had no money for mitigation or investigative assistance for petitioner's case. Doc. 209, pp. 55-56; ROA.3866-3867.

**44.** CPCPL did refer Gisleson to a possible consultant: Houston-based attorney Danalynn Recer with the Gulf Regional Advocacy Center. Doc. 209, p. 56, ROA.3867. Recer agreed to provide "general assistance" to Gisleson in the form of "some general advice, consultation" for a fee of $5,000, which Gisleson convinced his firm to pay. Doc. 209, pp. 54-56, ROA.3865-3867. Recer, like everyone else Gisleson contacted at that time, refused to enroll as co-counsel of record in the state post-conviction proceedings. Doc. 309, p. 57, ROA.3868.

**45.** Neither Gisleson nor anyone working on his behalf, nor Recer or anyone working on her behalf, did any mitigation investigation during the six-month period prior to

the filing of the second amended post-conviction petition. Doc. 209, pp. 60-62, ROA.3871-3873. As a result, the penalty phase ineffective assistance of counsel claim in that petition continued to be based only on trial counsel's penalty phase failures as reflected in the trial transcript, with a passing reference to a Wessinger family history of high blood pressure and "cardio" problems and Wessinger's history of childhood seizures. Ex. 8, pp. 37, 44.

**46.** The second amended petition did not cure the inadequacies Gisleson expressed to the Louisiana Supreme Court in June of 2001. Doc. 209, p. 65, ROA.3876.

**47.** It became completely clear to Gisleson by the time he sought to withdraw as counsel of record for Wessinger that there was no way he could do his "due diligence" in the case. Doc. 209, p. 43; ROA.3854. He had been unable to retain the necessary investigative assistance, despite reaching out to multiple state agencies and actors. Doc. 209, pp. 44-45, ROA.3855-3856. Without investigative assistance that he had sought from every possible state entity, he was unable to do what needed to be done to assist petitioner in state post-conviction proceedings. Doc. 209, p. 45, ROA.3856.

**48.** Gisleson was unable to develop and present an ineffective assistance of penalty phase counsel claim beyond the record-based claims reflected in his state court post-conviction petitions because of "lack of money, lack of expertise, lack of help, lack of experience" and "lack of time." Doc. 209, p. 66, ROA.3877.

**49.** The CPCPL is a Section 501(c)(3) non-profit law office that primarily contracts with the Louisiana Public Defender Board to provide post-conviction representation to inmates on death row in Louisiana. Testimony of Gary Clements,

a Louisiana state capital post-conviction expert and attorney with the Capital Post-Conviction Project of Louisiana (CPCPL) since mid-October 2001, Doc. 210, p. 8, ROA.3953.

**50.** "[G]enerally it takes a couple of years to properly put a case together in [capital] postconviction," once a core team is assembled consisting of two attorneys, with at least one having more than five years of experience in capital post-conviction work, along with a mitigation specialist and a paralegal. Testimony of Gary Clements, Doc. 210, pp. 11-12, 24, ROA.3956-3957, 3969. This standard of performance in Louisiana, which prevailed in 2001-2003, is based upon U.S. Supreme Court death penalty jurisprudence and American Bar Association guidelines for how to conduct a death penalty case, which have been adopted by the Louisiana Public Defender Board as the standard for the State of Louisiana. Doc. 210, pp. 67-68, ROA.4012-4013.

**51.** There is period in the history of Louisiana death penalty state post-conviction which has been referred to as the "doughnut hole," and which ran from June 30, 1999, when the Loyola Death Penalty Resource Center was closed, until March 1, 2001, when CPCPL opened. Testimony of Gary Clements, Doc. 210, pp. 41-42, ROA.3986-3987. During this period, the cases of Louisiana death row inmates still continued through the state appellate system and into the state post-conviction phase. *Id.* Since there was no state entity or system in existence during this "doughnut hole" for representing or appointing and compensating counsel to represent these Louisiana death row inmates and no funding for experts or investigators, the Louisiana Bar Association created a Committee on Post-

Conviction Representation to try to recruit civil law firms, primarily in the New Orleans area, to represent these inmates on a *pro bono* basis in state post-conviction proceedings. Doc. 210, pp. 41-42, ROA.3986-3987. Gisleson's firm was recruited, and he was appointed as *pro bono* counsel for Wessinger and represented him, during this "doughnut hole" period when there was no state assistance or funding. *Id.*

**52. Penalty Phase Trial Counsel's Ineffective Assistance.** At the time of petitioner's first degree murder trial in June of 1997, he was represented in the penalty phase by Joseph William "Billy" Hecker, who was appointed as counsel for petitioner less than six months prior to trial, in January of 1997. Doc. 42-5, p. 20, ROA.853; Pet. Ex. 62, p. 1, attached herein as Exhibit A. Hecker inherited the case from petitioner's former attorney, Orscini Beard, who had not done any investigation on the case or sought any funds for experts and had been removed from the case because of his own arrest. *Id.* Additionally, during the six months prior to trial, Hecker suffered a serious personal loss as a result of his father's month-long illness that ended in his father's death on April 7, 1997. *Id.* During this traumatic time, Hecker "effectively was not a lawyer," just "a son." Doc. 42-5, p. 21, ROA.854; Pet. Ex. 62, p. 2. Two weeks after his father died and just seven weeks before petitioner's trial, Hecker, already overwhelmed, was forced to take custody of his 14-year-old daughter and set up a home with her. Doc. 42-5, pp. 21-22, ROA.854-855; Pet. Ex. 62.

**53.** Hecker did not deliberately choose to abandon any area of investigation, but "simply lacked adequate time, funding and focus." Pet. Ex. 63, p. 1, attached herein

as Exhibit B. He had no mitigation specialist investigating the case in mitigation and, as a result, could only put on character witnesses to say that petitioner was a good person who suffered from alcoholism at the time of the murders. *Id.*, pp. 1-2. Hecker never learned of the Wessinger family history of seizure disorders, mental retardation and other major health problems, and did not know that petitioner had neurological issues and suffered from seizures as a child. *Id.*, p. 2. Furthermore, due to time constraints and issues in his personal life, Hecker was unable to work with the mental health experts he had hired, Drs. Carey Rostow and Philip Louis Cenac, and put them on the stand in the penalty phase without first discussing with them their testimony. *Id.* Hecker denied that it was his strategy to put on the stand such important witnesses without knowing the full content of their testimony so that he could decide whether to call them. *Id.* He did not expect that, in their testimony, "they would call [his] client a liar, dangerous, and testify that he had confessed," would not have called them as witnesses had he known of this testimony, and was shocked and not prepared for how to handle it. *Id.*

**54.** Troy Wessinger, petitioner's older brother, served as the family liaison with both attorneys Hecker and, before him, Beard, who did nothing on the case and never conducted any investigation during the time he represented petitioner. Testimony of Troy Wessinger, Doc. 206, pp. 64-70, ROA.4095-4101.

**55.** Troy Wessinger and six other family members had only one meeting for about an hour with Hecker during the six-month period prior to trial. Doc. 206, pp. 71-73, ROA.4102-4104; Doc. 206, p. 134, ROA.4165. Hecker asked for some good character witnesses for petitioner, and Troy gave him the names of a few ladies

whose yards the family mowed growing up, who Hecker called at the penalty phase trial. *Id.* Additionally, a lot of the others who ended up testifying at the penalty phase came from Troy asking them to come to court to talk to the attorney about being character witnesses. Doc. 206, p. 77, ROA.4108. At most, Hecker talked to these penalty phase witnesses in the hallway of the courthouse during the trial and then put them on the witness stand without any preparation. *Id.*

**56.** Hecker did not perform the thorough mitigation investigation required of him under prevailing professional norms at the time. Expert Testimony of Mitigation Expert Russell Stetler, Doc. 208, pp. 35-36, ROA.4348-4349. Hecker had the ultimate responsibility for directing and supervising the mitigation investigation and assuring that it was done in a timely fashion as well as for retaining experts and spending time with those experts in order to see what they were learning and to prepare them to testify. *Id.* This obligation was not satisfied by counsel's one-hour group meeting of family members all together, as described by Troy Wessinger. Doc. 208, p. 39, ROA.4352; Doc. 208, p. 45, ROA.4358. Hecker also had the responsibility to provide the experts with independently corroborated objective information about petitioner's development and functioning, which he did not do. Doc. 208, p. 36, ROA.4349.

**57.** Hecker's performance in the penalty phase of petitioner's trial was deficient in that he failed to comply with prevailing professional norms at the time the case was tried as reflected in American Bar Association Guidelines in effect at the time, as well as the guidelines manual provided by LIDAB and the training that was available at the time regarding the best way to litigate capital cases. Expert

Testimony of Capital Defense Expert Michele Fournet, Doc. 208, p. 83, ROA.4396. There is no evidence in the records in the case, the trial transcript, or any of the testimony presented at the federal evidentiary hearing in March of 2015, that Hecker conducted any sort of thorough mitigation investigation under professional norms prevailing in Baton Rouge, Louisiana in 1997. Testimony of Michele Fournet, Doc. 208, pp. 101-102, ROA.4414-4415.

**58. The Prejudice to Petitioner Resulting from Trial Counsel's Penalty Phase Ineffective Assistance.** Petitioner's family history and genetics, as reflected in the mitigation investigation conducted for the first time by federal habeas counsel, evidences a significant maternal and paternal history of cardiac disease and cerebrovascular disease of the blood vessels of the heart, as well as learning disabilities and mental retardation, all of which was relevant to the diagnosis that petitioner suffers from a major neurocognitive disorder. Expert Testimony of Expert Physician Specializing in Neuropsychiatry, Dr. George Woods, Doc. 207, pp. 30-33, ROA.4277-4380; Doc. 207, p. 39, ROA.4286; Pet. Ex. 60.

**59.** Petitioner's environmental history and medical and psychological information, also gathered as a result of federal habeas counsel's mitigation investigation, support that, at some point in his young life, petitioner had a pediatric stroke in the left ventricular part of his brain, the left frontal lobe. Expert Testimony of Dr. George Woods, Doc. 207, p. 40, ROA.4287. Additionally, the brain imaging, including the highly reliable MRI which was first developed in 1973, showed a hole in petitioner's brain that occurred because of a cerebrovascular illness. Doc. 207, pp. 44-45, ROA.4291-4292, Pet. Ex. 61. The science regarding pediatric strokes, as

well as the brain imaging and neuropsychological testing, would have been available as early as 1997, when Hecker represented petitioner. Doc. 207, p. 48, ROA.4295.

**60.** Dr. Woods' expert findings made sense of why petitioner was so different from others in his family. Expert Testimony of Dr. George Woods, Doc. 207, p. 52, ROA.4299. The part of petitioner's brain where the stroke occurred and that was damaged was the frontal temporal lobe, which damage can impair one's ability effectively to weigh, deliberate and sequence one's behavior, to make good decisions and to change gears in response to changed circumstances. Doc. 207, pp. 52-53, ROA.4299-4300; Doc. 207, pp. 64-64, ROA.4311-4312.

**61.** While petitioner's now-deceased father, Horace, worked very hard his entire life, beginning as a boy working the fields on a plantation, Horace's main release was drinking alcohol after work. Testimony of Troy Wessinger, Doc. 206, p. 90, ROA.4121; Doc. 206, p. 107, ROA.4138. That drinking, which was seven days a week with Horace getting drunk most every day, led to domestic violence in the home as much as three days out of the seven. Doc. 206, p. 110, ROA.4141; Doc. 206, pp. 108-112, ROA.4139-4143.

**62.** The Capital Jury Project has interviewed large numbers of capital jurors since 1991, and found over multiple jurisdictions that evidence of brain damage and impairments and developmental difficulties, including violence in the home, domestic violence, child maltreatment and poverty are all very powerful mitigation that resonates with capital jurors. Expert Testimony of Mitigation Expert Russell Stetler Doc. 208, p. 18, ROA.4331.

**63.** There is a reasonable probability that, but for Hecker's unprofessional errors, the result of petitioner's penalty phase trial would have been different. Expert Testimony of Capital Defense Expert Michele Fournet, Doc. 208, p. 127, ROA.4440. Under Louisiana law, "all you need is one juror to hold out on the issue of penalty and you get a life sentence," and the presentation of the information that was uncovered by current counsel "would have almost certainly done more than that and certainly would have done at least that." Expert Testimony of Capital Defense Expert Michele Fournet, Doc. 208, pp. 127-128, ROA.4440-4441.

**Respectfully Submitted,**

/s/ Rebecca L. Hudsmith
**Rebecca L. Hudsmith, La. Bar No. 07052**
Federal Public Defender
Cristie Gautreaux Gibbens
Assistant Federal Public Defender
102 Versailles Blvd., Suite 816
Lafayette, LA 70501
Phone: (337) 262-6336
Fax: (337) 262-6605

Counsel for Petitioner

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been served on all counsel of record by operation of the Court's electronic filing system on this 30th day of August, 2019.

/s/ Rebecca L. Hudsmith
**Rebecca L. Hudsmith**
Federal Public Defender
Louisiana Bar No. 07052
102 Versailles Blvd., Suite 816
Lafayette, LA 70501
Phone: (337) 262-6336

Fax: (337) 262-6605