# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**TODD KELVIN WESSINGGER**

**VERSUS**

**DARREL VANNOY, ET AL.**

**CIVIL ACTION**

**NO. 04-637-JWD-EWD**

## RULING AND ORDER

This matter comes before the Court on Petitioner, Todd Wessinger's *Amended (Re-Urged) Motion for Summary Judgment and, in the Alternative, for Habeas Relief* (Doc. 278). Respondent, the State of Louisiana, opposes the motion and moves for dismissal/summary judgment (Doc. 282). Wessinger has filed a reply and opposition to Respondent's motion to dismiss/motion for summary judgment (Doc. 286). Respondent filed a Reply to Wessinger's opposition to its motion to dismiss/motion for summary judgment (Doc. 294). Wessinger filed a Sur-Reply (Doc. 297) to address arguments raised for the first time by Respondent in Doc. 294. Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, Wessinger's motion for habeas relief (Doc. 278) is granted.

## I.     Relevant Procedural History

Wessinger was indicted on two counts of first degree murder in the Nineteenth Judicial District Court for the Parish of East Baton Rouge for the 1995 shooting deaths of Stephanie Guzzardo and David Breakwell. After a trial by jury, Wessinger was convicted and sentenced to death on both counts. (*See* Petitioner's *Statement of Uncontested Material Facts…"* SUMF, Doc. 278-3, ¶1, 2). Wessinger filed a federal petition for habeas corpus relief on September 7, 2004, alleging trial counsel was ineffective at the penalty phase. (Doc. 1). Wessinger later amended his

petition with claim "XI-C," adding additional allegations that Wessinger's trial counsel was ineffective during the penalty phase of his trial. (Doc. 120 at 232-305) (*SUMF* ¶17, 18). The Court initially denied relief on all claims, including Claim XI-C (Doc. 135).

Wessinger timely filed a Rule 59(e) *Motion to Alter Judgment* (Doc. 139, 141), arguing, *inter alia*, that the Court's dismissal of Claim XI-C was manifestly erroneous based on two separate theories. Wessinger argued that the claim was unexhausted and procedurally defaulted, but the default should be excused pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012), which allows the federal court to consider a substantial ineffective assistance of trial counsel claim that was unexhausted due to the ineffectiveness of post-conviction counsel (Doc. 139, 141). Second, Wessinger argued the default should be excused because the State of Louisiana "refused to provide the requested necessary funding for a mitigation and other expert assistance in state post-conviction proceedings, despite post-conviction counsel's request for funding from multiple sources, including the state post-conviction court, such that the state corrective process was ineffective to protect the petitioner's rights." (*Id*.).

Over Respondent's objection (Doc. 149), the Court granted Wessinger's motion and determined that Claim XI-C was procedurally defaulted (Doc. 156). The Court acknowledged that procedural default may be excused through a showing of cause and prejudice. The ruling ordered, "the case reopened as to Petitioner's Claim XI-C" (*Id*.).  An evidentiary hearing was held on January 12-13, March 18-19, and March 23 of 2015. Wessinger presented lay and expert witnesses and supporting documentation. Respondent called no witnesses. (Doc. 206, 207, 208, 209, 210) (*SUMF* ¶22). On July 27, 2015, the Court issued a ruling granting habeas relief on Claim XI-C. The Court found Wessinger's post-conviction counsel ineffective, excusing the procedural default. The Court also concluded that Wessinger's trial counsel was ineffective during the penalty phase

of his trial, and considering the evidence presented at the evidentiary hearing there was a reasonable probability that at least one juror would have voted for life imprisonment instead of the death penalty. Accordingly, the Court ordered a new penalty phase trial. (Doc. 216, 217).

Respondent appealed to the Fifth Circuit, which reversed the decision with a ruling issued on July 20, 2017. *Wessinger v. Vannoy*, 864 F.3d 387 (5th Cir. 2017). The Fifth Circuit "conclude[d] that [post-conviction counsel's] performance in raising and developing [Petitioner's] claim for ineffective assistance of trial counsel at the penalty phase was not deficient" (*Id.* at 392) because "[t]he state post-conviction court denied [post-conviction counsel's] motion for funds "for any and all types of investigation" and "[post-conviction counsel] "repeatedly reached out to various organizations for funding or assistance and was repeatedly denied" (*Id.*). Wessinger sought a writ of certiorari with the United States Supreme Court, which was denied on March 5, 2018. *Wessinger v. Vannoy*, 138 S. Ct. 952 (2018).

On August 30, 2019, Wessinger filed *Motion for Summary Judgment, or in the Alternative, for an Evidentiary Hearing on Cause and Prejudice, or in the Alternative, for Relief from Judgment* on the grounds that the Court never addressed his inadequate state process theory (Doc. 234). The Court initially denied Wessinger's motion, relying on the mandate rule and language in the Court's ruling reopening Claim XI-C, stating "*all other claims are denied*" (Doc. 246). Wessinger subsequently filed a motion pursuant to Rule 59(e) requesting the Court alter or amend its ruling. Wessinger argued that the language "*all other claims are denied"* referred to claims other than XI-C, which Wessinger was simultaneously attempting to revive, and the Court determined lacked merit (Doc. 248-1). Upon consideration of Wessinger's motion, the Court found that it manifestly erred in denying Wessinger's summary judgment based on the mandate rule because the language "*all other claims are denied*" referred to claims other than XI-C, the Court never ruled on the

merits of Wessinger's inadequate state process theory, and law of the case doctrine and the mandate rule are both inapplicable. The Court partially granted Wessinger's motion, permitting him to file the amended motion for summary judgment (Doc. 254).

Wessinger filed an *Amended Motion for Summary Judgment and, in the Alternative, for Habeas Relief on Claim XI-C*, on October 20, 2020 (Doc. 255). Respondent filed an opposition (Doc. 258). Upon review, the Court discovered that Wessinger's motion could not be adequately addressed because the Court was no longer in possession of the state court record (Docs. 264, 267). After a status conference on the matter (Doc. 267), the Court ordered the Clerk of Court for the 19th Judicial District Court to produce a copy of the record and the District Attorney's office to upload the record electronically into the Court's CM/ECF system (Doc. 268). The Court order also permitted Wessinger to re-urge his amended motion for summary judgment within sixty days of the production of the record. Wessinger re-urged his motion on April 11, 2022, which includes the same substance of the *Amended (Re-Urged) Motion for Summary Judgment and, in the Alternative, for Habeas Relief on Claim XI-C* filed on October 20, 2020 (Doc. 278). On May 16, 2022 Respondent filed a *Combined Motion to Dismiss, and, in the Alternative, Motion for Summary Judgment, and in Opposition to Petitioner's Amended (Re-Urged) Motion for Summary Judgment and, in the Alternative, for Habeas Relief* (Doc. 282).

## II.    Relevant Factual Background

### A.  Background Relevant to Wessinger's Inadequate State Process Theory

The United States Supreme Court denied Wessinger's petition for writ of certiorari on direct appeal on December 6, 1999 (Doc. 273-52 at 47). A death warrant was issued by the trial judge on January 31, 2000, setting his execution for April 5, 2000 (Doc. 273-3 at 9). Wessinger had not yet been appointed counsel for post-conviction relief pursuant to Louisiana's statutory

mandate, LSA-RS 15:141.1 and LSA-RS 15:151.2(E). Wessinger's appointed appellate counsel filed a motion to stay his execution, appoint post-conviction counsel, and determine the funding source for the cost of post-conviction proceedings. (Doc. 273-3 at 31-34). In this motion, Wessinger reiterated to the trial court what the Louisiana Supreme Court had stated in his direct appeal ruling, "[i]neffective assistance of counsel claims are customarily addressed in post-conviction proceedings, not on direct appeal." *State v. Wessinger*, 98-1234 (La. 5/28/99), 736 So. 2d 162, 195. Wessinger also advised the trial court that he needed funding to develop these claims that could not be brought on direct appeal because the evidence lies outside of the record.

On March 30, 2000, the trial court held a hearing to determine who would represent Wessinger in the post-conviction proceedings and the funding source (Doc. 272-7 at 30 through 272-8 at 8). Counsel for the Crisis Assistance Center, who represented Wessinger on direct appeal, appeared on behalf Wessinger for the limited purpose of the hearing. Counsel requested that the trial court set a hearing to determine counsel and direct that the executive director of the Louisiana Indigent Defender Assistant Board ("LIDAB") appear for the hearing (Doc. 272-8 at 2). The trial court appointed the LIDAB to represent Wessinger and stayed his execution until April 17, 2000 (Doc. 272-8 at 7-8).

On April 24, 2000, the trial court held a hearing to determine who would represent Wessinger (Doc. 272-8, at 10 through Doc. 272-9, at 8). The director of LIDAB, Jelpi Picou, appeared on behalf of Wessinger. Picou explained that the legislative mandate to provide post-conviction counsel to death row inmates was unfunded, there was no funding to provide counsel to Wessinger, and Wessinger was one of sixteen unrepresented death row inmates (Doc. 272-8 at 13-14). According to Picou, Wessinger was sixteenth on the list of unrepresented inmates that was sent to Judge Ginger Berrigan, the chair of the Louisiana State Bar Association *pro bono* panel

5

(*Id*. at 14). The State of Louisiana disputed the contention that LIDAB had no funding in its budget for counsel, argued LIDAB had a statutory duty to provide representation and was attempting to delay Wessinger's execution by not appointing counsel, and requested the trial court issue a death warrant because no application for post-conviction relief had been filed on behalf of Wessinger (Doc. 272-8 at 16-19, 34-35) (Doc. 272-9 at 2-5). At the end of the hearing, with no counsel appointed by LIDAB to represent Wessinger during post-conviction proceedings and no post-conviction application filed, the trial judge ruled that a death warrant would be issued. (Doc. 272-9 at 5). The trial judge signed a death warrant on April 25, 2000 setting Wessinger's execution for June 7, 2000 (Doc. 273-54 at 25).

Wessinger sought relief with the Louisiana Supreme Court, which issued an order on June 2, 2000, directing the trial court to recall the warrant of execution set for June 7, 2000, and appointing private attorney Winston Rice as post-conviction counsel (Doc. 273-3 at 36). *State ex rel. Wessinger v. State*, 763 So. 2d 608 (La. 6/2/00). The record reflects that Rice asked the trial court for an extension of time to file the post-conviction application (Doc 273-3 at 38-41). Twenty-four days before the deadline of December 29, 2000 to file the post-conviction application and one day before the statutory deadline under the Antiterrorism and Effective Death Penalty Act (AEDPA), Rice asked to withdraw from representation, confiding that his mental and physical health had deteriorated due to a neurological and physiological disorder. (Doc. 121 at 74-75) (Doc. 19). This Court equitably tolled the AEDPA statute of limitations due to Rice's abandonment of Wessinger during the post-conviction proceedings and Rice's deception by failing to inform Wessinger of his incapacity and inability to continue to function as his counsel (Doc. 19).

Federal Judges Ginger Berrigan and Carl Barbier visited the firm of Herman, Herman, Katz & Cotlar, LLP in New Orleans in the fall of 2000 and requested the firm accept the *pro bono*

representation of Wessinger (*SUMF* ¶ 23). The firm's *pro bono* commitment--and the need for Wessinger to file a state post-conviction petition arose during the period between June of 1999 and March of 2001, when no state-funded entity existed to represent Louisiana's death row inmates needing the assistance of counsel for the filing of state post-conviction petitions and a Louisiana State Bar Association committee was formed to fill this gap by recruiting civil law firms to help in these cases (*SUMF* ¶ 24). On January 3, 2001, the Louisiana Supreme Court formally appointed first-year associate Soren Gisleson (Doc. 273-11 at 19) (Doc. 121 at 78) (*SUMF* ¶3).

Just before Christmas, in December of 2000, Gisleson received a file on the case from previous state post-conviction *pro bono* counsel, Winston Rice, who had suffered a mental breakdown and had not done any work on the case (*SUMF* ¶ 25). Prior to his appointment, Gisleson filed a three-page shell petition (*SUMF* ¶4) (Doc. 273-4 at 2-4). At a status conference on February 5, 2001, the trial court granted Wessinger an extension until April 10, 2001 to file an amended petition (*SUMF* ¶4) (Doc. 272-9 at 9-17). On March 12, 2001, Wessinger filed a motion seeking funding to establish the factual basis of his ineffective assistance of counsel claims (Doc. 273-4 at 7-26) (*SUMF* ¶5). Wessinger subsequently filed a motion to extend the April 10, 2001 deadline to amend his petition (*SUMF* ¶6) (Doc. 273-11 at 2 through Doc. 273-12 at 18).

Gisleson reached out to various entities for funding, expertise, and help (Doc. 209 at 22) (*SUMF* ¶27). In the spring of 2001, the LIDAB had contracted with Capital Post Conviction Project of Louisiana (CPCPL) to "implement the appointment of counsel and representation of death-sentenced inmates in post-conviction proceedings," including providing resource assistance to *pro bono* lawyers and providing direct representation (Doc. 234-6 at 19-22) (*SUMF* ¶30). Although CPCPL opened for business on March 8, 2001, no funds were budgeted for experts or investigators in cases where *pro bono* counsel were appointed, and it did not have the staff to give

investigative assistance to *pro bono* counsel except as determined on a "case-by-case basis." (*Id*.). CPCPL "is not permitted and does not have sufficient funds to pay for experts' fees or investigative costs in cases where the client is represented by outside counsel" (*SUMF* ¶ 31). Gisleson contacted Denise LeBoeuf, the director of the newly formed and state-funded CPCPL, who told him, "We don't have it for you. That's not how our funding structure works. We can't give you any money" (Doc. 209 at 26) (*SUMF* ¶ 28).[1] Gisleson also asked CPCPL for help and expertise and was told, "[w]e can't give it to you…by giving you our resources and our time, we are in effect giving you our money" (*Id*.). LeBoeuf provided Gisleson an affidavit dated March 13, 2001 for submission in Wessinger's post-conviction proceedings, which attested: "[w]e can state categorically that CPCPL is not a funding source of experts or contract investigators" and LeBoeuf did "not currently anticipate that any funds will be expended by CPCPL for the representation of Mr. Wessinger in post-conviction (Doc. 234-6) (*SUMF* ¶ 30).[2]

On the April 10, 2001 filing deadline for the state post-conviction petition, Gisleson, having gotten no relief from the state trial court on either motion and having been denied assistance from every state actor, entity and source of state funding that he pursued, appeared before the state court "with hat in hand and no petition" and stated "I just can't do it. I don't have anything." (*SUMF* ¶ 32) (Doc. 272-9 at 18 through 272-10 at 11). The State of Louisiana took the position

---

[1] Respondent objected to *SUMF* ¶28 and ¶29 on the basis of hearsay. The statements referenced in these paragraphs are testimony from the federal evidentiary hearing. Counsel for Respondents did not object to the testimony as hearsay during the hearing. In the specific context of hearsay, a party waives a hearsay challenge if he does not "timely object[ ] or move[ ] to strike." *See* Fed. R. Ev. 103(a)(1); *see also United States v. Everett,* 237 F.3d 631, 2000 WL 1701776, at *5 n. 7 (5th Cir.2000) ("Hearsay admitted without objection 'is to be considered and given its natural probative effect as if it were in law admissible.'") (quoting *United States v. Gresham,* 585 F.2d 103, 106 (5th Cir.1978)). *Guerrero v. Total Renal Care, Inc.,* 932 F. Supp. 2d 769, 777 (W.D. Tex. 2013). Respondent's objection is overruled. The statement will be accepted as undisputed, as Respondent failed to point to a reference in the record controverting the assertion. *See* Local Rule 56(f).

[2] CPCPL director, Gary Clements, testified at the federal evidentiary hearing on January 13, 2015. Clements testified that between June 30, 1999, when the Loyola Death Penalty Resource Center closed and March 1, 2001, when the CPCPL opened, there was no structure in place for post-conviction representation of death row inmates and the bar association, somewhat unsuccessfully, recruited civil attorneys to take the cases *pro bono* (Doc. 201 at 41-43).

that the LIDAB was responsible for funding Wessinger's post-conviction defense, including investigative and expert services (Doc. 234-9 at 4). The trial court ordered Gisleson to petition the LIDAB, which the court found to be responsible for funding the post-conviction investigation, to determine if the board would actually fund the investigation and report back to the court. Further, the trial court set an April 24, 2001 hearing date if there were "any problems with getting funding," at which time the court told Gisleson, "if you have any evidence to present, you better have it that day because it won't be continued to another day. That issue will be resolved that day." (Doc. 234-9 at 26, 30) (*SUMF* ¶ 7).

When Gisleson reached out to the LIDAB, he was told that they had no funding or expertise they could provide to him in representing Wessinger (Doc. 209 at 23-24) (*SUMF* ¶ 27). The director of the Baton Rouge Indigent Defense Board also stated that his office "is not responsible for providing funding for capital post-conviction petitioners," and has no funds available even if ordered to pay by the state court (Doc. 273-12 at 19) (*SUMF* ¶ 33).[3] On April 16, 2001 Wessinger's counsel notified the trial court that the Louisiana Indigent Defender Assistance Board (LIDAB), Capital Post-Conviction Project of Louisiana (CPCPL), and Baton Rouge Indigent Defense Board (BRIDB) all disavowed responsibility for funding Wessinger's post-conviction defense (Doc. 273-12 at 20-23) (*SUMF* 8). The notice indicated that the director of LIDAB, Edward Greenlee, advised: "LIDAB is not responsible for any funding of post-conviction, with the exception of cases handled by CPCPL" (Doc. 234-10) (*SUMF* ¶ 33). Edward Greenlee wrote a letter to the trial court judge on April 11, 2001, stating "the only funds in the LIDAB budget for Capital Post-Conviction cases have been fully dedicated to CPCPL" (Doc. 273-12 at 19) (*SUMF* ¶ 9).[4]

---

[3] Respondents also objected to *SUMF* ¶33 on the basis of hearsay. The objection is overruled. Greenlee's letter is part of the official state court record (Doc. 234-11 at 2) and is admissible evidence in these proceedings. *See* 28 U.S.C. § 2254(g).

[4] Discussed, *infra,* Edward Greenlee was the first counsel appointed by the trial court to represent Wessinger.

Greenlee's letter referenced his testimony in another capital post-conviction case pending in the 19th Judicial District Court, *Jimmy Ray Williams v. Burl Cain*, No. 7-94-871. *Id.* On February 4, 2005, the 19th Judicial District Court issued an order in *Jimmy Ray Williams v. Burl Cain*, declaring that LIDAB was violating its statutory mandate by refusing to fund (including expert and investigative services) the defense of capital post-conviction defendants who were represented by appointed *pro bono* counsel (Doc. 234-16) (Doc. 234-17).

Another hearing was held in Wessinger's post-conviction proceedings on April 24, 2001 (Doc. 272-10 at 12-27). Wessinger's counsel advised the trial court they needed to obtain Wessinger's medical records because Wessinger had seizures as a child and was prescribed phenobarbital. (*Id.* at 15; 17-18). The court denied Wessinger's request for funding for experts. (*Id.* at 21).

On June 5, 2001, a week before the June 11, 2001 deadline to file the amended post-conviction application, Gisleson filed a motion to withdraw with the Louisiana Supreme Court contending he was unable to "provide competent representation…under the time and resource constraints" (Doc. 234-13) (*SUMF* ¶ 12, 34). This motion was denied by the Louisiana Supreme Court, with one justice concurring and suggesting that counsel for petitioner "may seek assistance of counsel of LIDAB if he deems that advisable." (*SUMF* ¶ 12).

In preparing the state post-conviction application, Gisleson did not obtain medical records, school records, employment records or family history records of Wessinger. He did not interview witnesses, friends, teachers, coaches, or family members beyond one or two conversations over the phone with Wessinger's mother and brother about guilt-related issues. He had a few conversations with his client (Doc. 209 at 41, 48, 49) (*SUMF* ¶ 35). Gisleson concluded, based on his review of the penalty phase transcript, that trial counsel's performance was "awful" and a "rank

failure" and a penalty phase ineffective assistance of counsel claim should be raised. However, Gisleson did not have the assistance of a mitigation investigator, sociologist, or even a "regular gumshoe fact" investigator to conduct a mitigation investigation in support of that claim and never made any strategic decision not to pursue such an investigation prior to filing the amended petition (Doc. 209 at 36-37, 41, 96) (*SUMF* ¶ 36).[5]

Gisleson filed a First Amended Post-Conviction Application by the June 11, 2001 deadline (First Amended PCR) (*SUMF* ¶13). The 136-page Application was the product of a master petition that included every conceivable issue that could be raised in state post-conviction as well as canned statements of law, which Gisleson had been given by Louisiana Crisis Assistance Center attorneys, and it was based only on Gisleson's reading of the state court record "with the exception of a couple of discrete facts that he may have found in the file or from a couple of general telephone conversations he had with [Wessinger's] mother" (Doc. 209 at 34, 38) (*SUMF* ¶ 38).

After Gisleson filed the First Amended PCR in state trial court and his motion to withdraw with the Louisiana Supreme Court, he did nothing on the case for 20 months. Gisleson assumed he was "out of the case, that they are just looking for some other lawyer to replace me" (Doc. 209 at 50) (*SUMF* ¶ 40). When Gisleson was served with the state's opposition to his First Amended PCR in February of 2003, he literally ran to the Louisiana Supreme Court building in New Orleans, where he found a letter dated June 20, 2001, which had been mailed to his home address and which he had never seen before. The letter denied his motion to withdraw (*SUMF* ¶ 41).

Realizing the case had been referred to a commissioner for review and was still alive, he had "an opportunity to do something," so Gisleson decided to file a Second Amended Post-

---

[5] Respondent denies *SUMF* ¶ 36. This statement is taken directly from Gisleson's federal evidentiary hearing testimony. Respondent disputes the reason that Gisleson did not have these resources but does not point to anywhere in the record controverting the fact that Gisleson did not have these resources. Local Rule 56(f).

Conviction Application ("Second Amended PCR") (Doc. 209 at 54) (*SUMF* ¶ 42). Gisleson once again reached out to the CPCPL seeking assistance and was told, once again, that the organization could not help and had no money for mitigation or investigative assistance for Wessinger's case (Doc. 209 at 55-56) (*SUMF* ¶ 43).[6] CPCPL did refer Gisleson to a possible consultant: Houston-based attorney Danalynn Recer with the Gulf Regional Advocacy Center. Gisleson convinced his firm to pay Recer a consultation fee of $5000 for "some general advice, consultation," but she refused to enroll as co-counsel of record (Doc. 209 at 54-57) (*SUMF* ¶ 44). Neither Gisleson nor Recer, nor anyone working on her behalf, did any mitigation investigation during the six-month period prior to the filing of the Second Amended PCR. (*SUMF* ¶ 45). The Second Amended Post-Conviction Application was filed on August 1, 2003. (*SUMF* ¶ 14).

The trial court held a status conference on September 3, 2003, during which all of Wessinger's claims were dismissed (Doc. 272-10 at 28 through 272-11 at 20) (*SUMF* ¶ 15). The Louisiana Supreme Court denied certiorari. *State ex rel. Wessinger v. Cain*, 2003-3097 (La. 9/3/04), 882 So. 2d 605.

### B. Background Relevant to Wessinger's Underlying Ineffective Assistance of Penalty Phase Counsel Claim

A warrant for Todd Wessinger's arrest on two counts of first degree murder and one count of armed robbery was issued on November 19, 1995. (Doc. 271-2 at 5). The trial court appointed Ed Greenlee and Jack Nossaman with the office of the public defender as Wessinger's counsel (Doc. 271-24 at 32-38). In December of 1995, Wessinger's family was contacted by attorney, Orscini Beard (Doc. 206 at 63). Beard accepted a used car from Wessinger's mother as a retainer fee (*Id*). Beard had been recently reinstated to the practice of law in October of 1995 after a three-

---

[6] Respondents also objected to *SUMF* ¶43 on the basis of hearsay. The objection is overruled. *See* fn. 1, *supra*.

year suspension that stemmed from a federal perjury charge. *In re Beard*, 94-2824 (La. 10/30/95), 661 So.2d 982.

On December 16, 1996 the trial court held a hearing on a motion to enroll that was filed by Orcini Beard. The state objected to Beard's enrollment over concerns that he was not qualified to defend a death penalty case and over concerns that Wessinger would seek public funds to finance his case. The trial court allowed Beard to enroll but refused Greenlee and Nossaman's request to withdraw (Doc. 271-25 at 6-40). Greenlee and Nossaman objected to the court's decision and filed a motion to withdraw (Doc. 271-3 at 1-3).  At a second hearing on February 14, 1996 the state reiterated its concerns that Wessinger would later request funding from the state if the public defender's office was allowed to withdraw. The trial court allowed Nossaman and Greenlee to withdraw. (Doc. 271-26 at 1-9).

Beard served as Wessinger's trial counsel from January 11, 1996 through January 7, 1997 (Doc. 271-27 at 30-39). In March of 1996, just three months into his representation of Wessinger, Beard was arrested on a scheme to defraud cellular telephone companies (Doc. 122 at 44); *In re Beard*, 2000-0808 (La. 6/16/00), 762 So.2d 618. Due to this arrest, Beard missed a court appearance in Wessinger's case on March 19, 1996 (Doc. 122 at 36) (Doc. 271-26 at 10-17). Beard missed another court appearance in September of 1996 and the trial judge issued a bench warrant for his arrest (Doc. 122 at 40) (Doc. 271-1 at 14) (Doc. 271-27 at 15-22). The bench warrant was later recalled (Doc. 271-1 at 14).

Todd Wessinger's brother, Troy Wessinger, was the primary contact with Orscini Beard (Doc. 206 at 64).  Beard represented Wessinger for approximately one year but did no work during that time. Beard did, however, continue to ask for money (Doc. 206 at 64-65). The Wessinger

family held fund-raisers, paying Beard around $7,000-$8,000 in addition to the car tendered as the initial retainer fee (Doc. 206 at 65-66).

On December 13, 1996, the Louisiana Supreme Court revoked the conditional reinstatement of Beard's license and ordered another suspension. *In re Beard*, 94-2824 (La. 12/13/96), 684 So.2d 398. Beard was ultimately disbarred on June 16, 2000. *In re Beard*, 2000-0808 (La. 6/16/00), 762 So.2d 618. The disbarment was, in part, due to Beard's conviction for theft of telephone services, which occurred during his representation of Wessinger.

Attorneys William "Billy" Hecker and Gregory Rome were appointed to represent Wessinger on January 7, 1997 after the state advised the trial court that Beard's conditional reinstatement to the bar had been suspended (Doc. 271-5 at 10-11) (Doc. 271-27 at 30-39). The indigent defender's office asked that Hecker and Rome be appointed from the voluntary attorney list because the office was overwhelmed with capital cases at the time (*Id.* at 36). Hecker served as lead counsel on Wessinger's case but focused on the penalty phase (Doc. 234-4, ¶ 1). Hecker assumed some investigation had been conducted but discovered that Beard had done nothing to investigate either phase of the trial, nor had Beard sought funding for experts (Doc. 234-3, ¶ 3).

Hecker experienced a series of events in his personal life that distracted him from Wessinger's defense (Doc. 234-4, ¶ 4). In March of 1997 Hecker's father suffered a stroke as a complication of open-heart surgery. Hecker spent 26 days at the hospital by his father's side (*Id*). Over the prosecution's objection, the trial court granted a continuance of the trial date until June 16, 1997 due to Hecker's circumstances (Doc. 271-1 at 18-19) (Doc. 271-7 at 13-14). Hecker's father died on April 7, 1997. Hecker describes the impact of his father's death as "devastating," leaving him "dazed" and "incapacitated" by grief for months (Doc. 234-3 ¶ 6). As an additional complication, two weeks after his father's death, Hecker unexpectedly assumed full custody of his

14

teenaged daughter. Hecker describes his state at the time as "grief-stricken, exhausted, and pre-occupied" (*Id.*).

Hecker focused on the penalty phase of the trial. (Doc. 234-3) (Doc. 234-4). He did not deliberately choose to abandon any area of investigation, but "simply lacked adequate time, funding and focus" (Doc. 234-4). He had no mitigation specialist investigating the case and, as a result, could only put on character witnesses to say that Wessinger was a good person who suffered from alcoholism at the time of the murders (*Id.*). Hecker described his penalty phase strategy: "[w]e painted a picture of Mr. Wessinger as a good person who suffered from alcoholism and was not acting like himself at the time of the crime because that is the only theory we had based on the people we talked to" (Doc. 234-4). Hecker's affidavit:

> I had no mitigation specialist and, as a result, I never learned of the information that I have been told was subsequently developed. I did not know that Mr. Wessinger's family had a history of seizure disorders, mental retardation and other major health problems. I also never learned that Mr. Wessinger himself had neurological issues and suffered from seizures as a child. Because we had no mitigation specialist and had such limited time, I also never learned about the intergenerational history of poverty and violence in Mr. Wessinger's family. This is all information that we would have put before the jury in Mr. Wessinger's case if we had discovered it…

> Due to the time constraints and issues in my personal life, I was unable to work closely with the experts we hired, Drs. Rostow and Cenac. The trial moved faster than we had anticipated and I was forced to put them on the stand a day before I had intended. Because the trial was moving so quickly, I did not have time to discuss their testimony prior to calling them to the stand. My ordinary practice was to discuss the case with experts and ascertain their findings and the content of their testimony prior to calling them as a witness. Of course, I would not have asked an expert to testify falsely, but I certainly would not have called an expert that was going to provide damaging testimony, testimony which would have bolstered the state's case. It was not strategy on my part to put such important witnesses on the stand without knowing the full content of their testimony. If I had known that they would call my client a liar, dangerous, and testify that he had confessed, I would not have called them as witnesses. I was shocked by this testimony and not prepared for how to handle it. I have never testified about this issue nor was I ever asked by the state court if I had a strategic reason for my actions. If I had been asked, I would have answered as I have in this declaration.

(*Id.*).

Troy Wessinger, Wessinger's older brother, served as the family liaison with both attorneys Hecker and, before him, Beard, who did nothing on the case and never conducted any investigation during the time he represented Wessinger (Doc. 206 at 64-70) (*SUMF* ¶ 54). Troy Wessinger and about six other family members had only one meeting for about an hour with Hecker prior to trial (Doc. 206 at 70-75, 134) (*SUMF* ¶ 55). Hecker asked for the names of character witnesses and Troy Wessinger gave him the names of a few ladies whose yards the family mowed growing up, who Hecker called at the penalty trial (Doc. 206 at 74-75) (*SUMF* ¶ 55). Additionally, a lot of the others who ended up testifying at the penalty phase came from Troy Wessinger asking them to come to court to talk to the attorney about being character witnesses (Doc. 206 at 76-77). At most, Hecker talked to these penalty phase witnesses in the hallway of the courthouse during the trial and put them on the witness stand without any preparation (*Id.* at 77).

Jury selection began on June 17, 1997 and eight days later, on June 24, 1997, Wessinger was convicted on two counts of first degree murder (*SUMF* ¶1). The next day, June 25, 1997, the same jury returned death sentences on both counts (*SUMF* ¶2). The Louisiana Supreme Court affirmed the convictions and sentences. *State v. Wessinger*, 98-1234 (La. 5/28/99), 736 So.2d 162.

Wessinger's amended federal habeas petition alleges in Claim XI-C that trial counsel was ineffective at the penalty phase of Wessinger's trial (Doc. 120, p. 232). Wessinger's federal habeas counsel conducted a mitigation investigation for the first time and discovered Wessinger's family history and genetics show a significant maternal and paternal history of cardiac disease and cerebrovascular disease of the blood vessels of the heart, as well as learning disabilities and mental retardation, all of which are relevant to the diagnosis that Wessinger suffers from a major neurocognitive disorder (Doc. 207 at 39) (*SUMF* ¶ 58). The mitigation investigation also

uncovered that Wessinger's father often drank alcohol, which led to domestic violence in the home as much as three days out of seven (Doc. 206 at 110) (*SUMF* ¶ 61).

Wessinger's environmental history and medical and psychological information gathered because of federal habeas counsel's investigation support that, at some point in his young life, Wessinger had a pediatric stroke in the left ventricular part of his brain, the left frontal lobe. The brain imaging, including an MRI, showed a hole in Wessinger's brain that occurred because of a cerebrovascular illness (Doc. 207 at 44-45) (*SUMF* ¶59). The science regarding pediatric strokes, as well as the brain-imaging and neuropsychological testing would have been available as early as 1997, when Hecker represented Wessinger (Doc. 207 at 48) (*SUMF* ¶59). The part of Wessinger's brain where the stroke occurred and that was damaged, the frontal temporal lobe, can impair one's ability to effectively weigh, deliberate and sequence one's behavior, to make good decisions and to change gears in response to changed circumstances (Doc. 207 at 64-65) (*SUMF* ¶ 60).

The Capital Jury Project has interviewed large numbers of capital jurors since 1991 and found over multiple jurisdictions that evidence of brain damage and impairments and developmental difficulties, including violence in the home, domestic violence, child maltreatment and poverty are all very powerful mitigation that resonates with capital jurors (Doc. 208 at 18) (*SUMF* ¶ 62).

## III.    Rule 56 Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . .    [T]he nonmoving party must come forward with 'specific facts showing that there is a

genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and internal quotations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (internal citations omitted).

"As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000). The court applies general summary judgment standards to the extent they do not conflict with the AEDPA. *See Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002) ("[Rule 56] applies only to the extent that it does not conflict with the habeas rules."), *abrogated on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004).

### 1. *Wessinger's MSJ* (Doc. 278)

Wessinger seeks habeas relief on Claim XI-C, which contends his trial counsel was ineffective during the penalty phase of his trial. Wessinger acknowledges that Claim XI-C is procedurally defaulted but urges that the default be excused. Wessinger argues that the default is excused pursuant to the "cause and prejudice" exception to procedural default announced in *Coleman v. Thompson*, 501 U.S. 722 (1991).

Wessinger contends the unique circumstances that ensued during the post-conviction process were ineffective to protect his rights and serve as "cause" to excuse his procedural default. Wessinger provides a detailed history of the predicament faced by Louisiana capital post-conviction petitioners who were represented by *pro bono* appointed attorneys between June 30,

1999 and February 4, 2005.  Wessinger argues that his *pro bono* appointed counsel, Soren Gisleson, diligently sought assistance from every state actor relevant to funding in capital state post-conviction proceedings and was denied. Wessinger also argues that during the timeframe his *pro bono* appointed counsel was seeking to protect his rights through the post-conviction process, the Louisiana Indigent Defender Assistance Board (LIDAB) was operating under an unlawful funding policy that caused the procedural default of his ineffective assistance of penalty phase counsel claim. Specifically, without funding for an investigator or mitigation specialist, Wessinger was unable to develop the factual basis for the claim. Wessinger argues that the factual basis for the claim was ultimately presented to this Court once adequate resources were made available.

Wessinger points to *Panetti v. Davis*, 863 F.3d 366 (5th Cir. 2017) and *Moore v. Quarterman*, 533 F.3d 338 (5th Cir. 2008) as relevant authority for excusing procedural default when the state's corrective process is ineffective to protect a petitioner's rights. Wessinger also directs the Court to the United States Supreme Court opinion in *Williams v. Taylor*, 529 U.S. 420 (2000) for the proposition that a state court's "understandable" decision to deny funding does not necessarily stand in the way of the Court finding "cause" to excuse procedural default.

With respect to the "prejudice" prong of the "cause and "prejudice" inquiry, Wessinger points to the Court's July 27, 2015 ruling, which found Claim XI-C to be meritorious (Doc. 216). Wessinger argues he is entitled to summary judgment on Claim XI-C for the same reason.

### 2. *Respondent's Motion to Dismiss/ Motion for Summary Judgment/ Opposition* (Doc. 282)

Respondent argues that Wessinger's Motion for Summary Judgment should be construed as an improper successive habeas petition. Respondent contends that Wessinger's motion is "serial habeas litigation," and "abuse of the writ." (Doc 282-1 at 14-18).  Respondent argues that because Wessinger failed to seek a certificate of appeal from the Fifth Circuit, this Court lacks jurisdiction

to entertain his claims. Respondent also argues that Wessinger's April 2012 Motion to Alter or Amend was untimely because "[n]othing prohibited Wessinger from raising his [inadequate state process] theory in his original petition in 2004." (Doc 282-1 at 18).

Citing *Beazley v. Johnson*, 242 F.3d 248 (5th Cir. 2001), Respondent argues that ineffective state process is not grounds for habeas relief. Respondent further contends that the state court decisions denying funding to are entitled to deference. Lastly, Respondent argues that Wessinger's penalty phase ineffective assistance of counsel claim is without merit. Respondent contends that the evidence Wessinger believes should have been presented to the jury during the penalty phase could have suggested that he was a "product of his environment," likely to continue to be "dangerous in the future" and it is "virtually impossible to establish prejudice." (Doc. 282-1 at 25).

### 3. *Wessinger's Reply* (Doc. 286)

Wessinger contends that most of the facts that support his inadequate state process theory are admitted by Respondent (Doc. 286 at 14). Wessinger denies that his inadequate state process theory was untimely raised or abandoned (*Id.* at 19). Wessinger provides a detailed procedural history of the case (*Id.* at 1-10). He points out that the Court persistently intended to hold an evidentiary hearing on Claim XI-C, during which he could have introduced the supporting evidence he did not have the opportunity to present during post-conviction proceedings (*Id.* at 19). However, the United States Supreme Court issued the opinion in *Cullen v. Pinholster*, 563 U.S. 170 (2011) on April 4, 2011, which held that the federal court may only rely on the state court record when determining whether a state court decision was contrary to or an unreasonable application of federal law (Doc. 286 at 5). After *Pinsholster*, Respondent argued that Wessinger's Claim XI-C was more expansive than the claim presented to the state court and the Court could not consider additional evidence (*Id.* at 19-20). Wessinger argued that he was entitled to an

evidentiary hearing notwithstanding the *Pinholster* decision, but the Court denied Wessinger's habeas petition, including Claim XI-C without a hearing (*Id.*). One month after the denial of Wessinger's habeas petition, the United States Supreme Court issued another seminal opinion, *Martinez v. Ryan*, 566 U.S. 1 (2012). *Martinez* held for the first time that ineffective assistance of post-conviction counsel is a viable excuse for procedurally defaulted ineffective assistance of trial counsel claims. (*Id* at 6). Wessinger argues that this chain of events led to the timing of his Rule 59(e) motion and assertion of his inadequate state process theory (*Id.* at 20). Wessinger points out that this Court determined that his inadequate state process theory became "newly relevant" when the Fifth Circuit Court of appeal ruled that his post-conviction counsel was not ineffective (*Id.* at 9).

Wessinger disputes Respondent's claim that his motion for summary judgment is a successive habeas petition, citing *Gonzales v. Crosby*, 545 U.S. 524 (2005) (*Id.* at 21). Wessinger denies that he is abusing the writ of habeas corpus, contending that his motion is not a successive petition, but is seeking relief on a claim that was previously deemed meritorious by this Court (*Id.*).

Wessinger points out that Respondent admits to evidence in support of the merits of his claim that trial counsel was ineffective during the penalty phase of his trial (*Id.* at 11-12). Wessinger distinguishes the cases cited by Respondent in support of the proposition that prejudice cannot be established. Particularly, Wessinger argues that Texas cases referencing the "double-edged" nature of mitigating evidence are inapplicable because Louisiana does not require special jury findings of future dangerousness (*Id.* at 12).

### 4. *Respondent's Reply in Support of their Motion to Dismiss/ for Summary Judgment* (Doc. 294)

In its Reply Respondent argues that the newly released United States Supreme Court opinion in *Shinn v. Ramirez*, 142 S.Ct. 1718 (2022) is dispositive of Wessinger's ineffective assistance of counsel claim. Specifically, Respondents argue that *Shinn v. Ramirez* prohibits the Court from considering any evidence introduced for the first time in federal court. Because Wessinger's ineffective assistance of counsel claim relies entirely on evidence introduced during the federal evidentiary hearings, Respondents argue that the claim fails.

### 5. *Wessinger's Sur-Reply* (Doc. 297)

Wessinger urges the Court to "soundly reject[]" Respondent's argument that *Shinn v. Ramirez* forecloses consideration of the evidence introduced at the federal hearings in this matter. Wessinger argues that the holding of *Shinn v Ramirez* is inapplicable because he does not rely on his postconviction counsel's ineffectiveness to establish the "cause" necessary to excuse procedural default. Wessinger argues that the restrictions on evidentiary hearings in 28 U.S.C. § 2254(e)(2) do not apply to Wessinger because he did not fail to develop the factual basis of Claim XI-C in state court. Wessinger points to the Fifth Circuit's conclusion that the failure to develop evidentiary support for the claim was "not because of any deficiency on [post-conviction counsel's] part."

## IV.    ANALYSIS

As an initial matter, the issues before the Court are: (1) whether the Court can consider procedurally defaulted Claim XI-C and, if so, (2) whether Claim XI-C is meritorious.  Not before the Court are the merits of Wessinger's April 2012 Rule 59(e) Motion to Alter or Amend. (Doc. 139). Wessinger's timely Rule 59(e) motion,[7] which is the pleading in which Wessinger raised his

---

[7] The Court interprets Respondent's arguments in its motion to dismiss/motion for summary judgment as a request to reconsider the disposition of Wessinger's 2012 *Motion to Alter*. Respondent did not oppose Wessinger's Rule 59(e) *Motion to Alter* in 2012 on the grounds that it was untimely, or on the grounds that the inadequate state process theory could have been raised at an earlier juncture (Doc. 149). Nor did Respondent challenge the propriety of Wessinger's

inadequate state process theory, does not constitute a successive habeas petition. *See Banister v. Davis*, 140 S.Ct. 1698, 1708 (2020) ("Rule 59(e) motions are not second or successive petitions, but instead a part of a prisoner's first habeas proceeding"). The Court, therefore, has jurisdiction over Wessinger's claim. Also, not before the court is the question of whether Wessinger can raise his inadequate state process theory.[8]   This issue was thoroughly briefed, considered, and ruled upon by the Court on May 16, 2012 (Doc. 156) and again after the Fifth Circuit appeal on September 10, 2020 (Doc. 254). Respondents' Motion to Dismiss/Motion for Summary Judgment is without merit.

### A.  Can the Court Consider Procedurally Defaulted Claim XI-C?

A federal habeas claim is procedurally defaulted when the state court has based its rejection of the claim on a state procedural rule that provides an adequate basis for relief, independent of the merits of the claim. *Coleman v. Thompson,* 501 U.S. 722, 729-32 (1991). Federal habeas review of procedurally defaulted claims is barred "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."[9] *Id.* at 750, "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id.* at 753. (internal quotation marks and citation omitted). For example, "a showing that the factual or legal basis for a claim was not reasonably available to counsel, or that

---

Rule 59(e) motion in its appeal to the Fifth Circuit in 2015. *See* Fifth Circuit Docket No. 15-70027, Document: 00513292480. The Court will not, some ten plus years after the *Motion to Alter* was filed, reconsider its ruling. *See* Fed. R. Civ. P. 60 (A motion under Rule 60(b) must be made no more than one year after the entry of the judgment or order or the date of the proceeding).

[8] Wessinger's Motion for Summary Judgment is, therefore, a motion seeking relief on a claim considered part of his original habeas petition and the Court does not construe it as a successive habeas petition.

[9] Petitioner does not argue the "fundamental miscarriage of justice" exception applies to his claim.

some interference by government officials …made compliance impracticable, would constitute cause under thus standard" *Id.* The Court has not assayed "an exhaustive catalog of such objective impediments." *Murray v.* Carrier, 477 U.S. 478, 488 (1986). The precise contours of the cause requirement have not been clearly defined. *See Amadeo v. Zant,* 486 U.S. 214, 221(1988). *See also Jamison v. Lockhart,* 975 F.2d 1377, 1379-80 (8th Cir.1992). At a minimum, however, a petitioner must show that "something *external* to [him], something that cannot fairly be attributed to him," caused the procedural default. *Coleman,* 501 U.S. at 753, (citing *Murray v. Carrier,* 477 U.S. at 488). "Prejudice" means that the errors "worked to [the petitioner's] actual and substantial disadvantage." *Id*. at 484.

i. <u>Procedural Default</u>

The post-conviction court procedurally barred Wessinger's attempt to assert Claim XI-C. Wessinger's First Amended Petition alleged his trial counsel was ineffective for failing to present medical evidence of his childhood history of convulsions and head trauma, present evidence of emotional and mental illness, and present evidence of abuse. The Commissioner's *Preliminary Report on Procedural Bars* recommended dismissal of the penalty phase ineffective assistance of counsel claim because it lacked the requisite factual support:

**M. Failure to Present Mitigating Evidence**

**i. Regarding the Defendant's Youth**
Counsel has alleged that it is **possible** that the Defendant suffered from convulsions and head trauma that may have affected his ability to control his emotions, and that medical records **may** be available to show such…. Because the Defendant has not apparently obtained the records to support this statement either, dismissal without prejudice is appropriate to allow him to obtain evidence to show that there was substantial mitigating evidence available that was not produced. Until further facts are presented, this claim is not sufficiently supported to warrant any relief.

**ii. Regarding Emotional and Mental Illness of Defendant**
This claim is based on the same **possible** medical records previously referred to in #i. above and should be dismissed without prejudice on the same basis.

24

**v. Regarding Abuse Suffered by Defendant**
This claim is contained in a single conclusory statement that the Defendant was
abused in the past, which is insufficient to warrant a hearing or any relief.

(Doc. 121-1 at 30) (emphasis in original). The post-conviction judge expressly dismissed all claims

in the First Amended Petition as procedurally barred at a hearing on September 4, 2003:

"Let's look at the First Amended Petition…I've reviewed that and actually the state
has filed a response to that…and after reviewing the first one, I've determined that
there's nothing in there that I believe needs to be. **Everything in there is
procedurally barred.**"

(Doc. 234-14 at 4-5) (emphasis added).

This Court determined on May 16, 2012 that Claim XI-C was unexhausted, technically

exhausted, and procedurally defaulted (Doc. 156). Technically exhausted claims are procedurally

defaulted through the independent and adequate state ground doctrine. *See Busby v. Dretke*, 359

F.3d 708, 724 (5th Cir. 2004). A closer review of the record demonstrates that the Court's ultimate

conclusion was correct—the claim is procedurally defaulted. The claim is procedurally defaulted

because it was dismissed by the state court on an independent and adequate state ground.[10]

Regardless of whether Claim XI-C was procedurally defaulted through failure to exhaust or the

independent and adequate state ground doctrine, the default may be excused through "cause and

prejudice." *See Harris v. Reed*, 489 U.S. 255, 263 (1989) (If the state court judgment "clearly and

expressly state[d] the judgment rests on a procedural bar," review is precluded unless the petitioner

can demonstrate "cause and prejudice" for the procedural bar).[11]

---

[10] The post-conviction judge did not specifically reference which procedural bar applied to each of Wessinger's claims.
Based on the content of the Commissioner's *Preliminary Report on Procedural Bars*, it appears that the applicable
article is LSA-C.Cr.P art. 926(b)(3), which requires a postconviction applicant to "state the grounds upon which relief
is sought, specifying with reasonable particularity the factual basis for such relief." LSA-C.Cr.P art. 926(b)(3) has
been found by the federal courts to be an independent and adequate state ground sufficient to bar federal review under
the doctrine of procedural default. *See Brumfield v. Cain*, 2008 WL 2600140, *3-4 (M.D. La. June 30, 2008).
[11] Gisleson stated at the September 4, 2003 hearing that he intended the Second Amended Petition for Post-Conviction
Relief to supplement and not replace the First Amended Petition (Doc. 272-10 at 30). The Second Amended Petition
repeats the allegations made in the First Amended Petition regarding Wessinger's childhood history of seizures and

ii.    Cause and Prejudice

Through a series of events outside of his control, Wessinger was represented by *pro bono* counsel and not the CPCPL. Mere happenstance left Wessinger without the resources afforded to other similarly situated capital post-conviction defendants to adequately present an ineffective assistance of counsel claim to the post-conviction court. The record reflects that LIDAB's failure to comply with its statutory mandates made it impracticable for Wessinger to establish the factual basis of Claim XI-C.

Louisiana has directed prisoners, for at least forty years, to raise ineffective assistance of counsel claims during post-conviction proceedings rather than on appeal because the evidence to support these claims usually lies outside the record.[12] Indeed, when Wessinger attempted to raise an ineffective assistance of counsel claim on direct appeal,[13] the Louisiana Supreme Court, wrote "[i]neffective assistance of counsel claims are customarily addressed in post-conviction

---

[12] use of phenobarbital (Doc. 273, at p. 4), which are nearly identical to the allegations in the First Amended Petition (Doc. 272-3 at p. 30) that were expressly denied as procedurally barred. The trial judge did not specifically mention the penalty phase allegations of ineffective assistance of counsel claims that are repeated in the Second Amended Petition during the hearing. However, Wessinger's Second Amended Petition did not cure the factual deficiency upon which the First Amended Petition was expressly procedurally barred. The only issues in the Second Amended Petition that the trial court specifically addressed on the record at the September 4, 2003 hearing were: failure to object to inadmissible expert evidence (Doc. 272-10 at 31); the failure of trial counsel to prepare the testimony of Drs. Cenac and Rostow (*Id.* at 36); ineffective assistance of counsel due to Hecker's personal problems (Doc. 272-11. at 3); ineffective assistance of counsel during voir dire (*Id.* at 3); a claim pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), (*Id.* at 5); and ineffective assistance of counsel for failure to file a motion to quash (*Id*. 26-29). At the close of the hearing the trial court denied all of Wessinger's claims (*Id.* at 19).

[12] *See State v. Anthony*, 347 So. 2d 483, 494 (La. 1977) (allegations of ineffective assistance of counsel are properly raised by writ of habeas corpus in a post-conviction proceeding); *State v. Mitchell*, 94-2078 (La. 5/21/96), 674 So. 2d 250, 255 (ineffective assistance of counsel claims are more properly raised by application for post-conviction relief in the trial court, where a full evidentiary hearing may be conducted if warranted); *State ex rel. Glover v. State*, 97-1474 (La. 12/19/97), 704 So. 2d 242 (because an ineffective assistance of counsel claim is in most cases better raised in an application for post-conviction relief than on direct review and because this is relator's first application for post-conviction relief, La.C.Cr.P. art. 930.4 does not apply); *State v. Watson*, 2000-1580 (La. 5/14/02), 817 So. 2d 81 (reinstating conviction vacated by appellate court due to ineffective assistance of counsel because such claims are more properly raised in an application for post-conviction relief where a full evidentiary hearing may be conducted to explore the issue). The United States Fifth Circuit Court of Appeal has recognized, "[t]he Louisiana courts…have…repeatedly held that ineffective assistance of trial counsel claims should typically be brought in collateral proceedings…" *Coleman v. Goodwin*, 833 F.3d 537, 542 (5th Cir. 2016).

[13] Petitioner attempted to argue his counsel was ineffective for failing to file a motion for a new trial.

proceedings, not on direct appeal." *State v. Wessinger*, 98-1234 (La. 5/28/99), 736 So. 2d 162, 195. The Fifth Circuit has recognized that Louisiana's direct appeal system does not present petitioners with a meaningful opportunity to raise an ineffective assistance of counsel claim. *Coleman v. Goodwin*, 833 F.3d 537 (5th. Cir. 2016). Accordingly, the <u>only</u> opportunity Wessinger had to raise his penalty phase ineffective assistance of counsel claim was through Louisiana's post-conviction proceedings.

In 1999, the Louisiana Legislature approved Act 1012, which enacted LSA-RS 15:149.1:

> In a capital case in which the trial counsel was provided to an indigent defendant and in which the jury imposed the death penalty, the court, after imposition of the sentence of death, shall appoint the Indigent Defense Assistance Board, which shall promptly cause to have enrolled counsel to represent the defendant on direct appeal and in any state post-conviction proceedings, if appropriate.

LSA-RS 15: 151.2(E)(2) was also in effect during Wessinger's post-conviction proceedings, which set forth LIDAB's responsibilities:

> In cases where a sentence of death has been imposed, the board shall promptly cause counsel to be enrolled to represent the defendant. The board shall adopt rules and retain only such staff counsel or other counsel, who will work under the supervision of the board, as are necessary to provide counsel to represent capital defendants on direct appeal to the Supreme Court of Louisiana and to seek post-conviction relief if appropriate in state and federal court. The board shall also adopt rules regarding the provision of reasonably necessary services associated with the proceedings, including investigative, expert, and other services. The rules shall require that funds to pay for such reasonably necessary services shall be provided only upon a written showing specifically identifying the nature of the services, the cost of such services, and the need for such services with mandatory guidelines for compensation and litigation expense maximums. The board may seek funding as is available under federal law or from other public and private sources to cover the costs of providing representation in connection with applications for post-conviction relief filed in state and federal court.

LIDAB had two statutory responsibilities to Todd Wessinger: (1) promptly appoint counsel, and (2) fund his post-conviction defense. LIDAB abandoned its responsibility to Wessinger on both counts.

When Wessinger's petition for certiorari was rejected by the United States Supreme Court on December 6, 1999, a death warrant was issued for his execution to take place on April 5, 2000. Wessinger's appellate counsel, who had no continued duty to represent him, filed a motion to stay on his behalf to stop the execution and assert his right to counsel under LSA-RS 15:149.1. The execution was stayed to provide LIDAB with the opportunity to appoint counsel. When no counsel was appointed and no post-conviction application filed, the trial court held a hearing.

During the hearing, the LIDAB director asked for additional time to appoint counsel. The prosecution advocated for the issuance of a death warrant, which was signed by the trial judge the day after the hearing. The LIDAB filed a motion to stay the execution with the Louisiana Supreme Court, suggesting appointment of *pro bono* counsel Winston Rice to represent Wessinger in post-conviction proceedings. The Louisiana Supreme Court stayed the execution, and appointed Winston Rice to represent Wessinger. Rice's personal and health problems resulted in abandonment of his responsibilities to Wessinger, which led this Court to equitably toll the AEDPA statute of limitations.

LIDAB flouted its responsibility to appoint post-conviction counsel to represent Todd Wessinger. The results were not inconsequential. Two death warrants were issued to execute Wessinger without his statutory right to post-conviction counsel. Two death warrants were issued before Wessinger had access to the only avenue to assert his federal constitutional right to raise ineffective assistance of counsel claims. The Louisiana Supreme Court interceded to prevent Wessinger's execution and appointed *pro bono* counsel. By this time, nearly six months elapsed since the United States Supreme Court denied certiorari on Wessinger's direct appeal. Winston Rice was appointed *pro bono* counsel from June of 2000 until December of 2000 but abandoned his duties to Wessinger during that time.

When first-year associate Soren Gisleson took over the file in December of 2000, an entire year had already elapsed since the Supreme Court had denied certiorari on direct appeal. Gisleson was facing a tight deadline to investigate and prepare a comprehensive post-conviction application in a two-count capital murder case.[14] Gisleson was also facing an insurmountable systemic obstacle. Until the Louisiana Supreme Court intervened in 2004 in *State ex rel. Williams v. State*, 2004-575 (La. 12/1/04), 888 So. 2d 792, LIDAB was operating an unlawful policy of refusing to fund capital post-conviction cases assigned to *pro bono* counsel.

Jimmy Ray Williams was tried, convicted, and sentenced to death in the 19th Judicial District Court on June 15, 1994 for the first degree murder of Gordon Lawless. His conviction and sentence were affirmed on direct appeal. *State v. Williams*, 96-1023 (La. 1/21/98), 708 So.2d 703. Like Wessinger, Williams had an execution date set without appointment of counsel or an opportunity to seek post-conviction review. Williams filed a *pro se* brief with the Louisiana Supreme Court, which ordered appointment of counsel. *State ex rel. Williams v. State,* 99–0365 (La.2/10/99), 750 So.2d 801.  During his post-conviction proceedings, Williams' *pro bono* counsel petitioned the district court for expert funding, arguing the system of providing funds to indigent capital post-conviction defendants violated equal protection and due process rights because defendants represented by CPCPL (through LIDAB) received funds without having to petition the court. The district court ordered LIDAB to provide the funding, but LIDAB informed the court that funding was unavailable. The district court held an evidentiary hearing regarding funding availability. The district court determined that denial of funding to Williams violated due process and equal protection under the law, but the state also had the right to a timely adjudication of the issues. The district court stayed the proceedings until guidance could be sought from the Louisiana

---

[14] The trial court set the deadline to April 10. 2001 (Doc. 234-7 at 20-26) and extended the deadline, once, until June 11, 2001 (Doc. 234-9).

Supreme Court on the funding issue. *State ex rel. Williams v. State*, 2004-575 (La. 12/1/04), 888 So. 2d 792, 794.

Williams sought supervisory writs with the Louisiana Supreme Court, arguing that LIDAB's refusal to fund his defense in the same manner as capital defendants represented by CPCPL violated his equal protection rights. His case was consolidated with Allen Robertson, another capital post-conviction defendant in the 19th Judicial District Court represented by *pro bono* counsel.[15] The State of Louisiana took the position that LIDAB was in violation of its statutory duty and did not have the authority to withhold funding from Williams:

> Responding to the equal protection arguments of the defendants, in briefs to this Court the State argues, *inter alia,* LIDAB does not have authority to withhold funds from capital defendants seeking post-conviction relief simply because they are represented by *pro bono* counsel and not CPCPL. The State contends LIDAB, acting through its agent CPCPL, is responsible for funding defendant's necessary expenses. According to the State, LIDAB should fulfill its obligation to fund capital post-conviction cases as directed by statutory law.

*Id.* at 796.

The Louisiana Supreme Court expressed concern about the constitutional violations but remanded the case to develop the record because it appeared LIDAB was violating its statutory mandate:

> We are particularly interested in the question concerning LIDAB's adoption of a resolution to prohibit the provision of funds for expert witnesses to civil law firms handling capital post-conviction cases on a *pro bono* basis in light of the statutory requirements contained in La.Rev.Stat. 15:151.2 E(2) and F, and mindful of the equal protection arguments raised, the effect of this resolution on

---

[15] Robertson's case was argued at the same time as Williams. The Louisiana Supreme Court pretermitted ruling on Robertson's case when it issued the opinion in *State ex rel. Williams v. State*, 2004-575 (La. 12/1/04), 888 So. 2d 792. Robertson's case was held in abeyance and considered moot when LIDAB adopted new funding rules pursuant to La. Admin. Code tit. 22, part XV, § 201 *et seq. State ex rel. Robertson v. Cain*, 2003-2747 (La. 1/31/07), 947 So. 2d 709.

> defendants equal protection rights. The legislature specifically delegated to LIDAB the power and responsibility for adopting rules regarding the provision of reasonably necessary services associated with indigent post-conviction relief. Without a record on this issue, we are unable to determine if there has been any violation of LIDAB's authority.

*Id.* at 797.

On remand, the district court found that LIDAB was in violation of LSA-RS 15:151.2(E)(2) and 15:151.2(F) by failing to fund all indigent post-conviction petitioners:

> La. R.S. 15:151.2E1 states: "The board shall have the authority by rule to develop and maintain such programs as necessary to implement the guidelines for supplemental assistance." LIDAB contracted with the Capital Post-Conviction Project of Louisiana (CPCPL) to carry out the enumerated powers listed in La. R.S. 15:151.2E2 regarding post-conviction proceedings. The record reflects that CPCPL's Board of Directors adopted a policy that became an official resolution of LIDAB and signed by Executive Director Edward Greenlee on July 24, 2003. The third paragraph of the Resolution states: "[Therefore be it resolved] that at the request of the CPCPL, the Louisiana Indigent Defense Assistance Board adopts the policy of prohibiting the CPCPL from providing any funds for expert witnesses to civil law firms handling capital post-conviction cases on a *pro bono* basis." The record further contains evidence that LIDAB does not regulate CPCPL on how it spends the funds allocated to it by the LIDAB. **That policy of CPCPL, as resolved by LIDAB, is inconsistent with what the court believes to be LIDAB's responsibility to fund all indigent cases similarly situated. This includes those that CPCPL handles directly and cases like that of petitioner who is represented by civil law firms on a *pro bono* basis as a result of appointment by the Louisiana Supreme Court.**

(Doc. 234-16) (emphasis added). The district court ruled that "LIDAB has a responsibility to CPCPL for funding, and as such funding cannot be to the exclusion of [Williams]." The district court ordered Williams to reapply to LIDAB for funding for expert assistance to provide LIDAB with the opportunity to "place [him] in line with all other cases and make decisions along the lines of funding responsibilities directed by statute." (*Id.*). The district court also found, "to permit the

31

State to proceed forward would be a fundamentally unfair proceeding at this time. The petitioner has a right to reasonably necessary funds to assist him for effective representation of his claims."

After the district court's order, LIDAB informed the court that a subcommittee had been formed to begin drafting the appropriate rules for adoption and promulgation pursuant to Louisiana's Administrative Procedure Act. LIDAB also provided the district court with a timeline for rulemaking process, with the earliest completion date of September 20, 2005. (Doc. 234-17). On January 12, 2007, the Louisiana Supreme Court found further proceedings to be moot, as LIDAB had adopted new rules under La. Admin. Code 22: XV:201, *et seq. State ex rel. Williams v. State*, 2004-0575 (La. 1/12/07), 946 So. 2d 172. The administrative rules adopted by the LIDAB in 2006 specifically permit *pro bono* counsel representing capital post-conviction defendants to apply for funding for expert witnesses:

> B. Any applications made by private counsel on behalf of a defendant sentenced to death for funding of reasonably necessary services of expert witnesses, cost of specialized scientific testing and other ancillary services based on partial indigency shall make application in accordance with Subsection A above. Additionally, counsel for the applicant must reveal all financial arrangements regarding representation.

22 La. Admin. Code Pt XV, 203.

The Louisiana Supreme Court's opinion in *State ex rel. Williams v. State* ended LIDAB's unlawful policy of refusing to fund expert services for capital defendants represented by *pro bono* counsel. Jimmy Ray Williams and Allen Robertson were able to benefit from the new rules and received funding. However, by the time the Louisiana Supreme Court intervened in December of 2004, it was too late for Todd Wessinger. His application for post-conviction review had already been dismissed and his federal habeas petition had already been filed. Wessinger contends he is the only Louisiana death row prisoner represented by *pro bono* counsel that was denied expert funding because of LIDAB's policy (Doc. 278-1 at 20). Respondent does not refute this contention.

Respondent argues that the procedural default cannot be excused because the state court's decision to deny expert funding to Wessinger is entitled to deference under AEDPA. The Court disagrees. Section 2254(d)(1) deference pertains to any *claim* in a habeas petition that was adjudicated on the merits. The Supreme Court has stated that "a 'claim'… is an asserted federasl basis for relief from a state court's judgment of conviction." *See Gonzales v. Crosby*, 545 U.S. 524, 530 (2005); *see also Cristin v. Brennan*, 281 F.3d 404, 418 (3d. Cir. 2002) (a "claim" is one which granted would entitle a habeas petitioner to relief on the merits); *Fahy v. Horn*, 516 F.3d 169, 180 (3d. Cir. 2008) (Because resolution of the question of whether Fahy's waiver of collateral and appellate review was valid would not entitle him to relief on the merits of his habeas petition, the waiver question is not a "claim" and not entitled to deference).

A state court adjudication of something other than a "claim" is not entitled to deferential review under AEDPA.  Wessinger's request to the state court for funding for expert services would not entitle him to relief on the merits, is not a "claim" under § 2254(d)(1) and is not entitled to deferential review. Infirmities in state habeas proceedings do not constitute grounds for relief in federal court. *Trevino v. Johnson,* 168 F.3d 173, 180 (5th Cir.1999); *Nichols v. Scott,* 69 F.3d 1255, 1275 (5th Cir.1995); *Kinsel v. Cain*, 647 F.3d 265, 273 (5th Cir. 2011) (An attack on a state habeas proceeding does not entitle the petitioner to habeas relief in respect to his conviction, as it is an attack on a proceeding collateral to the detention and not the detention itself.) [16]

According to *State ex rel. Williams v. State*, LIDAB operated an unlawful funding policy throughout the duration of Wessinger's post-conviction proceedings. LIDAB provided funds to indigent defendants represented by CPCPL as a matter of course, but arbitrarily denied Wessinger

---

[16] Respondent cites language in *Wessinger v. Vannoy*, 864 F.3d 387, 393 (5th Cir. 2017) in support of the contention that the state court decision is entitled to deference. The denial of funding was not an issue before the Fifth Circuit. As mentioned, *supra*, had Wessinger brought any stand-alone claim regarding denial of funding by the post-conviction court, the claim would have been dismissed by the Fifth Circuit because it is not cognizable in habeas corpus review.

the same funding because his counsel was *pro bono*. LIDAB's had no rational basis for treating Wessinger any differently than those indigent death penalty defendants who were represented by counsel directly through the LIDAB or CPCPL.[17] The arbitrary and unlawful application of LIDAB's funding policy caused the procedural default of Wessinger's penalty phase ineffective assistance of counsel claim.

To be clear, the Court does not hold that Wessinger's procedural default is excused merely because he was denied funding. Here, the State of Louisiana, through the *State ex rel. Williams v. State* litigation, determined that the process afforded Wessinger was fundamentally unfair. The Court's holding in this matter is limited to an amalgamation of facts unique to this case and the unlawful nature in which Wessinger was denied resources which were provided as a matter of course to others similarly situated.

The record also reflects that there is a reasonable probability that the result of his postconviction proceedings would have been different if he would have had access to the resources necessary to develop the factual basis of his penalty phase ineffective assistance of counsel claim. Wessinger's post-conviction counsel had enough information to suspect brain dysfunction because as a child Wessinger was prescribed phenobarbital and suffered from seizures. Counsel also had some information that Wessinger had suffered from mental illness and abuse. Wessinger's post-conviction counsel presented an underdeveloped claim because gathering medical records, investigating, and obtaining an expert opinion on brain dysfunction requires the monetary resources he was denied by the LIDAB. After access to adequate resources, Wessinger's federal habeas counsel was able to fully develop the factual basis of the claim that Wessinger's trial counsels' penalty phase performance was constitutionally inadequate.

---

[17] Equal protection imposes a requirement of some rationality in the nature of class singled out. *See Rinaldi v. Yeager*, 384 U.S. 305 (1966).

### iii.    Ineffective Assistance of Trial Counsel

**A.   Can the Court Consider Evidence from Federal Evidentiary Hearing in Light of *Shinn v. Ramirez?***

The question presented in *Shinn v. Ramirez* was the application of 28 U.S.C § 2254(e)(2), concerning the limitations on evidentiary hearings in federal courts, when the petitioner claims his procedurally defaulted claim should be excused because post-conviction counsel was ineffective. Section 2254(e)(2) provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> **(A)** the claim relies on--
>
> **(i)** a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> **(ii)** a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> **(B)** the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

"§ 2254(e)(2) applies only when a prisoner 'has failed to develop the factual basis of a claim…A prisoner is 'at fault' if he bears the responsibility for the failure to develop the record." *Shinn v. Ramirez,* 142 S.Ct. at 1734 (internal citations omitted). "A failure to develop the factual basis of the claim, as § 2254(e)(2) requires, is not established unless there is some lack of diligence, or some greater fault, attributable to the prisoner *or the prisoner's counsel*." *Id.* at 1735 (internal citations omitted) (emphasis in original). The Supreme Court articulated its holding:

> We now hold that under § 2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence

> beyond the state court record based on ineffective assistance of state postconviction counsel.

Wessinger is not claiming that his procedural default should be excused because his postconviction counsel was ineffective. As discussed at length above, the "cause" for the procedural default was *external to the defense and defense counsel*. Section 2254(e)(2) does not prohibit a federal evidentiary hearing because Wessinger did not "fail" to develop the claim in state court. The holding of *Shinn v. Ramirez* does not apply, and this Court may consider the evidence presented at the 2015 evidentiary hearings.

## B. *Strickland Standard*

The United States Supreme Court established the legal principles that govern ineffective assistance of counsel claims in *Strickland v. Washington,* 466 U.S. 668 (1984). An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. *Id.* at 687. To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." *Id.* at 688. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Ibid.* To establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Under the AEDPA, a federal court applies the deferential standard of review under § 2254(d)(1) to "*any claim adjudicated on the merits." Salazar v. Dretke*, 419 F.3d 384, 394–95 (5th Cir. 2005). Because Wessinger's penalty phase ineffective assistance of counsel claim was not adjudicated on the merits, our review is *de novo*. In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test, this Court's review of the un-adjudicated prong is

*de novo. See Rompilla v. Beard,* 545 U.S. 374, 390 (2005) (holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith,* 539 U.S. 510, 534 (2003) (same). The Court assesses prejudice by reweighing the aggravating evidence against the totality of the mitigating evidence adduced both at trial and in the habeas proceedings. *Porter v. McCollum*, 558 U.S. 30, 41 (2009).

In *Wiggins v. Smith*, 539 U.S. 510, 522 (2003), the United States Supreme Court laid out guidelines for assessing counsel's performance during the penalty phase of a capital trial. The standards for capital defense work articulated by the American Bar Association are "guides to determining what is reasonable." *Id.* at 524. "The ABA Guidelines provide that investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor….Among the topics counsel should consider presenting are medical history, educational history, employment and training history, family and social history*,* prior adult and juvenile correctional experience, and religious and cultural influences" *Id.* (internal citations omitted).

The United States Supreme Court has identified the types of failures that amount to ineffective performance prior to and during the penalty phase of a capital trial: *Williams v. Taylor*, 529 U.S. 362, 395-396 (2000) (failure to prepare for the penalty phase until one week before trial and to discover records showing petitioner was borderline mentally retarded, had suffered repeated head injuries, and might have brain damage organic in origin); *Wiggins*, 539 U.S. 510, 517, 524-525 (2003) (abandonment of investigation after acquiring rudimentary knowledge of history from narrow set of sources and failing to discover severe physical and sexual abuse); *Rompilla*, 545

U.S. 374, 389, 392 (2005) (failure to review available documentation pointing to evidence of schizophrenia, extreme mental disturbance significantly impairing several cognitive functions, and likely fetal alcohol syndrome); *Porter v. McCollum*, 558 U.S. at 39 (2009) (failure to obtain school, medical or military records or interview family members, which would have yielded information showing an abusive childhood, heroic military service, long-term substance abuse, impaired mental health, and brain damage that could manifest in violent behavior); *Sears v. Upton*, 561 U.S. 945-952 (2010) (cursory investigation limited to witnesses selected by the petitioner's mother which failed to discover verbal abuse, sexual abuse, severe learning disabilities, and significant frontal lobe abnormalities).

## C. What the Jury Heard at Trial

At trial, the jury heard that Todd Wessinger entered the Calendar's restaurant on Perkins's Road on November 19, 1995. In the process of taking approximately $7,000 from the Calendar's safe, Wessinger shot Eric Armentor in the back, tried to shoot Alvin Ricks in the head, shot and killed David Breakwell and shot and killed Stephanie Guzzardo. Armentor, who survived his injuries, testified that he arrived at Calendar's for work around 9:40 a.m. After he entered the building and punched the time clock, he heard a "pow" and realized he had been shot. Armentor testified that he saw a man with a gun in his hand and then he heard a struggle coming from the office. Armentor heard Guzzardo saying, "I promise, I promise." He then heard a gunshot and saw Guzzardo fall to the floor (Doc. 271-54 at 22). Armentor identified the gunman as Wessinger (*Id.* at 23). Armentor recovered from the gunshot to his back but was hospitalized twice and suffered injuries to his stomach, liver, pancreas, and lung (*Id.* at 28).

Calendar's employee, Alvin Ricks also testified at trial. Ricks testified that he was washing dishes and heard two gunshots. A man approached him, put a gun to his head, pulled the trigger

and it did not go off. The gunman asked for Guzzardo's location (Doc. 271-54 at 29). Ricks testified that he told the gunman that he did not know. The gunman then attempted to shoot him in the leg, but the gun did not go off for a second time (*Id.* at 29). Ricks then ran out of the back door of the restaurant. Ricks testified that he knew the gunman as "Todd," who he had seen previously at the Staring Lane Motel (*Id.* at 29-31). Calendar's employee Eric Mercer testified that he was present during the shootings but did not see the shooter (Doc. 271-54 at 12). Mercer testified that he heard David Breakwell say, "please don't shoot me" (*Id.* at 11). Mercer tried to get out of the restaurant, but the doors were locked so he laid down until the police arrived (*Id.*). When the police arrived, Mercer saw Armentor, who had been shot and was asking for help. He also saw David Breakwell's legs protruding from the cooler door (*Id.* at 11-12).

EMS employee, Tonya Mizell, testified that she responded to the scene at Calendar's on November 19, 1995 (Doc. 271-54 at 6). She began working on the patient closest to her, which was David Breakwell. Breakwell had a pulse and was barely breathing (*Id.*). Breakwell had suffered a gunshot wound to the chest and his heart stopped by the time he was loaded into the ambulance unit (*Id.* at 9). Dr. Alfredo Suarez, pathologist who performed Breakwell's autopsy, testified that the bullet went through his right lung. Breakwell also sustained a fractured spine and severed spinal cord. Suarez testified that Breakwell would have been in "excruciating" pain from the time he shot until he died (Doc. 271-57 at 35-36).

The jury heard the 911 call that was placed by Stephanie Guzzardo as the shootings were taking place, including her own (Doc. 271-54 at 40).[18] Pat Lane, a ballistics expert, testified that Stephanie Guzzardo was shot from a range of 12-15 inches (Doc. 271-58 at 1). Dr. Suarez also performed Guzzardo's autopsy. Suarez testified that Guzzardo bled to death within seconds of

---

[18] The record that was provided to the Court by Respondent does not include the content of the 911 call. The call was not transcribed as it was played to the jury.

being shot, was in a lot of pain, and knew she was going to die. Suarez testified that he listened to the 911 tape, heard Guzzardo screaming, and determined that Guzzardo survived for 17-18 seconds after she was shot (Doc. 271-57 at 29-31).

During the penalty phase of the trial, the jury heard testimony from David Breakwell's neighbor (Doc. 271-59 at 34), friend (Doc. 271-60 at 1-2), and co-workers (*Id.* at 3-6). They also heard testimony from Stephanie Guzzardo's parents (Doc. 271-60 at 7-13). The defense case included testimony from Mrs. Joe Sanders, who called Wessinger "courteous" (Doc. 271-60 at 15-21). The mothers of Wessinger's children, Terisita Kent and Daphne Walker, also testified. Kent and Walker testified that their children loved their father and he financially supported them. They also testified that Wessinger was a heavy drinker (Doc. 271-60 at 22-26, 34-37).

Wessinger's mother, Linda Wessinger, brother, Troy Wessinger, his aunts, Urline Alexander and Gloria Wessinger, and his first cousin, Shewana Prejean testified (Doc 271-62 at 20-22) (Doc. 271-60 at 39-41) (Doc. 271-61 at 25-32) (*Id.* at 31-33). These witnesses offered small insight into Wessinger's character, referencing his care of his disabled sister, referring to him as a "nice Christian person," (Doc. 271-61 at 25) and describing him as caring (Doc. 271-60 at 41, Doc. 271-61 at 31-32, Doc. 271-62 at 20). Two witnesses, Deon Hawkins (Doc. 271-60 at 27-33) and Noble Enime (Doc. 271-60 at 42 through Doc. 271-61 at 6) testified that Wessinger had become a Christian since his arrest.

The most damning evidence at the penalty phase came from the defense expert witnesses. Defense counsel first called psychologist, Carey Rostow, Ph.D. (Doc. 271-61 at 6-24). As mentioned above in Joseph Hecker's affidavit, Hecker did not discuss Rostow's testimony with him prior to calling him as a witness. Rostow's penalty phase testimony corroborates this fact (*Id.* at 9). Rostow testified that Wessinger's only medical problem was that he wore orthopedic shoes

as a child and his early life was "healthy and happy" and "there was no abuse" (*Id.* at 8). Rostow

gave some very damaging testimony *on direct examination* about Wessinger's character and moral

development:

> He knows where he is and who he is and knows right from wrong, but it does indicates [sic] that this is a [sic] individual who can be moody, socially inappropriate, and has difficulty thinking in logical ways that we might call adequate or significant social judgment. He tends on times to be angry and resentful, and he sees the world as a dangerous, unreliable, and rejecting place…He tends to become confused, aggressive, and suspicious…. This is an individual who had become dependent on alcohol…. He has some difficulties with long-term social relationships, and he certainly seems to have difficulty reflecting on his behavior, learning from experience, and this is often biased through a view of the world characterized by and [sic] sense of maladjustment, resentfulness and unreliability. [H]e appears to be undisciplined and disorganized, occasionally explosive. Alcohol and other abusable substances affect the brain symptomatically in such a way as to amplify these characteristics.
>
> .… Alcohol has a particular tendency to affect and change the chemical composition of the frontal lobes of the brain…. These changes include an increase in suspiciousness, what we call paranoia. It includes a reduction in the level of maturity, in decisions on the part of the patient that we call social judgment which are defective and inadequate and a general sense that the world is a dangerous and insecure place.
>
> .… I give him the diagnosis of alcohol dependence. I also give him the diagnosis of adjustment disorder unspecified, meaning that his current life situation is rather threatening and difficult and he is reacting to some fear and depression. I give him a third diagnosis of mixed-substance abuse…. I also give him an Axis-2 diagnosis, a paranoid personality with anti-social features. What that means is that his long-term fundamental way of viewing the world tends to be suspicious, looking at the world as an unreliable and dangerous place, in which others are out to get him, out to make life difficult and perilous for him, and he is not someone who is committed to conforming his behavior to the requirements of society. His particular way, his particular style of conducting his life is deviant somewhat self-serving. This is a long-term way of seeing the world and something that has been true about him all his life.
>
> .… He—in my opinion, Mr. Wessinger does not play by the same rules that most people do. He sees the world as a place that is there to meet his needs. His social relationships tend to be shallow. He does not seem to have deep extensive relationships with other people. They tend to be more fleeting. He tends to look at other people in terms of their abilities to meet his needs other than in terms of some long-term devotion to them as sacred individuals in his life. He tends to be

> somewhat exploitative. If he can take something that doesn't belong to him, we [sic] would well do that. This is not a rare circumstance. This is a personality defect and it has to do, I suspect, with his moral development up to this time in his life.

(Doc. 271-61 at 10-13). However, Rostow's testimony came with a very important caveat— "Axis 3, in the diagnostic system we use, has to do with medical problems that may affect a person's behavior, often diabetes, heart disease, or brain injury may be a factor here. I don't know of any such thing, so I defer to the physicians who examine the individual" (*Id.* at 13).

The defense team went on to call psychiatrist, Dr. Louis Cenac, who compounded the devastating testimony provided by Rostow (Doc. 271-61 at 34 through 271-62 at 17). Like Rostow before him, Dr. Cenac did not meet with Hecker to prepare his testimony before he took the stand (Doc. 271-61 at 36). On direct examination, Dr. Cenac relayed to the jury a detailed account provided to him by Wessinger of the night leading up to the robbery and homicides, including information that was not previously provided during the guilt phase of the trial (Doc. 271-61 at 37 through 271-62 at 2). This account involved character damaging information, including the fact that Wessinger was engaged in selling cocaine the night before the murders (Doc 271-62 at 1). Cenac testified about the effects of alcohol consumption on Wessinger's brain and characterized him as "very" dangerous (Doc. 271-62 at 4-5).

### D. Federal Evidentiary Hearings

Evidentiary hearings were held in this Court on January 12, 2015, January 13, 2015, March 18, 2015, March 19, 2015, and March 23, 2015.[19] Lay and expert witnesses testified about the performance of Wessinger's trial attorneys prior to and during the penalty phase of his trial. The

---

[19] The Court is permitted to consider the evidence submitted during the evidentiary hearing. *See Williams v. Taylor*, 529 U.S. 420 (2000) (When a petitioner is unable to develop his claim in state court despite diligent effort, an evidentiary hearing is not barred by 28 U.S.C. § 2254(e)(2)).

witnesses also offered mitigation evidence that was never heard by Wessinger's jury before it sentenced him to death.

Troy Wessinger, Todd Wessinger's older brother testified at the hearing (Doc. 206 at 59-145) Troy Wessinger attended one meeting with Gregory Rome, William Hecker, and several other relatives. The meeting occurred about five months before trial and lasted about an hour and a half (*Id.* at 72-73). Troy Wessinger gave Hecker the names of a couple of ladies that ended up testifying in the penalty phase, Bobbie Germany and Irene Sanders (*Id.* at 74-75).  Troy Wessinger also testified at the penalty phase of his brother's trial but did not meet with Hecker or engage in any discussion with Hecker about his testimony before taking the stand. (*Id.* at 75-76).

Troy Wessinger also offered information about his family's social history and Todd's medical history that Orscini Beard, Gregory Rome and William Hecker never asked about (*Id.* at 81, 132-133). Troy Wessinger testified that Todd was treated by Dr. Bombet for seizures as a child and took phenobarbital (*Id.* at 96-97). Todd also wore corrective shoes until the second or third grade because he had gait problems (*Id.* at 97-98).

Troy Wessinger testified about the atmosphere of the Wessinger household during Todd's childhood.  Both of Todd Wessinger's parents, Horace and Linda, grew up on plantations in Louisiana (*Id.* at 82, 90). The first child born of the union between Horace and Linda, Cynthia, suffers from cerebral palsy (*Id.* at 92-93). Troy Wessinger's described Cynthia's disability as a "big burden" on the family. Cynthia requires around the clock care, cannot walk, has slurred speech and is mentally "slow" (*Id.* at 93-94). Linda was Cynthia's primary caregiver (*Id.* at 94). Horace worked for a janitorial service and in his own lawn care business (*Id.* at 101-103).

Troy Wessinger testified about his father's frequent use of alcohol and the resulting consequences. Horace Wessinger would drink alcohol 7 days a week and would become violent

43

about 3 days a week (*Id.* at 110). Horace Wessinger was verbally abusive towards Todd, but it would become worse when he drank (*Id.* at. 107). Troy Wessinger testified that domestic violence occurred between his mother and father when his father drank, and the police were called a couple of times (*Id.* at 107-108). Troy Wessinger recalls Todd attempting to intervene in the fights between his parents to protect his mother (*Id.* at 109).

Todd Wessinger's first cousins, Demetric Alexander and Sharon Alexander, testified at the federal evidentiary hearings. Demetric Alexander's testimony corroborated the alcohol abuse that occurred in the Wessinger household (*Id.* at 179-190). Sharon Alexander corroborated the alcohol abuse, verbal abuse, and domestic violence that occurred in the Wessinger household (*Id.* at 191-216). Sharon Alexander also offered details about physical abuse suffered by Todd Wessinger. Sharon Alexander shared a story where she recalled Horace Wessinger dragging Linda off a couch by her leg. When Todd attempted to intervene on his mother's behalf, she hit him in the back (*Id.* at 203). Sharon Alexander also recalled other times when Linda hit Todd. Sharon Alexander believed Linda Wessinger inexplicably singled Todd out for physical abuse (*Id.* at 205-206). Alexander also testified that Linda would threaten to kill Todd with the gun she kept in her dresser in a Crown Royal bag (*Id.* at 207-208).

Dr. George Woods, neuropsychiatrist provided expert opinion testimony at the federal evidentiary hearing (Doc. 207 at 3-65). Dr. Woods conducted 3 clinical interviews of Wessinger, interviewed family members, and reviewed the results of Wessinger's PET and MRI scans. He also reviewed medical records, previously conducted neuropsychological testing, prior expert reports, and penalty phase testimony from the trial court record (*Id.* at 10). Dr. Woods concluded that Wessinger has a major neurocognitive disorder (*Id.* at 30). Dr. Woods also testified that Wessinger has a significant family history of cardiovascular disease, learning disabilities, mental

retardation, and seizure disorders (*Id.* at 32-33). He explained that Wessinger's MRI shows evidence that Wessinger suffered a stroke at a young age in the left ventricular part of his brain, the left frontal lobe (*Id.* at 40).[20] The MRI shows a "lacunar infarct" or hole, caused by cerebrovascular illness (*Id.* at 45). The left frontal lobe of the brain controls decision making and the ability to weigh and deliberate (*Id.* at 40).

Woods testified that Wessinger's history and performance on neuropsychological testing is consistent with someone who suffered a left frontal lobe lacunar stroke in the early years of life (*Id.* at 40-47). Particularly, the left frontal lobe is an area known to cause gait problems and seizures, both of which Wessinger suffered from a child (*Id.* at 40-41). Over time, Wessinger went from being right-handed to left-handed (*Id.* at 46). The neuropsychological motor testing showed a transfer from the dominant hand to the non-dominant hand, which occurs in about 50% of children who have lacunar strokes (*Id.* at 43, 46). The classic triad of a lacunar stroke includes gait impairment, handedness impairment, and history of seizures (*Id.* at 43). Dr. Woods recommended the MRI based on Wessinger's performance on the neuropsychological testing, mainly the Halsted-Reitman Impairment Index, which showed problems with connection between the right and left side of the brain (*Id.* at 47).

Dr. Woods testified that in a lacunar stroke, the motor impairments resolve but the decision-making impairment remains (*Id.* at 46). The lacunar stroke Wessinger suffered would impair his executive functioning (*Id.* at 52). Dr. Woods testified that Wessinger would have trouble with the ability to weigh and deliberate, trouble thinking in new and stressful situations, and trouble

---

[20] The MRI results as read by Dr. Woods: "There's a well demarcated-ovoid"—oval— "area of abnormal signal intensity in the left frontal periventricular white matter measuring .7 centimeters by .4 centimeters. There is no mass effect. It is isointense with the cerebral spinal fluid," meaning its not full of cerebral spinal fluid. "It does not enhance." So, it's not an active. "There is no abnormal enhancement seen. Impression: Well demarcated lesion in the left frontal periventricular white matter is consistent with either dilated perivascular space or old lacunar infarct. Study is otherwise unremarkable" (Doc. 207, p. 39).

with the ability to make good decisions (*Id.*). In Dr. Woods opinion, the location of the damage to Wessinger's brain explains Wessinger's history of poor decision-making. It also explains why he is different from his brother Troy, who was able to achieve success in school and adapt his behavior in response to a violent, alcoholic father (*Id.* at 52-54).

## E. Analysis

Attorney Joseph P. William ("Billy") Hecker, now deceased, focused on the penalty phase of Wessinger's trial (Doc. 234-4, ¶1). Hecker admitted in an affidavit dated April 20, 2012, that the events involving the death of his father and custody of his daughter limited his ability to prepare for Wessinger's case (Doc. 234-4, ¶5). Hecker also admitted that he did not deliberately choose to abandon any area of investigation, but rather he lacked time, funding, and focus (Doc. 234-4, ¶6). Hecker states in his affidavit that the only theory they had was that Wessinger suffered from alcoholism, and it was based on the "people we talked to." Hecker attributed lack knowledge about Wessinger's history of childhood seizures and violence in the Wessinger family to lack of time and a mitigation specialist (*Id.*). Hecker also stated in his affidavit that he did not have time to work with closely with Dr. Rostow or Dr. Cenac or prepare their testimony. Hecker stated he would not have called these experts to testify if he had known the full content of their testimony. (Doc. 234-4, ¶6).

The information about Wessinger's history of childhood seizures and violence the Wessinger family was readily available to counsel through Troy Wessinger. Troy Wessinger testified at both the guilt and penalty phases of Wessinger's trial. Troy Wessinger testified that he met with counsel but counsel did not discuss his testimony with him in advance. Neither time nor inadequate resources would have prevented counsel from asking Troy Wessinger the necessary questions to elicit this critical mitigation evidence. Counsel was responsible to seek this evidence

through the "well-defined norms" laid out in the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989). *See* guidelines 11.4.1 (C) (noting that counsel's investigation should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut aggravating evidence); guideline 11.4.1(C)(2)(C) (noting that counsel should collect medical history, family history, social history, and prior correctional experience); guideline 11.4.1(C)(3)(C) (noting counsel should seek names of collateral persons who can expound upon and corroborate information gathered); *See also*, *Wiggins,* at 524.

Counsels' failure to uncover this easily available information also led to a mitigation case at the penalty phase that involved uninformed, incorrect, and damaging information. Dr. Rostow told the jury that there was no abuse in Wessinger's childhood, which was not the case. Dr. Rostow told the jury that the only medical problem that Wessinger suffered from as a child was wearing orthopedic shoes, which was also not correct. Dr. Rostow offered terribly damaging testimony about Wessinger's character, referring to him as "socially inappropriate," "aggressive," "explosive," "deviant," "exploitative." Dr. Rostow was missing a critical piece of information that he admitted would have better informed his opinion—the fact that Wessinger suffered from brain damage. Dr. Rostow testified that he would have deferred to the physicians who examined Wessinger and provided an Axis 3 diagnosis. If Dr. Rostow had known about Dr. Woods' diagnosis, he would have deferred to Dr. Woods' opinion about how Wessinger's brain damage affected his decision-making and it is likely most if not all of Dr. Rostow's damaging testimony would not have been heard by the jury. Dr. Cenac testified that Wessinger was dangerous and a liar. While Dr. Cenac did not testify about deferring to another doctor, his report indicates he also identified no Axis 3 diagnosis to adequately inform his opinion (Doc. 272-25 at 8).

Hecker began his closing argument during the penalty phase:

> I hoped I would never have to stand up here today, but I knew I would. I knew from the first time I got in this case. I knew Mr. Sinquefield was right, that I would be facing a death penalty jury.

(Doc. 271-63 at 34). Hecker also acknowledged the damaging nature of the 911 tape (*Id.*). Knowing that the penalty phase was an almost certain outcome with emotional aggravating evidence, a mitigation investigation limited to a brief discussion with Wessinger's family members does not reflect reasonable professional judgment. *See Porter*, 558 U.S. at 39 (the decision not to investigate did not reflect reasonable professional judgment; *Sears*, 561 U.S. at 952 (the cursory nature of investigation limited to one day or less talking to witnesses selected by Sears' mother was on its face constitutionally inadequate).

To determine whether Wessinger was prejudiced by his counsels' deficient performance, we "consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweig[h] it against the evidence in aggravation." *Sears*, 561 U.S. at 955-956, citing *Porter*, 558 U.S. at 41. A proper analysis under *Strickland* considers the newly uncovered mitigation evidence, along with what was presented at the penalty phase of Wessinger's trial, to assess whether there is a reasonable probability that Wessinger would have received a different sentence after a constitutionally sufficient mitigation investigation. *See Porter,* 558 U.S. at 40; *Williams,* 529 U.S. at 397–398; *Sears,* 561 U.S. at 955; *Strickland,* 466 U.S., at 694.

The sum total of the mitigating evidence offered at the penalty phase of Wessinger's trial was that Wessinger was an alcoholic, he loved his children, and his family did not want him to be executed.[21] (Doc. 271-60 at 15 through 271-63 at 15). Had a constitutionally adequate

---

[21] Counsel also called two witnesses to discuss how unlikely it would be for the governor to pardon Wessinger if he was sentenced to life instead of death (Doc. 271-62 at 252 through 271-63 at 10). However, this evidence cannot be characterized as mitigation.

investigation been conducted, the jury would have heard that Wessinger grew up in a house where he witnessed domestic violence and was physically and verbally abused by his mother to the point of having his life threatened with a gun.  Had a constitutionally adequate investigation been conducted, the jury would have heard that Wessinger suffered a stroke as a young child that caused brain damage to the area responsible for executive functioning, resulting in impaired ability to make good decisions. The jury would not have heard the damning and uninformed testimony from Drs. Rostow and Cenac.

Wessinger committed two violent murders in his former place of employment without any attempt to conceal his identity, all for approximately $7,000. During the penalty phase, the jury was presented with only the aggravating factors of this inexplicable act along with inaccurate and incomplete information. Trial counsels' ineffectiveness deprived the jury of the information needed to properly judge Wessinger's moral culpability. Had the jury been able to place Wessinger's life history and brain damage on the "mitigating side of the scale" there is a reasonable probability that at least one juror would have "struck a different balance" and the jury would not have returned a sentence of death. *See Wiggins*, 539 U.S. at 537. Indeed, the jury was denied the type of evidence the United States Supreme Court has identified as prejudicial in the ineffective assistance of counsel analysis. *See Williams,* 529 U.S. at 370-371; 395 (mental impairments organic in origin and evidence of a "nightmarish" childhood); *Rompilla,* 545 U.S. at 392 (organic brain damage); *Porter*, 558 U.S. at 35 (brain damage that could manifest in impulsive violent behavior and evidence of an abusive childhood).[22]

---

[22] The evidence of abuse in Wessinger's case is not as significant as the evidence described in *Williams*. However, the Court is considering the evidence of abuse in conjunction with the evidence of organic brain damage in reaching the conclusion that Wessinger was prejudiced by counsel's inadequate mitigation investigation.

Respondent cites cases originating in Texas, arguing that the mitigation evidence could have hurt Wessinger if it was presented in the penalty phase because it could have proved future dangerousness. These cases are irrelevant here because, in Texas, a defendant is only eligible for the death penalty upon a unanimous jury finding that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. *See* Tex. Code. Crim. Proc. Ann. Art. 37.071. No such risk of inadvertently proving the prerequisite to a death sentence exists under Louisiana's statutory scheme. Indeed, "mental disease or defect" is an enumerated mitigating circumstance to be considered by the jury in La. Code Crime Proc. Ann. Art. 905.5.

### V.    Conclusion

The right to the effective assistance of counsel is a critical component of the right to a fair trial. "[Death is a punishment different from all other sanctions in kind rather than degree." *Woodson v. North Carolina,* 428 U.S. 280, 303 (1976). "Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Id.* at 305. The inaccurate and incomplete information presented to the jury during the penalty phase deprives this case of the appropriate degree of reliability that death is the appropriate punishment. Accordingly, the petition will be granted as to Claim XI-C, ineffective assistance of counsel during the penalty phase. Wessinger's death sentences are vacated, and the matter is remanded to the 19th Judicial District Court for the Parish of East Baton Rouge for a new penalty phase trial.

Accordingly,

**IT IS ORDERED** that the *Amended (Re-Urged) Motion for Summary Judgment and, in the Alternative, for Habeas Relief* (Doc. 278) filed by Petitioner, Todd Kelvin Wessinger, is

**GRANTED.** Wessinger's death sentences are vacated, and the matter is remanded to the 19th Judicial District Court for the Parish of East Baton Rouge for a new penalty phase trial.

  **IT IS FURTHER ORDERED** that the *Motion to Dismiss and, in the alternative, Motion for Summary Judgment* (Doc. 282) filed by Respondent, Burl Cain, Charles C. Foti, Jr. is **DENIED.**

  Signed in Baton Rouge, Louisiana, on <u>December 20, 2022</u>.

               _____

               **JUDGE JOHN W. deGRAVELLES**
               **UNITED STATES DISTRICT COURT**
               **MIDDLE DISTRICT OF LOUISIANA**